# EXHIBIT A

171,0371



CORPORATION SERVICE COMPANY®

# Notice of Service of Process

**DDZ / ALL**
**Transmittal Number: 5260082**
**Date Processed: 07/26/2007**

| | |
|---|---|
| **Primary Contact:** | SOP Scan - St. Paul<br>SOP - PowerBrief - Wilmington<br>Sop - Scan<br>Suite 400 2711 Centerville Road<br>Wilmington, DE 19808 |
| **Copy of transmittal only provided to:** | SOP Coordinator |

| | |
|---|---|
| **Entity:** | St. Paul Surplus Lines Insurance Company<br>Entity ID Number 0171198 |
| **Entity Served:** | St. Paul Surplus Lines Insurance Company |
| **Title of Action:** | Continental Casualty Company vs. St. Paul Surplus Lines Insurance Company |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Contract |
| **Court:** | Yolo Superior Court, California |
| **Case Number:** | CV07-1474 |
| **Jurisdiction Served:** | California |
| **Date Served on CSC:** | 07/26/2007 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| **Plaintiff's Attorney:** | John E. Peer<br>213-629-1600 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**
*CSC is SAS70 Type II certified for its Litigation Management System.*
2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882   |   sop@cscinfo.com

# CASE MANAGEMENT AND THE CIVIL ADR PROGRAM PACKET (2007)

All cases pending a case management conference (CMC) and all new filings in 2007 are subject to the court's CMC and alternative dispute resolution (ADR) procedures. See, Local Rules 12 and 13 and Appendices 3 and 4. Litigants and their counsel should review and be familiar with that material that is now on the court's website: www.yolo.courts.ca.gov.

This packet contains:

1. The Case Management Conference policies
2. The ADR Information Sheet for the Yolo County Superior Court
3. An Order to Continue Case Management Conference and Stipulation to Attend ADR form

This and other information and local forms are available on the court's website: www.yolocourts.com

*NOTE: This complete packet must be served on the opposing party(ies) together with the complaint. (CRC 3.221)*

Clerk of the Court

Yolo County Superior Court

725 Court Street, Room 103

Woodland, CA 95695

530 406 6704

Cover Sheet
CMC/ADR Packet
03/2007

At the CMC, you may expect the CMC judge to make appropriate pre-trial orders on any of the following matters (CRC 3.715.):

- An order identifying the case as one which may be amenable to early settlement or other alternative disposition technique;

- An order referring the case to arbitration, mediation or other dispute resolution process, or a referral to the ADR Administrator for mandatory dispute resolution education.

- An order assigning a trial date. (Counsel are required to be prepared to select a trial date at the CMC.)

- An order transferring the case to the limited jurisdiction of the Superior Court;

- An order identifying the case as one which may be protracted and determining what special administrative and judicial attention may be appropriate, including special assignment, appointment of referee or special master, and the like;

- An order of discovery; including but not limited to establishing a discovery plan or schedule, assignment to a discovery referee, and/or establishing a discovery cut-off date;

- An order scheduling the exchange of expert witness information;

- An order scheduling a subsequent CMC; and

- Such other orders to achieve the interests of justice and the timely disposition of the case.

Orders to ADR are intended to implement the ADR process which began with the filing of the complaint. When cases are filed, counsel are advised of the ADR processes in educational/procedural materials delivered by the court clerk. These must also be served on the defendant. The goal is to move as many cases to judicial arbitration or voluntary ADR as possible prior to or at the CMC and to have the cases resolved within the requirements of the Trial Delay Reduction Act, Government Code section 68607 and CRC 3.714(b). (See, Alternative Dispute Resolution on the court's website.)

**POLICIES IN APPENDICES 3 AND 4 TO THE CURRENT RULES 12 and 13 MAY BE REVISED FROM TIME TO TIME. PLEASE CHECK THE COURT'S WEBSITE FREQUENTLY FOR ADVISORIES OF PROCEDURAL CHANGES AFFECTING THE CMC AND ADR PRACTICES.**

(www.yolo.courts.ca.gov)

that satisfaction with ADR is generally high, especially among those with extensive ADR experience.

## Arbitration and Mediation

The Yolo County Superior Court currently offers pre-screened panelists with experience and training in each of the following areas.

1. **Arbitration.** An arbitrator hears evidence presented by the parties, makes legal rulings, determines facts and makes an arbitration award. Arbitration awards may be entered as judgments in accordance with the agreement of the parties or, where there is no agreement, in accordance with California statutes. Arbitrations can be binding or non-binding, as agreed by the parties in writing.
2. **Mediation.** Mediation is a voluntary, informal, confidential process in which the mediator, a neutral third party, facilitates settlement negotiations. The mediator improves communication by and among the parties, helps parties clarify facts, identify legal issues, explore options and arrive at a mutually acceptable resolution of the dispute.
3. **Judicial Arbitration.** Some cases will be ordered to Judicial Arbitration if they come within the provisions of Code of Civil Procedure section 1141.11 and California Rules of Court, 3.811 and 3.812. Local Rule 13 and Appendix 4 govern this ADR procedure.

Litigants are encouraged to use an ADR process as early in the case as circumstances permit. All appropriate cases will be reviewed for referral to ADR at the Case Management Conference.

## ADR Procedures for the Yolo County Superior Court

1. Upon filing a Complaint, the Plaintiff will receive this information sheet from the Superior Court Clerk. **Plaintiff is required to include the ADR Information Sheet when he or she serves the Complaint on the Defendant.**
2. All parties to the dispute may voluntarily agree to take the matter to an ADR process. Stipulation Forms for this procedure are provided on-line at the court's website. (At the website, click on the "ADR" link and then on "Forms".) Parties choose and contact their own ADR provider. A list of providers is available on-line at the Panelist link.
3. An initial Case Management Conference ("CMC") will normally be scheduled within 120 days of the filing of the Complaint. An original and copy of the Case Management Conference Statement (see Forms link) must be completed and provided to the court clerk no later than 15 days prior to the scheduled conference. The CMC is governed by Local Rule 12 and the policies in Appendix 3, with which all parties are expected to comply.

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF YOLO**<br>725 COURT STREET<br>WOODLAND, CA. 95695<br>530-406-6704 | **NOTICE OF CASE MANAGEMENT CONFERENCE and RELATED ORDERS (Unlimited Case)** |
| Plaintiff(s):  Continental Casualty Company<br><br>vs.<br><br>Defendant(s):   St. Paul Surplus Lines Insurance Company | |
| | Case #:  CV-07-1474 |

**Case Management Conference is set for:** ___11-19-07___ @ 10a.m. in Department 16,
**LOCATED AT 238 W BEAMER ST, WOODLAND, CA**

**This is Notice of your Case Management Conference (CMC).** The date, time and department are written above. **This notice contains new policies effective in 2007.** Case Management authority is delegated to David M. Blicker, Judge Pro Tem.**

1.  In accordance with applicable statutes, California Rules of Court and Local Rules 12, 13 and Appendices 3 and 4, you are hereby ordered to:
    (a)  Serve all named defendants and file proofs of service on those defendants with the court within sixty (60) calendar days of filing the complaint (CRC 3.110).
    (b)  Serve a copy of this notice, the Case Management Statement and the ADR information sheet on all named parties in this action (CRC 3.220-3.222).
    (c)  Comply with CRC 3.110 relating to responsive pleadings, cross complaints and extensions of time and defaults.
    (d)  File and serve a completed Case Management Statement **at least fifteen (15) calendar  days** before the CMC (CRC 3.725). Failure to do so may result in monetary sanctions.
    (e)  Appear at the CMC in person or by CourtCall. A failure to appear shall result in dismissal or other sanctions.
    (f)  Meet and confer in person or by telephone (see, CRC 3.724) to consider each of the issues identified in CRC 3.725 no later than thirty (30) calendar days before the date set for the Case Management Conference.
    (g)  Comply with the court's applicable CMC and ADR rules and policies.

2.  **Defaults.** When a default judgment is requested the party requesting the entry of default must obtain a judgment against the defaulting party within sixty (60) days after entry of default, unless the court has granted an extension.

3.  **You are further ordered** that at the Case Management Conference noticed above. you must be fully familiar with the case and authorized to proceed with all CMC and ADR matters, including setting a trial date.

NOTICE OF CASE MANAGEMENT
Unlimited Civil
2/2007

1

| | |
|---|---|
| Superior Court of California, County of Yolo<br>725 Court Street<br>Woodland, Ca. 95695<br>530-406-6704 | For Court Use Only |
| Plaintiff(s):<br><br>Vs.<br><br>Defendant(s): | |
| | Case No: |

## Stipulation to Continue Case Management Conference to Attend ADR
Notice: This stipulation must be submitted at least 15 days before the case management conference

Counsel and the parties certify they have met and conferred on the subjects set forth in Rule of Court 3.722, including the selection of an alternative dispute resolution (ADR) process: [check one]

☐ Mediation (Local Rule Appendix 4) **(RME)**    ☐ Judicial Arbitration (Local Rule 13; Appendix 4) **(RMA)**
☐ Private Arbitration **(RFA)**
   ☐ Binding
   ☐ Non-Binding

☐ Counsel and the parties have selected/stipulated to _____ to act as neutral for the selected ADR process.

Counsel and the parties further stipulate:

1. All parties have been served and intend to submit to the jurisdiction of the court;
2. All parties have agreed to a specific plan for sufficient discovery to make the ADR process meaningful;
3. Defendant(s) first appearance fee has been paid or will be submitted with this Stipulation and Order;
4. Copies of this Stipulation and self-addressed stamped envelopes are provided for returning file-stamped copies to counsel and the parties;
5. Case Management Conference Statements are fully completed and submitted with this stipulation;
6. Judicial Arbitration referral fee of $150 is submitted with this stipulation; and
7. All parties are aware that a request for continuance of the ADR deadline established by this Stipulation and Order is discouraged, and the request may be denied if, in the judgment of the court, a case management conference should be held at the re-scheduled date set forth below.

_____          _____
Counsel for Plaintiff(print name)                    Counsel for Defendant(print name)

_____          _____
Signature                                                            Signature

_____          _____
Counsel for Plaintiff(print name)                    Counsel for Defendant(print name)

_____          _____
Signature                                                            Signature

| |
|---|
| Pursuant to the Stipulation of the parties, the CMC set for _____ is vacated and rescheduled for _____ at _____a.m. in Dept. 16 and the above case is referred to _____, ADR provider.<br><br>Dated:_____       _____<br>                                                          ADR Administrator |

Stip & Order to Continue CMC and Referral to ADR
03-07 (SCA)

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Jo Ann Montoya, State Bar No.131310<br>WOOLLS & PEER<br>A Professional Corporation<br>One Wilshire Boulevard, 22nd Floor<br>Los Angeles, California 90017 | **FILED**<br>**YOLO SUPERIOR COURT**<br><br>JUL 18 2007<br><br>By _____<br>Deputy |

TELEPHONE NO.: (213) 629-1600  FAX NO.: (213) 629-1660
ATTORNEY FOR *(Name)*: CONTINENTAL CASUALTY COMPANY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF YOLO
STREET ADDRESS: 725 Court Street
MAILING ADDRESS:
CITY AND ZIP CODE: Woodland, California  95695
BRANCH NAME: Main Courthouse

CASE NAME:   CONTINENTAL CASUALTY COMPANY v. ST. PAUL
SURPLUS LINES INSURANCE COMPANY

| CIVIL CASE COVER SHEET<br>[X] Unlimited   [ ] Limited<br>(Amount           (Amount<br>demanded         demanded is<br>exceeds $25,000)  $25,000 or less) | Complex Case Designation<br>[ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | CASE NUMBER: CV07-1474<br>JUDGE:<br>DEPT: |
|---|---|---|

*Items 1–5 below must be completed (see instructions on page 2.)*

**1. Check one box below for the case type that best describes this case:**

| Auto Tort | Contract | Provisionally Complex Civil Litigation |
|---|---|---|
| [ ] Auto (22) | [ ] Breach of contract/warranty (06) | **(Cal. Rules of Court, rules 3.400-3.403)** |
| [ ] Uninsured motorist (46) | [ ] Collections (09) | [ ] Antitrust/Trade regulation (03) |
| **Other PI/PD/WD (Personal Injury/Property** | [X] Insurance coverage (18) | [ ] Construction defect (10) |
| **Damage/Wrongful Death) Tort** | [ ] Other contract (37) | [ ] Mass tort (40) |
| [ ] Asbestos (04) | **Real Property** | [ ] Securities litigation (28) |
| [ ] Product liability (24) | [ ] Eminent domain/Inverse | [ ] Environmental/Toxic tort (30) |
| [ ] Medical malpractice (45) | condemnation (14) | [ ] Insurance coverage claims arising from the |
| [ ] Other PI/PD/WD (23) | [ ] Wrongful eviction (33) | above listed provisionally complex case |
| **Non-PI/PD/WD (Other) Tort** | [ ] Other real property (26) | types (41) |
| [ ] Business tort/unfair business practice (07) | **Unlawful Detainer** | **Enforcement of Judgment** |
| [ ] Civil rights (08) | [ ] Commercial (31) | [ ] Enforcement of judgment (20) |
| [ ] Defamation (13) | [ ] Residential (32) | **Miscellaneous Civil Complaint** |
| [ ] Fraud (16) | [ ] Drugs (38) | [ ] RICO (27) |
| [ ] Intellectual property (19) | **Judicial Review** | [ ] Other complaint *(not specified above)* (42) |
| [ ] Professional negligence (25) | [ ] Asset forfeiture (05) | **Miscellaneous Civil Petition** |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Petition re: arbitration award (11) | [ ] Partnership and corporate governance (21) |
| **Employment** | [ ] Writ of mandate (02) | [ ] Other petition *(not specified above)* (43) |
| [ ] Wrongful termination (36) | [ ] Other judicial review (39) | |
| [ ] Other employment (15) | | |

**2. This case** [ ] is [X] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the
factors requiring exceptional judicial management:
  a. [ ] Large number of separately represented parties   d. [ ] Large number of witnesses
  b. [ ] Extensive motion practice raising difficult or novel   e. [ ] Coordination with related actions pending in one or more courts
         issues that will be time-consuming to resolve             in other counties, states, or countries, or in a federal court
  c. [ ] Substantial amount of documentary evidence   f. [ ] Substantial postjudgment judicial supervision
**3. Type of remedies sought** *(check all that apply):*
  a. [X] monetary  b. [X] nonmonetary; declaratory or injunctive relief  c. [ ] punitive
**4. Number of causes of action** *(specify):*  4
**5. This case** [ ] is [X] is not  a class action suit.
**6. If there are any known related cases, file and serve a notice of related case.** *(You may use form CM-015.)*
Date: July 3, 2007

Jo Ann Montoya, State Bar No.131310
_____
(TYPE OR PRINT NAME)
                                        ▶ _____
                                        (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed
  under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result
  in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all
  other parties to the action or proceeding.
• Unless this is a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. January 1, 2007] | **CIVIL CASE COVER SHEET** | Legal<br>Solutions<br>Plus | Cal. Rules of Court, rules 3.220, 3.400-3.403;<br>Standards of Judicial Administration, § 19 |
|---|---|---|---|

# SUMMONS
## (CITACION JUDICIAL)

**SUM-100**

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
ST. PAUL SURPLUS LINES INSURANCE COMPANY; DOES 1
through 10, inclusive

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**F I L E D**
**YOLO SUPERIOR COURT**

JUL 1 8 2007

By _____
Deputy

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
CONTINENTAL CASUALTY COMPANY

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>SUPERIOR COURT OF STATE OF CALIFORNIA<br>COUNTY OF YOLO<br>725 Court Street<br>Woodland, California 95695<br>Main Courthouse | CASE NUMBER:<br>*(Número del Caso):* CV07-1474 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
John E. Peer, State Bar No. 95978     (213) 629-1600  (213) 629-1660
WOOLLS & PEER, A Professional Corporation
One Wilshire Boulevard, 22nd Floor     **JAMES B. PERRY**
Los Angeles, California 90017

DATE:   JUL 1 8 2007          Clerk, by _____, Deputy
*(Fecha)*                     *(Secretario)*              *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* St. Paul Surplus Lines Insurance Company

   under: ☒ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*                                   Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Legal
Solutions
Plus

Code of Civil Procedure §§ 412.20, 465

1  JOHN E. PEER - State Bar No. 95978
   MARTIN T. LEE – State Bar No. 130160
2  JO ANN MONTOYA - State Bar No. 131310
   **WOOLLS & PEER**
3  A Professional Corporation
   One Wilshire Boulevard, 22nd Floor
4  Los Angeles, California 90017
   Telephone:    (213) 629-1600
5  Facsimile:    (213) 629-1660
   jpeer@woollspeer.com
6  jmontoya@woollspeer.com

7  Attorneys for Plaintiff,
   CONTINENTAL CASUALTY COMPANY

**F I L E D**
YOLO SUPERIOR COURT

JUL 18 2007

By_____
            Deputy

8

9              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10                     **FOR THE COUNTY OF YOLO**

11

12  CONTINENTAL CASUALTY COMPANY,          Case No.: CV 07 - 1474
                                           [Unlimited Jurisdiction]
13
14                  Plaintiff,             **COMPLAINT FOR DECLARATORY
     v.                                    RELIEF; EQUITABLE CONTRIBUTION;
15                                         EQUITABLE INDEMNITY; AND
                                           EQUITABLE SUBROGATION**
16  ST. PAUL SURPLUS LINES INSURANCE
    COMPANY; DOES 1 through 10, inclusive,
17
                   Defendants.
18

19

20

21        COMES NOW plaintiff Continental Casualty Company ("Continental Casualty"), and as its

22  complaint against St. Paul Surplus Lines Insurance Company ("St. Paul") and Does 1 through 10,

23  alleges as follows:

24                              **THE PARTIES**

25        1.      Continental Casualty is, and at all relevant times was, a corporation authorized to do

26  business in California and authorized to issue insurance policies to insureds doing business in

27  California.

28        2.      Continental Casualty is informed and believes, and on that basis alleges, that

*(left margin vertical text)* WOOLLS & PEER  A Professional Corporation  One Wilshire Boulevard, 22nd Floor  Los Angeles, California 90017

1  defendant St. Paul is, and at all relevant times was, a corporation authorized to do business in

2  California and authorized to issue insurance policies to insureds doing business in California.

3.      Continental Casualty is informed and believes, and on that basis alleges, that
defendants named as DOES 1 through 10, inclusive, are unknown to Continental Casualty, which
therefore sues them by such fictitious names.  Continental Casualty will amend this Complaint to
allege the true names and capacities of DOE defendants when Continental Casualty ascertains the
true names and capacities.  Based on information and belief, Continental Casualty alleges that DOES
1 through 10 each issued an insurance policy under which they owed a duty to defend and/or
indemnify Crown, as defined hereinafter, in the context of the underlying action which is the subject
of the dispute at issue in this Complaint.

## GENERAL ALLEGATIONS

4.      Continental Casualty is informed and believes and thereupon alleges that on or about
October 5, 2000, Crown Credit Company and Tasq Technology, Inc. ("Tasq") entered into a Master
Lease Agreement for the lease of a forklift to be used at Tasq's warehouse in Roseville, California.
(A copy of the Master Lease Agreement is attached hereto as Exhibit A.)  The leased forklift was
owned and/or manufactured by Crown Equipment Corporation dba Crown Lift Trucks ("Crown").

5.      Continental Casualty is informed and believes and thereupon alleges that Tasq hired
West Coast Conveyor and Equipment, Inc. ("West Coast") to perform work at the Tasq warehouse
in Roseville, California.  Continental Casualty is informed and believes and thereupon alleges that
Dan Coupe ("Coupe") was then employed by West Coast.

6.      On or about June 29, 2001, Coupe was killed while operating the Crown forklift at
the Tasq warehouse in Roseville, California.

7.      On or about June 25, 2002, Coupe's family filed suit against Crown and Tasq in Yolo
County Superior Court, case No. P 002-1064 ("Underlying Action").  Coupe's family filed a first
amended complaint on or about October 16, 2002.  (A copy of the first amended complaint in the
Underlying Action is attached hereto as Exhibit B.)

8.      Continental Casualty issued primary general liability policy No. GL138201604 ("the
primary policy") and commercial umbrella policy CUP 247893359 ("the umbrella policy") to First

WOOLLS & PEER
A Professional Corporation
One Wilshire Boulevard, 22ⁿᵈ Floor
Los Angeles, California 90017

1   Data Corporation (together, "the Continental Casualty policies") as the first named insured from

2   March 31, 2001 to March 31, 2002.   (Copies of Continental Casualty's primary and umbrella

3   policies are attached hereto as Exhibits C and D.) Tasq qualified as an insured under the Continental

4   Casualty policies.   Crown also tendered its defense as an additional insured under the Continental

5   Casualty policies in connection with the Underlying Action and Continental Casualty accepted

6   Crown's defense, subject to a reservation of rights.

7        9.     Continental Casualty is informed and believes and thereupon alleges that St. Paul

8   issued primary general liability insurance policy No. LC 05526260 to Crown, in effect from October

9   1, 1999 to October 1, 2001. (A copy of what Continental Casualty believes to be St. Paul's policy

10   issued to Crown is attached hereto as Exhibit E.)  St. Paul received notice of the Underlying Action

11   no later than September 21, 2006, when Continental Casualty tendered Crown's defense to St. Paul.

12        10.    On or about September 21, 2006, Continental Casualty tendered Crown's defense and

13   indemnity in connection with the Underlying Action to St. Paul.   (A true and correct copy of

14   Continental Casualty's initial tender letter is attached hereto as Exhibit F.)  Continental Casualty

15   received no response from St. Paul to that tender.

16        11.    On or about December 18, 2006, Continental Casualty paid a total of $3,500,000

17   under the Continental Casualty policies to resolve all plaintiffs' claims against both Crown and Tasq.

18   St. Paul paid nothing toward that settlement.  Continental Casualty's $3,500,000 settlement payment

19   included $1,000,000 paid under its primary policy and $2,500,000 paid under its umbrella policy.

20        12.    St. Paul paid no monies toward the settlement on behalf of its named insured Crown.

21

22   ### FIRST CAUSE OF ACTION FOR DECLARATORY

23   ### RELIEF RE DUTY TO INDEMNIFY

24   (Against St. Paul and Does 1 through 10)

25        13.    Continental Casualty incorporates by this reference paragraphs 1 through 12 as if set

26   forth herein.

27        14.    An actual controversy has arisen and now exists between Continental Casualty on the

28   one hand and St. Paul and Does 1 through 10 on the other with respect to St. Paul's and Does 1

WOOLLS & PEER
A Professional Corporation
One Wilshire Boulevard, 22nd Floor
Los Angeles, California 90017

1  through 10's duty to indemnify Crown in the Underlying Action under the St. Paul policy and the

2  policy or policies issued by Does 1 through 10.  As to this controversy, Continental Casualty

3  requests the court to make and enter a binding judicial declaration in accordance with Continental

4  Casualty's contentions set forth below.  The requested declarations are both necessary and proper at

5  this time under the circumstances in that the interests of judicial economy and substantial justice will

6  be served thereby.

7       15.     Continental Casualty contends that St. Paul owed an obligation to indemnify Crown

8  in the Underlying Action for the following reasons:

9          a.     St. Paul issued a primary policy to Crown;

10          b.     The Underlying Action made claims against Crown that were within the

11                 coverage provided by the St. Paul primary policy;

12          c.     Continental Casualty paid monies on behalf of Crown, including monies paid

13                 under the umbrella policy;

14          d.     St. Paul paid no monies to settle the claims against its named insured;

15          e.     Therefore, St. Paul owed a duty to contribute to the Crown settlement in the

16                 Underlying Action;

17          f.     As the entity who paid the entirety of the settlement paid on behalf of Crown,

18                 Continental Casualty is entitled to recover a portion of its payment from St.

19                 Paul.

20       16.     Continental Casualty is informed and believes, and on that basis alleges, that St. Paul

21  disputes Continental Casualty's contentions set forth in the preceding paragraph.

22       17.     Continental Casualty contends that Does 1 through 10 owed an obligation to defend

23  and/or indemnify Crown in the Underlying Action for the following reasons:

24          a.     Does 1 through 10 issued a liability policy or policies to Crown;

25          b.     The Underlying Action made claims against Crown that were within the

26                 coverage provided by the liability policy or policies issued by Does 1 through

27                 10;

28          c.     Does 1 through 10 paid no monies to settle the claims against its named

WOOLLS & PEER
A Professional Corporation
One Wilshire Boulevard, 22nd Floor
Los Angeles, California 90017

PRINTED ON RECYCLED PAPER          4

115214.2

**COMPLAINT**

1          insured;

2       d.      Therefore, Does 1 through 10 owed a duty to contribute to the Crown

3          settlement in the Underlying Action;

4       e.      As the entity who paid the entirety of the monies paid on behalf of Crown,

5          Continental Casualty is entitled to recover a portion of its payment from Does

6          1 through 10.

7      18.     Continental Casualty is informed and believes, and on that basis alleges, that Does 1

8 through 10 dispute Continental Casualty's contentions set forth in the preceding paragraph.

9

10           **SECOND CAUSE OF ACTION FOR EQUITABLE CONTRIBUTION**

11               (Against St. Paul and Does 1 through 10)

12      19.     Continental Casualty incorporates by this reference paragraphs 1 through 12 as if set

13 forth herein.

14      20.     Continental Casualty is informed and believes, and on that basis alleges, that St. Paul

15 and/or Does 1 through 10 owed an obligation to indemnify Crown in the Underlying Action.

16      21.     Continental Casualty paid monies to settle the Underlying Action against Crown

17 under both its primary and umbrella policies.  St. Paul and/or Does 1 through 10 owed an obligation

18 to contribute to the Crown settlement under their primary policies issued to Crown.  Based on the

19 principle of equitable contribution, as primary insurers St. Paul and/or Does 1 through 10 owe an

20 obligation to reimburse Continental Casualty for all monies Continental Casualty paid under its

21 umbrella policy to settle the Underlying Action on behalf of Crown.

22      22.     Continental Casualty requests that the Court order St. Paul and/or Does 1 through 10

23 to reimburse Continental Casualty for all monies Continental Casualty paid under its umbrella policy

24 on behalf Crown in the Underlying Action, plus interest thereon.

25

26           **THIRD CAUSE OF ACTION FOR EQUITABLE INDEMNITY**

27               (Against St. Paul and Does 1 through 10)

28      23.     Continental Casualty incorporates by this reference paragraphs 1 through 12 as if set

WOOLS & PEER
A Professional Corporation
One Wilshire Boulevard, 22nd Floor
Los Angeles, California 90017

**COMPLAINT**

1   forth herein.

2        24.     Continental Casualty is informed and believes, and on that basis alleges, that St. Paul

3   and/or Does 1 through 10 owed an obligation to indemnify Crown in the Underlying Action.

4        25.     Continental Casualty paid monies to settle the Underlying Action against Crown.

5   Continental Casualty is informed and believes, and thereupon alleges, that Continental Casualty paid

6   indemnity that should have been paid by St. Paul and/or Does 1 through 10.  Based on the principle

7   of equitable indemnity, as primary insurers St. Paul and/or Does 1 through 10 owe an obligation to

8   reimburse Continental Casualty for all monies Continental Casualty paid under its umbrella policy to

9   settle the Underlying Action against Crown.

10        26.     Continental Casualty requests that the Court order St. Paul and/or Does 1 through 10

11   to reimburse Continental Casualty for all monies it paid under its umbrella policy to settle the

12   Underlying Action against Crown, plus interest thereon.

13

14        **FOURTH CAUSE OF ACTION FOR EQUITABLE SUBROGATION**

15                    (Against St. Paul and Does 1 through 10)

16        27.     Continental Casualty incorporates by this reference paragraphs 1 through 12 as if set

17   forth herein.

18        28.     Continental Casualty is informed and believes, and on that basis alleges, that St. Paul

19   and/or Does 1 through 10 owed an obligation to indemnify Crown in the Underlying Action.

20        29.     Continental Casualty paid monies on behalf of Crown in the underlying litigation,

21   including monies paid under the umbrella policy.  Based on the principle of equitable subrogation, as

22   primary insurers St. Paul and/or Does 1 through 10 owed an obligation to contribute to the

23   settlement of the underlying litigation against Crown, and St. Paul and/or Does 1 through 10 are

24   obligated to reimburse Continental Casualty all monies Continental Casualty paid under its umbrella

25   policy to settle on behalf of Crown.

26        30.     Continental Casualty requests that the Court order St. Paul and/or Does 1 through 10

27   to reimburse Continental Casualty for all monies it paid under its umbrella policy to settle the

28   underlying litigation against Crown, plus interest thereon.

WOOLLS & PEER
A Professional Corporation
One Wilshire Boulevard, 22nd Floor
Los Angeles, California 90017

WHEREFORE, Continental Casualty demands judgment against St. Paul as follows:

### ON THE FIRST CAUSE OF ACTION

1.     For a declaration that St. Paul and/or Does 1 through 10 owed a duty to indemnify Crown in connection with the Underlying Action;

### ON THE SECOND CAUSE OF ACTION

2.     That St. Paul and/or Does 1 through 10 be ordered to reimburse Continental Casualty for all monies Continental Casualty paid under its umbrella policy to settle the Underlying Action against Crown; plus interest thereon;

### ON THE THIRD CAUSE OF ACTION

3.     That St. Paul and/or Does 1 through 10 be ordered to reimburse Continental Casualty for all monies Continental Casualty paid under its umbrella policy to settle the Underlying Action against Crown; plus interest thereon;

### ON THE FOURTH CAUSE OF ACTION

4.     That St. Paul and/or Does 1 through 10 be ordered to reimburse Continental Casualty for all monies Continental Casualty paid under its umbrella policy to settle the Underlying Action against; plus interest thereon;

### ON ALL CAUSES OF ACTION

5.     For costs of suit;

6.     For prejudgment interest;

7.     For post judgment interest;

8.     For such additional and further relief as the court deems just and proper.

DATED:  June 29, 2007

WOOLLS & PEER
A Professional Corporation

JOHN E. PEER
MARTIN T. LEE
JO ANN MONTOYA
Attorneys for Plaintiff,
CONTINENTAL CASUALTY COMPANY

COMPLAINT

WOOLLS & PEER
A Professional Corporation
One Wilshire Boulevard, 22nd Floor
Los Angeles, California 90017

*A*

**EXHIBIT A**

# CROWN Credit Company

New Bremen, Ohio 45869 USA
Phone: 419/629-2311
Fax: 419/629-0224

## Master Lease Agreement

THIS AGREEMENT is being made, effective as of the **5th** day of **October**, **2000**, by and between CROWN CREDIT COMPANY, with offices at the address set forth above ("Lessor"), and **TASQ Technology Inc.** Corporation with offices at **575 Menlo Drive, Rocklin, CA 95765** ("Lessee").

*Any amendments or modifications of this Agreement must be in writing and signed by Lessee and Lessor to be binding.   (Lessee's Initials)   [X]

### SECTION 1. LEASING OF UNITS.

1.01   From time to time during the term of this Agreement, Lessee may, subject to agreement by Lessor, lease units of material handling equipment and related equipment ("Units") from Lessor.

1.02   A Unit shall become subject to this Agreement upon the parties' execution of a Lease Schedule (a "Schedule") therefor. Each Schedule shall be deemed to incorporate all of the terms and conditions of this Agreement and shall contain such additional terms and conditions as may be mutually agreed by Lessor and Lessee.

1.03   Concurrently with delivery of each Unit, Lessee shall execute and deliver to Lessor a notice of delivery form indicating the date of delivery. The term of the lease for each Unit shall begin on the date of delivery thereof as indicated on the applicable notice of delivery form and shall continue for the period stated in the Schedule covering such Unit.

### SECTION 2. TERMS OF PAYMENT; TAXES.

2.01   Lessee shall pay to Lessor the rent ("Rental Charge") for each Unit set forth in the applicable Schedule, such Rental Charge to be payable beginning on the date, and at the intervals during the term of the lease of the Unit, provided in such Schedule.

2.02   Lessor shall equip each Unit with a meter for recording the number of hours of its operation. Lessor may, from time to time, in its discretion, read or cause such meters to be read in order to determine whether any Excess Usage Charges (as defined in the Schedule applicable thereto) are payable by Lessee. Should any meter on any Unit break or fail to function so that an accurate reading of the actual hours of usage is not possible, Lessee shall pay Excess Usage Charges as reasonably computed by Lessor on the basis of Lessee's previous usage of the Unit and such other factors and information relating to the use of the Unit as Lessor may have available to it.

2.03   Lessor shall invoice Lessee on a periodic basis for any Excess Usage Charges and any other amounts payable by Lessee under this Agreement, and Lessee shall remit payment of the same to Lessor within 30 days after the date of Lessor's invoice.

2.04   Rental Charges shall be paid by Lessee by automatic debit from the bank account specified by Lessee or by any other means so as to constitute immediately available funds. If not paid by automatic debit, all charges payable by Lessee under this Agreement or any Schedule shall be sent to Lessee at the address indicated on the invoice relating thereto.

2.05   Interest shall accrue on amounts payable and past due under this Agreement or any Schedule from the date any such amount is due until the date of payment at a rate equal to fifteen percent (15%) per annum or at the then highest allowable interest rate per annum under the law of the state in which the Lessee's principal office is located, whichever is less.

2.06   All charges set forth herein are exclusive of any sales, use, recording, personal property, or other taxes applicable to or arising in connection with the leasing of the Units hereunder. All such taxes, other than taxes based upon the net income of Lessor, shall be the responsibility of Lessee and shall be paid to Lessor when invoiced.

2.07   Lessor shall prepare and file all personal property and other such tax reports or returns relating to the Units. Lessee shall promptly provide Lessor with all necessary information or assistance to enable Lessor to file such reports or returns in a timely manner and shall, when invoiced, pay Lessor a reasonable service charge related thereto.

### SECTION 3. DELIVERY; OWNERSHIP; LIENS.

3.01   Unless otherwise indicated in the applicable Schedule, all Units will be shipped F.O.B. shipping point and Lessee shall bear all transportation and insurance charges to the location specified in the Schedule. Lessee assumes all risk of loss or damage to the Units after they are delivered to the carrier at the shipping point.

3.02   Ownership of any Unit covered hereby shall remain in Lessor, and Lessee shall not, by means of this Agreement or any Schedule, acquire any interest in any Unit other than that of a lessee. Lessee hereby grants its power of attorney to Lessor to execute, on Lessee's behalf, all financing and continuation statements and other documents which Lessor deems necessary or advisable in order to record and secure Lessor's ownership of and interest in the Units. In addition, if so requested by Lessor, Lessee shall itself execute all such statements and documents and deliver the same to Lessor.

3.03   Lessee shall not permit any liens, charges, or encumbrances to be placed upon any Unit. Notice of any such lien, charge or encumbrance shall be forwarded to Lessor immediately upon receipt by Lessee.

3.04   Upon Lessor's request, Lessee shall cause the Units to be plainly, permanently, and conspicuously marked to indicate Lessor's interest in the Units. Lessee shall promptly replace any such markings which may be removed or destroyed or become illegible and shall keep all Units free from any marking or labeling which could be interpreted as a claim of ownership thereof by Lessee or anyone other than Lessor.

### SECTION 4. WARRANTY AND LIMITATION OF LIABILITY.

4.01   Lessee acknowledges that Lessor is not the manufacturer of any Unit or the manufacturer's agent; that each Unit is of a size, design, capacity, description, and manufacture selected by Lessee; and that Lessee is satisfied that each Unit is suitable and fit for its purposes. The only warranty made in connection with any Unit shall be the standard warranty, if any, of the manufacturer of such Unit which is in effect on the date of execution of the Schedule covering such Unit. As the lessor of the Units, LESSOR MAKES NO WARRANTIES, EXPRESS OR IMPLIED, WHETHER OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE, WITH RESPECT TO THE UNITS OR ANY PARTS OR LABOR FURNISHED DURING ANY SERVICING OF THE UNITS. Lessor does not intend, and shall not be deemed, to adopt as its own any warranty given by any manufacturer. For so long as no default by Lessee under this Agreement or any Schedule shall have occurred and be continuing (i) Lessor assigns to Lessee all rights of Lessor under any warranties given by the manufacturer of each Unit, to the extent that such warranties are assignable by Lessor; and (ii) Lessor shall, at Lessee's expense, cooperate with and assist Lessee in obtaining the benefits of any warranties given by the manufacturer of any Unit. Lessee agrees that its rights under or as a beneficiary of any such warranties shall be subject to the terms of Lessor's supply contracts with the manufacturers.

4.02   Lessee agrees that Lessor SHALL NOT BE LIABLE to Lessee for (i) any defect in any Unit, (ii) any liability, claim, loss, damage, or expense of any kind arising out of or in any way related to Lessee's possession, use or operation of any Unit, (iii) any delay in providing any Unit, or (iv) any SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, howsoever caused.

4.03   Lessee shall defend and hold Lessor harmless from and against any and all of the following (whether actual or alleged), unless directly caused by Lessor's gross negligence, willful misconduct, or failure to perform its obligations under this Agreement: all damages, claims, suits, proceedings, fines, penalties, liabilities, and expenses (including attorneys' fees) arising out of or in any manner related to Lessee's possession, use or operation of any Unit.

### SECTION 5. USE, CARE, AND RETURN OF UNITS.

5.01   Lessee agrees to comply with all applicable federal, state, or local laws, regulations, or orders affecting the possession or use of any Unit by Lessee; to operate each Unit within its rated capacity and in accordance with any instructions provided by Lessor or the manufacturer of the Unit; to restrict operation of each Unit to safe, careful, competent and trained personnel selected and controlled by Lessee; to properly store each Unit; to immediately notify Lessor of any malfunction of the hour meter on any Unit; not to permit any party other than Lessor to service, repair, or otherwise tamper with the hour meter on any Unit; and not to remove any Unit from the location specified in the applicable Schedule without Lessor's prior consent (which shall not be unreasonably withheld).

5.02   Lessee shall not affix or install upon any Unit any accessory, attachment or other device or make any modifications or alterations to any Unit without the prior written consent of Lessor (which shall not be unreasonably withheld). Lessee hereby releases and agrees to indemnify Lessor from and against all responsibility or liability (including liability for any violation of federal, state, or local laws, rules or regulations) arising out of, in connection with, or in any way related to the installation or use of such devices on any Unit or the modification or alteration of any Unit.

5.03   In order to ascertain whether Lessee is fulfilling its obligations hereunder, Lessor shall have the right to inspect any Units from time to time without advance notice to Lessee.

5.04   Within three business days after the date of expiration or termination of the term of any lease of any Unit, Lessee shall return such Unit, at Lessee's cost and risk, to Lessor, in care of the authorized dealer for Lessor's parent corporation, Crown Equipment Corporation ("Crown"), which is closest to the location of the Unit, or to such other location as Lessor and Lessee shall mutually agree.

### SECTION 6. INSURANCE; DAMAGE; LOSS OR DESTRUCTION.

6.01   Until each Unit is returned to Lessor as provided in this Agreement, Lessee relieves Lessor from, and Lessee shall bear, responsibility for all risk of damage to or loss or destruction of the Unit, howsoever caused.

6.02   Lessee shall, at its cost, provide all risk insurance for each Unit in an amount at least equal to the replacement cost thereof and maintain with respect to each Unit (and any temporary Units furnished by Lessor) adequate comprehensive general liability insurance (minimum limits: $2,000,000.00 combined single limit) against any bodily injury and property damage arising out of or in any manner related to Lessee's possession, use or operation of the Unit. All such insurance shall name Lessor and Crown as additional insureds, shall contain an endorsement providing that such insurance shall be primary insurance and shall provide that Lessor shall receive thirty days prior notice of cancellation, nonrenewal, advance of any retrospective date, or aggregate erosion. Lessee shall furnish to Lessor, on or before the date of delivery of the Unit to Lessee, certificates evidencing such insurance. Lessee shall be liable for any amounts which are within the deductibles or which exceed the limits of the above-described insurance.

**PROVISIONS CONTINUED ON REVERSE.**

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

CROWN CREDIT COMPANY (LESSOR)

By _James R. Miller_ (signature)

TASQ Technology Inc.

By _Robert A. Orr_  C.F.O. (LESSEE)

*Note: Lessee must also initial in box above.

6.03   Lessee shall notify Lessor of any major damage to, ...... sed for any major repair of, any Unit. Lessee shall not perform or engage any party to perform any such repairs on any Unit unless Lessee or the party so engaged has been first authorized by Lessor to perform the same.

6.04   If any Unit becomes lost, stolen, destroyed, irreparably damaged, confiscated, or requisitioned (a "Loss"), Lessee shall promptly notify Lessor thereof in writing. Provided that Lessee is not then in default under this Agreement or the applicable Schedule, Lessee shall, at its option, either (i) request that Lessor provide to Lessee, at Lessee's cost, a replacement Unit for the Unit effected by the Loss, the performance specifications, features, and useful life of the replacement Unit being at least equal to those of the Unit being replaced; or (ii) pay the applicable Termination Amount (as hereinafter defined) to Lessor, whereupon the lease of the Unit effected by the Loss shall terminate and all right, title, and interest of Lessee therein shall vest in Lessee. If a Loss occurs while Lessee is in default under this Agreement or the applicable Schedule, Lessee's obligation shall be as set forth in (ii) above. Any insurance proceeds payable with respect to the Loss shall be applied to reduce amounts otherwise payable by Lessee with respect to the replacement Unit or the Termination Amount, as the case may be. '.. '...

6.05   For purposes of this Agreement, the applicable "Termination Amount" shall be an amount equal to the sum of (i) all unpaid Rental Charges and other amounts payable to Lessor under this Agreement or the applicable Schedule with respect to the effected Unit accruing for any period prior to the date of the Loss; (ii) the present value of all remaining Rental Charges payable with respect to the affected Unit for the remainder of the term of its lease under the Schedule applicable thereto, discounted at a rate of six percent (6%) per annum; and (iii) the present value of the Residual Value of the affected Unit (as hereinafter defined), discounted at a rate of six percent (6%) per annum. "Residual Value" of an affected Unit means the value of the Unit at the expiration of the term of its lease hereunder, as estimated by Lessor at the time the Schedule covering such Unit was executed.

### SECTION 7.  MAINTENANCE.

7.01   Other than as set forth in the applicable Schedule, Lessor shall have no obligation to maintain or service any Unit.

7.02   Lessee shall have sole and complete responsibility for the performance of its maintenance responsibilities with respect to each Unit, as specified in the Schedule covering such Unit.  Lessee shall cause such responsibilities to be undertaken on a timely, workmanlike basis by qualified personnel. If any inspection by Lessor reveals that Lessee has neglected any of its responsibilities, Lessor shall so notify Lessee and Lessee shall promptly cause the same to be undertaken. Should Lessee fail to undertake such responsibilities promptly and to complete the same within a reasonable time, Lessor may, in addition to any other rights or remedies available to Lessor, perform such responsibilities or cause the same to be performed and invoice Lessee for the cost thereof.

7.03   All maintenance which Lessor is required to perform under the terms of any Schedule shall be performed during Lessor's regular working hours. Should Lessee request Lessor to perform maintenance at times other than Lessor's regular working hours, Lessee shall pay to Lessor, in addition to the applicable Rental Charges, all then applicable overtime charges for each hour of work by Lessor's personnel other than during regular working hours.

7.04   To enable Lessor to provide any maintenance which Lessor is required to perform under the terms of any applicable Schedule, Lessee shall make the Units available to Lessor at the dates and at times mutually agreed by Lessor and Lessee and provide such further assistance as Lessor may reasonably request from time to time.

7.05   Lessor shall repair or replace the hour meter on any Unit promptly upon learning that the meter is broken or not functioning properly. If any hour meter is damaged as a result of Lessee negligence, accidents, abuse or misuse of the Unit, the cost of such repair or replacement shall be separately invoiced to Lessee.

7.06   If Lessee permits any party other than Lessor, the authorized Crown dealer designated by Lessor, or another party specifically approved by Lessor, to perform any repairs, maintenance, or services on any Unit which are, in Lessor's judgment, improperly performed or make more difficult or costly the maintenance which Lessor is required to perform under the terms of any applicable Schedule, Lessor may, at its option (i) treat such improper performance as a breach of Lessee's obligations under subsection 7.02, or (ii) cease performing the maintenance which Lessor is required to provide for the Unit under the terms of such Schedule; provided, however, that such cessation shall not relieve Lessee of its responsibility to pay Rental Charges or Excess Usage Charges under such Schedule.

### SECTION 8.  CONTINGENCIES.

8.01   Lessor shall not incur any liability to Lessee, nor shall this Agreement or any Schedule be cancellable, for Lessor's failure to perform or delay in performing its obligations hereunder or thereunder, if prevented by wars, fires, strikes or other labor disputes, accidents, acts of God, governmental regulations or interference, delays in transportation, shortage or breakdown of or inability to obtain or non-arrival of any labor, material, or equipment used in the performance of this Agreement or any Schedule, or other causes beyond Lessor's control.

### SECTION 9.  TERM; TERMINATION.

9.01   The term of this Agreement shall begin on the date of execution hereof and, unless earlier cancelled in accordance with the provisions of this Agreement, shall continue until terminated by either party upon 30 days' prior notice to the other.

9.02   Termination of this Agreement by notice in accordance with subsection 9.01 shall not affect the obligations of the parties with respect to any Units leased under Schedules executed prior to the date of such termination. Such Schedules shall continue in full force and effect in accordance with the terms of such Schedule and this Agreement notwithstanding termination of this Agreement.

### SECTION 10.  CANCELLATION.

10.01   In the event that either party shall breach or fail to comply with any provision of this Agreement or any Schedule and such breach or failure shall continue for a period of 30 days after the giving of notice thereof by the other party, the other party may cancel this Agreement and/or the Schedule involved immediately upon the giving of notice thereof to the defaulting party. Notwithstanding the foregoing, if Lessee shall have failed to make any payment due under any Schedule within ten days after having been so notified by Lessor, Lessor may cancel this Agreement and/or the Schedule involved immediately after the expiration of the ten day period by giving notice of such cancellation to Lessee.

10.02   Upon Lessor's cance... ... ny schedule in accordance with the provisions of this Section, Lessee shall immediately (i) return at its risk, cost and expense, all Units covered by such Schedule to Lessor at such location as Lessor shall specify, and (ii) pay to Lessor all sums due and unpaid and any other amounts to which Lessor may be entitled by way of damages. Should Lessee fail to so return any Units, Lessor shall have the right to repossess the same and Lessee shall assemble such Units, provide Lessor with access to the premises at which the Units are located, and make the Units available to Lessor for repossession. Lessee shall be responsible and liable for all costs and expenses, including reasonable attorneys' fees, incurred by Lessor in attempting to collect from Lessee any amounts payable and past due or in enforcing Lessor's rights under this Agreement, including without limitation, in connection with the repossession of any Units which Lessee has not returned to Lessor.

10.03   Upon Lessor's cancellation of this Agreement or any applicable Schedule in accordance with the provisions hereof, Lessor shall be entitled to recover as damages for the loss of its bargain and not as a penalty, an amount equal to the sum of the following, less the fair market value of each affected Unit in the condition in which it was returned to or repossessed by Lessor (if it has been so returned or repossessed): (i) the applicable Termination Amount for each affected Unit (assuming, for purposes of calculation, that the effective date of the cancellation is the date of the Loss); (ii) any expenses paid or incurred by Lessor in connection with any repossession, holding, repair, subsequent sale, re-leasing, or other disposition of any affected Unit, including without limitation, attorneys' fees; and (iii) all other amounts then payable by Lessee to Lessor hereunder, including without limitation, amounts owing for indemnification. Amounts payable pursuant to this subsection shall be paid by Lessee within ten days after the date of Lessor's demand.

10.04   The rights and remedies given to either party in this Section (including without limitation, Lessor's right to recover liquidated damages in accordance with the provisions of subsection 10.03) shall be deemed to be in addition to, and not in lieu of, any other rights or remedies under the Uniform Commercial Code or otherwise at law or in equity.

### SECTION 11.  CONDITION OF UNITS UPON RETURN; SECURITY DEPOSIT.

11.01   Upon the expiration, termination, or cancellation of any Schedule, all Units covered thereby shall be returned to Lessor in good condition, ordinary wear and tear excepted.  A signed bill of lading, pick-up receipt, or similar document does not constitute acknowledgment by Lessor of any condition of any Unit being returned. Unit condition will be determined by a final inspection by Lessor after Unit has been returned to Lessee. If any Unit is returned to Lessor in a condition other than as set forth above and if such condition is not due to Lessor's failure to perform the maintenance it was required to perform under the applicable Schedule, Lessee shall pay to Lessor, in addition to all other charges, expenses, or damages payable by Lessee, an amount equal to the difference between the fair market value of the Unit if it had been returned in good condition, ordinary wear and tear excepted, and the actual fair market value of the Unit in the condition in which it was returned, each as determined by Lessee in its reasonable business judgment.

11.02   Lessor shall have the right, upon expiration, termination, or cancellation of any Schedule, to apply any security deposit paid pursuant to the terms of such Schedule or any other Schedule to any amount owing to Lessor under such Schedule, this Agreement, or any other Schedule.  The balance of any security deposit not so applied shall be remitted to Lessee within 30 days after the date of expiration, termination or cancellation.

### SECTION 12.  MISCELLANEOUS.

12.01   All notices, reports, consents, approvals, or other communications required or permitted under this Agreement shall be in writing, and be delivered in person, by facsimile, by courier or express service, or by mail, with proper charges prepaid, to the party for whom intended at its address first set forth in this Agreement or to such other address as such party may hereafter direct by notice to the other party, and shall be deemed to be given upon the date of actual receipt. The sending party shall have the burden of proving receipt.

12.02   Lessor shall have the right to charge Lessee a reasonable documentation preparation fee in connection with each Schedule executed pursuant to this Agreement, and Lessee shall pay such fee upon receipt of Lessor's invoice therefor.

12.03   WITHOUT LESSOR'S PRIOR CONSENT (WHICH SHALL NOT BE UNREASONABLY WITHHELD), LESSEE SHALL NOT ASSIGN OR IN ANY WAY DISPOSE OF ALL OR ANY PART OF ITS RIGHTS OR OBLIGATIONS UNDER THIS AGREEMENT OR ANY SCHEDULE OR ENTER INTO ANY SUBLEASE OF ANY UNIT.

12.04   Except as otherwise expressly provided in this Agreement, no failure on the part of either party to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver or relinquishment thereof; nor shall any single or partial exercise by either party of any right under this Agreement preclude any other or further exercise thereof, or the exercise of any other right. Waiver by any party of any breach of any provision of this Agreement shall not constitute or be construed as a waiver of any other provision of this Agreement or any other breach of the same or any other provision.

12.05   This instrument embodies the whole agreement of the parties relating to the subject matter of this Agreement and supersedes any and all prior oral or written negotiations, communications and agreements by or on behalf of the parties. This Agreement may not be varied by any purchase order, acknowledgment, confirmation, invoice, or shipping document issued by either party.

12.06   Lessor may assign or transfer this Agreement, any Schedule, or Lessor's interest in any Unit without notice to Lessee; provided, however, that no such assignment or transfer shall relieve Lessor of its obligations hereunder. Any assignee of Lessor shall have all of the rights, but none of the obligations, of Lessor under this Agreement or the affected Schedule, and Lessee agrees that it will not assert against any assignee of Lessor any defense, counterclaim, or offset that Lessee may have against Lessor. Lessee acknowledges that any assignment or transfer by Lessor will not materially change Lessee's duties or obligations under this Agreement or the affected Schedule, nor materially increase the burden or risks imposed on Lessee.

12.07   Any lawsuit or other action brought by Lessee against Lessor which is based upon any claim under this Agreement or any Schedule or upon any other claim relating to any Unit or Lessee's possession, use, or operation of any Unit must be commenced within one year after the date the act or omission on which such claim is based is or should have been discovered by Lessee.

12.08   This Agreement and all Schedules entered into pursuant to this Agreement shall be construed and enforced in accordance with the laws of the State of Ohio, as applicable to agreements made and wholly performed therein.

# CROWN Credit Company

New Bremen, Ohio 45869 USA
Phone: 419/629-2311
Fax: 419/629-9224

# Lease Schedule

No. 18163

THIS SCHEDULE is being executed as of the __5th__ day of __October__, __2000__, pursuant to the terms of the Master Lease Agreement, dated as of __October 5__ __2000__, (the "Master Lease"), between CROWN CREDIT COMPANY ("Lessor") and __TASQ Technology Inc.__, with offices at __575 Menlo Drive, Rocklin, CA 95765__ ("Lessee"), and is subject to provisions of the Master Lease, all of which are incorporated herein by reference. Capitalized terms used but not defined herein shall have the meanings given to them in the Master Lease.

## SECTION 1. UNITS BEING LEASED.

| Item No. | Description (Make, Model & Serial Number) | Rental Charge | Base Hours | Excess Usage Charge per Hour | Security Deposit |
|---|---|---|---|---|---|
| 1. | Crown, RC3020-30-241, SN: 1A231605 | $652.00 plus tax | 1250 per yr | $1.75 plus tax | N/A |
| 2. | Exide Battery, 18-125-15, SN: AYH201092 | | | | |
| 3. | Hobart Charger, 880H3-18, SN: 300CS67029 | | | | |

Reference PO #

First invoice includes 1st and last payment of the contract.

Maintenance Option (See 4.01 Reverse) ☐ A  ☐ B  ☒ C

Delivery
Rental Charge Start Date _____

Monthly

Payment Frequency _____

## SECTION 2. TERM; DELIVERY; LOCATION OF UNITS; FILINGS.

2.01   Unless earlier terminated or cancelled as provided in the Master Lease, the initial term of the lease of each Unit leased hereunder shall begin on the date of its delivery to Lessee and shall continue for a period of __60 months__. Thereafter, the term of the lease of each Unit shall continue for successive thirty day periods until terminated by either party by giving the other party at least thirty days prior notice of termination.

2.02   The Units shall be delivered to Lessee at the following location and shall be used by Lessee only at such location. Lessee shall under no circumstances remove any Unit from such location without Lessor's prior written consent (which shall not be reasonably withheld).

Location: __8875 Washington Blvd., Roseville, CA 95747__

Delivered

2.03   All Units shall be shipped F.O.B. _____ and __Lessor__ shall pay all transportation and insurance charges to the location specified in subsection 2.02.

2.04   Lessee hereby grants its power of attorney to Lessor and its designees to execute, on Lessee's behalf, all financing and continuation statements and other documents which Lessor deems necessary or advisable in order to record and secure Lessor's ownership of and interest in the Units. In addition, if so requested by Lessor, Lessee shall itself execute all such statements and documents and deliver the same to Lessor.

*PROVISIONS CONTINUED ON REVERSE.*

IN WITNESS WHEREOF, the undersigned have executed this Schedule as of the date first above written.

CROWN CREDIT COMPANY (LESSOR)

By _____

TASQ Technology Inc.                                                    (LESSEE)

By _____  C.F.O.

Printed in U.S.A.

*b*

**EXHIBIT  B**

1 ROBERT A. BUCCOLA, ESQ./BAR NO. 112880
CRAIG C. SHEFFER, ESQ./BAR NO. 131243
2 STEVEN M. CAMPORA, ESQ./BAR NO. 110909
DREYER, BABICH, BUCCOLA & CALLAHAM, LLP
3 715 UNIVERSITY AVENUE
SACRAMENTO, CALIFORNIA 95825
4 TELEPHONE: (916) 920-2111

5 L. THOMAS WAGNER, ESQ./BAR NO. 41234
HARDY ERICH BROWN & WILSON
6 1000 G STREET, SECOND FLOOR
SACRAMENTO, CALIFORNIA 95853
7 TELEPHONE: (916) 449-3800

8 ATTORNEYS FOR PLAINTIFFS

9

10

11

12        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

13             IN AND FOR THE COUNTY OF YOLO

14

15

16 LEEANN COUPE, KIMBERLY              ) NO.  P 002-1064
   COUPE, and CHRISTINE COUPE,        )
17                                     ) **FIRST AMENDED COMPLAINT FOR**
          Plaintiffs,                  ) **WRONGFUL DEATH**
18                                     )
   vs.                                 )
19                                     )
   CROWN LIFT TRUCKS, TASQ            )
20 TECHNOLOGY, INC., and DOES 1        )
   through 50, inclusive,             )
21                                     )
          Defendants.                  )
22

23

24        Plaintiffs, LEEANN COUPE, KIMBERLY COUPE and CHRISTINE COUPE,

25 complains of Defendants, CROWN LIFT TRUCKS, TASQ  TECHNOLOGY, INC., and

26 DOES 1 through 50, inclusive, and each of them, and alleges as follows:

27                              1

28 _____
              FIRST AMENDED COMPLAINT

FILED
YOLO COUNTY
SUPERIOR COURT

OCT 1 6 2002   Clerk

By_____
   S. GOLLAHER
        Deputy

**I.**

On or about June 29, 2001, defendants, and each of them, caused and contributed to the happening of a fatal lift truck accident, which occurred in Placer County, California, at the TASQ TECHNOLOGY, INC. facility, resulting in the wrongful death of DANIEL COUPE, a loving husband and father. Defendants are alleged herein to be liable under the laws of this state on multiple and varied theories of liability for their wrongful conduct.

**II**

That the true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES are unknown to Plaintiffs, who therefore sue such Defendants by such fictitious names, and Plaintiffs will amend this Complaint to show their true names and capacities when the same have been ascertained. Plaintiffs are informed and believe and thereon allege that each of the Defendants DOES are responsible under law in some manner negligently, in warranty, strictly or otherwise for the events and happenings herein referred to and proximately thereby caused injuries and damages to Plaintiffs as herein alleged.

**III**

Plaintiffs are now, and at all times herein mentioned, were, citizens and residents within the State of California, the subject accident occurred in the County of Placer, State of California, and the amount in controversy exceeds the minimum jurisdictional limit of this court.

**IV**

At all times mentioned herein, defendant CROWN LIFT TRUCKS, had its place of business in West Sacramento, Yolo County, California, and placed the subject lift truck into the stream of commerce from that location, and therefore plaintiffs designate Yolo County as the appropriate place of venue for the subject action.

2

FIRST AMENDED COMPLAINT

V.

At all times mentioned herein, LEEANN COUPE was the lawful and loving wife of decedent, Daniel Coupe. Mr. Coupe was killed in a lift truck accident on June 29, 2001, for which defendants, and each of them, have liability based upon negligence, warranty, or strict liability theories under California law.

VI

At all times mentioned herein, KIMBERLY COUPE, age 22, and CHRISTINE COUPE, age 20, allege, and in fact, are the daughters of decedent Daniel Coupe. The heirs herein mentioned are the decedent's sole and exclusive heirs at law. At all times mentioned herein, the heirs alleging damages in the subject complaint have sustained the loss of decedent's care, comfort, love and society, as well as significant economic losses as a result of the subject accident. Said losses will be proven with reasonable particularity in the course of the instant lawsuit.

VII

Plaintiffs are further informed and believe and thereon alleges that DOE Defendants and each of them, were the agents, employees or contractors of each of the other DOE Defendants and were, at all times herein mentioned, acting within the course and scope of said agency, employment or contract, and with the permission, knowledge and consent of each of the remaining Defendants.

VIII

Plaintiffs, for a First Cause of Action as against CROWN LIFT TRUCKS, TASQ TECHNOLOGY, INC., and DOES 1 through 25, and each of them, allege as follows:

3

FIRST AMENDED COMPLAINT

## FIRST CAUSE OF ACTION

### (Negligence - Product Liability)

I

On or about June 29, 2001, while Daniel Coupe was operating a lift truck, and component parts thereof, that was designed, tested, manufactured, installed, and otherwise placed into the stream of commerce by defendants CROWN LIFT TRUCKS, TASQ TECHNOLOGY, INC., and DOES 1 through 25, and each of them, was killed when the lift truck malfunctioned by failing to respond to decedent's proper operational input and as a result, caused it to pin and crush Daniel Coupe between the lift truck and shelving racks that were in place at the facility of defendant TASQ TECHNOLOGY, INC.

At all times mentioned herein, and unknown to Daniel Coupe, said lift truck was "defective" in its design, manufacture, assembly, component parts, and marketing, and was so defective when the vehicle was placed into the stream of commerce by defendant CROWN LIFT TRUCKS, TASQ TECHNOLOGY, INC., and DOES 1 through 25, and each of them. Specifically, defendants CROWN LIFT TRUCKS, TASQ TECHNOLOGY, INC., and DOES 1 through 25, and each of them, knew, or should have known, at the time this lift truck, and its component parts, was negligently designed, manufactured, tested, marketed, and placed into the stream of commerce, that it had a propensity to malfunction electrically, or otherwise, so as to cause it to fail to respond to the directional input of the operator, so as to render the usual operating mechanisms ineffective, so as to cause the lift truck to operate unresponsibly. It is alleged that the average lift truck operator, including decedent and others similarly situated, would have expected to have the lift truck operate at the speed and direction consistent with the input of the driver, without it failing, electrically, or otherwise. At all times mentioned herein, defendants CROWN LIFT TRUCKS, TASQ TECHNOLOGY, INC., and DOES 1 through 25, and each of them, actually knew that consumers such as decedent were wholly unaware of the existence of

4

1  said defects and that their consumers would rely and expect the lift truck to function in the

2  fashion it was designed and marketed to function within.

3  II

4  Defendants, CROWN LIFT TRUCKS and DOES 1 through 25, inclusive, and each

5  of them, were further negligent in the design, manufacturing, testing, and marketing of the

6  subject lift truck in that they failed to build into the design a reasonable occupant protection

7  area that would serve to prevent or minimize the physical impact upon the user of the lift

8  truck in the event the lift truck, for whatever reason, while traveling in a rearward travel

9  direction, collided with an object or structure. Said protection was technologically available

10 to these defendants at a time when defendants knew that "rearward travel" accidents,

11 similar to the one involved herein, would indeed occur and that when said accident

12 occurred, that the chances of serious injury or death to the operator would be greatly

13 enhanced without the incorporation of a vertical guard or other user protection into the

14 product's design.

15 WHEREFORE, plaintiffs pray for judgment against defendants, CROWN LIFT

16 TRUCKS, TASQ TECHNOLOGY, INC., and DOES 1 through 25, and each of them, as

17 follows:

18 1.  Loss of consortium and other non-economic damages in excess of the

19 minimum jurisdictional limits of this court.

20 2.  Prejudgment interest on all special damages;

21 3.  Funeral and burial expenses, according to proof;

22 4.  Loss of economic support;

23 5.  For costs of suit; and

24 6.  For such other and further relief as this Court may deem just and proper.

25 Plaintiffs, for a Second Cause of Action as against CROWN LIFT TRUCKS, TASQ

26 TECHNOLOGY, INC., and DOES 1 through 25, and each of them, allege as follows:

27 5

28 FIRST AMENDED COMPLAINT

## SECOND CAUSE OF ACTION
## (STRICT PRODUCT LIABILITY)

**I.**

Plaintiffs reallege and incorporate herein by reference as though fully set forth herein, each and every allegation contained in the First Cause of Action hereinabove set forth.

**II.**

Defendants, CROWN LIFT TRUCKS, TASQ TECHNOLOGY, INC., and DOES 1 through 25 and each of them, are liable to the heirs of the decedent as enumerated herein under multiple bases under California law under the legal theory known as strict product liability. Defendants, and each of them, designed, tested, assembled, manufactured, warranted, provided component parts, and otherwise put the subject defective lift truck into the stream of commerce, and ultimately to the "use" of decedent. Said lift truck was "defective" for all the reasons set forth above, in that it failed, electronically or otherwise, causing the lift truck to operate out of control, along with the lack of proper operator protection guards, entitling the heirs of the decedent to recover the full measure of their economic and non-economic damages from Defendants, and each of them.

WHEREFORE, Plaintiffs pray for judgment against Defendants CROWN LIFT TRUCKS, TASQ TECHNOLOGY, INC., and DOES 1 through 25 and each of them, as follows:

1.     Loss of consortium and other non-economic damages in excess of the minimum jurisdictional limits of this court.

2.     Prejudgment interest on all special damages;

3.     Funeral and burial expenses, according to proof;

4.     Loss of economic support;

6

FIRST AMENDED COMPLAINT

5.    For costs of suit; and

6.    For such other and further relief as this Court may deem just and proper.

Plaintiffs, for a Third Cause of Action as against TASQ TECHNOLOGY, INC., and DOES 26 through 50, and each of them, allege as follows:

## THIRD CAUSE OF ACTION

I

Plaintiffs reallege and incorporate herein by reference as though fully set forth herein, each and every allegation contained in the First and Second Causes of Action hereinabove set forth.

II

Some time on or before June 29, 2001, defendant TASQ TECHNOLOGY, INC., had hired Daniel Coupe's employer, West Coast Conveyors, to perform shelving installation work on behalf of defendant TASQ TECHNOLOGY, INC., at the TASQ TECHNOLOGY, INC., facility in Placer County, California. In order to assist in the completion of the work, defendant TASQ TECHNOLOGY, INC., supplied West Coast Conveyors and Daniel Coupe with the subject lift truck which had been manufactured by defendant CROWN LIFT TRUCKS. Defendant TASQ TECHNOLOGY, INC., requested Daniel Coupe and his employer, West Coast Conveyors, to utilize the subject lift truck supplied by TASQ TECHNOLOGY, INC., in completing the job in question.

II

Defendant, TASQ TECHNOLOGY, INC., and DOES 26 through 50, inclusive, and each of them, had a duty to supply safe, properly functioning equipment, including the subject lift truck, to West Coast Conveyors, and its employees, including Daniel Coupe, to perform work on behalf of TASQ at its facility. Defendant TASQ TECHNOLOGY, INC., and DOES 26 through 50, inclusive, and each of them, breached their duty by negligently supplying and furnishing an unsafe lift truck for use by Daniel

7

FIRST AMENDED COMPLAINT

1    Coupe and West Coast Conveyors in completing the work in question at the TASQ

2    TECHNOLOGY, INC., facility in Placer County on or before June 29, 2001, in that the

3    subject lift truck supplied for use by West Coast Conveyors and Daniel Coupe, was

4    unsafe for use in the work being performed. The subject lift truck was unsafe, and

5    TASQ TECHNOLOGY, INC., and DOES 26 through 50, inclusive, and each of them,

6    knew or should have known it was unsafe for the work being performed, as it had a

7    propensity to malfunction electrically, or otherwise, so as to cause it to fail to respond to

8    the directional input of the operator, so as to render the usual operating mechanisms

9    ineffective, so as to cause the lift truck to operate unresponsibly. Additionally, the

10   subject lift truck was unsafe and TASQ TECHNOLOGY, INC., and DOES 26 through

11   50, inclusive, and each of them, knew or should have known it was unsafe for the work

12   being performed, in that it did not incorporate a vertical guard or other user protection in

13   order to provide occupant protection in the event the lift truck, for whatever reason,

14   while traveling in a rearward travel direction, collided with an object or a structure, such

15   as the shelving racks that were present on the TASQ TECHNOLOGY, INC., premises,

16   in the vicinity of the work being performed by Daniel Coupe.  Daniel Coupe was

17   utilizing the lift truck that had been negligently supplied and furnished by defendant

18   TASQ TECHNOLOGY, INC., and DOES 26 through 50, inclusive, and each of them, at

19   the request of TASQ TECHNOLOGY, INC., at the time of the accident in question.

20   TASQ TECHNOLOGY, INC., by negligently furnishing and supplying unsafe equipment

21   for use by Daniel Coupe and West Coast Conveyors, actively contributed to the injuries

22   and eventual death of Daniel Coupe.

23        WHEREFORE, Plaintiffs pray for judgment against Defendants TASQ

24   TECHNOLOGY, INC., and DOES 26 through 50, inclusive, and each of them, as

25   follows:

26        1.    Loss of consortium and other non-economic damages in excess of the

27                                           8

28                              FIRST AMENDED COMPLAINT

1    minimum jurisdictional limits of this court.

2        2.   Prejudgment interest on all special damages;

3        3.   Funeral and burial expenses, according to proof;

4        4.   Loss of economic support;

5        5.   For costs of suit; and

6        6.   For such other and further relief as this Court may deem just and proper.

7                     **FOURTH CAUSE OF ACTION**

8                           i

9    Plaintiffs reallege and incorporate herein by reference as though fully set forth

10   herein, each and every allegation contained in the First, Second and Third Causes of

11   Action hereinabove set forth.

12                          ii

13   Defendants CROWN LIFT TRUCKS, TASQ TECHNOLOGY, INC., and DOES 1

14   through 50, inclusive, and each of them, owed a duty to Daniel Coupe to properly

15   maintain and service the subject lift truck so that it would not be in an unsafe condition

16   for his use. Defendants CROWN LIFT TRUCKS, TASQ TECHNOLOGY, INC., and

17   DOES 1 through 50, inclusive, and each of them, breached their duty to provide the

18   subject lift truck to Daniel Coupe in a safe condition in that they negligently maintained,

19   or failed to maintain, the subject lift truck so that it was presented for use by Daniel

20   Coupe in an unsafe condition. Specifically, defendants CROWN LIFT TRUCKS, TASQ

21   TECHNOLOGY, INC., and DOES 1 through 50, inclusive, and each of them, knew or

22   should have known that the negligent maintenance, or lack thereof, performed on the

23   subject lift truck prior to the time of Daniel Coupe's accident, would cause the subject lift

24   truck to be in a condition where it would have a propensity to malfunction, electrically or

25   otherwise, so as to cause it to fail to respond to the directional input of the operator, so

26   as to render the usual operating mechanisms ineffective, which would cause the lift

27                          9

28                      **FIRST AMENDED COMPLAINT**

1  truck to operate unresponsibly.

2      WHEREFORE, Plaintiffs pray for judgment against Defendants CROWN LIFT

3  TRUCKS, TASQ TECHNOLOGY, INC., and DOES 1 through 50, inclusive, and each of

4  them, as follows:

5      1.   Loss of consortium and other non-economic damages in excess of the

6  minimum jurisdictional limits of this court;

7      2.   Prejudgment interest on all special damages;

8      3.   Funeral and burial expenses, according to proof;

9      4.   Loss of economic support;

10     5.   For costs of suit; and

11     6.   For such other and further relief as this Court may deem just and proper.

12 DATED: October 10, 2002    DREYER, BABICH, BUCCOLA & CALLAHAM, LLP

13

14     BY    ROBERT A. BUCCOLA

15

16

17

18

19

20

21

22

23

24

25

26

27                 10

28         FIRST AMENDED COMPLAINT