1

2

3

4

5

6

7

8               IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CONTINENTAL CASUALTY
     COMPANY,
11
                 Plaintiff,              No. CIV S-07-1744 MCE EFB
12
            vs.
13
     ST. PAUL SURPLUS LINES
14   INSURANCE COMPANY; DOES 1
     through 10, inclusive,
15
                 Defendants.             ORDER
16   _____/

17        This Order addresses the discovery motions heard by this court on December 10, 2008,[1]

18   the related motion for sanctions based on the alleged spoliation of evidence referred to this court

19   and heard on March 25, 2009, and the court's *in camera* review of withheld documents ordered

20   May 28, 2009.  Attorney Jeffrey A. Dollinger appeared on behalf of Continental; Marc J.

21   Derewetzky appeared on behalf of St. Paul; and George J. Stephan represented both himself and

22   Crown.

23   ////

24   ////

25

26        [1]  The four discovery motions heard on that date are listed at page 5, *infra*.

I. <u>BACKGROUND</u>

This action, originally filed in Yolo County Superior Court, was removed on August 24, 2007, based on diversity jurisdiction.  28 U.S.C. § 1332.  Plaintiff Continental Casualty Company ("Continental") is incorporated and has its principal place of business in Illinois; defendant St. Paul Surplus Lines Insurance Company ("St. Paul") is incorporated and has its principal place of business in Minnesota.  Continental seeks declaratory relief, equitable contribution, indemnity and subrogation from St. Paul.

This case arises out of an underlying wrongful death action litigated in Yolo County Superior Court.  *LeeAnn Coupe et al. v. Crown Lift Trucks, et al.*, Case No. P-002-1064 ("underlying action" or "*Coupe* action").  That action arose out of a 2001 industrial accident in Roseville, California, in which Daniel Coupe, an independent contractor/employee of West Coast Conveyor and Equipment, Inc., was killed while operating a forklift.  The forklift was manufactured and maintained by Crown Equipment Corporation and/or Crown Credit Company dba Crown Lift Trucks ("Crown"), and leased to Tasq Technology, Inc. ("Tasq").  Both Tasq and Crown tendered their defense of the *Coupe* action to Continental.[2]  Tasq held primary general liability and commercial umbrella liability policies issued by Continental, with limits of $1,000,000 and $25,000,000, respectively, which included the duty to defend.  Continental immediately agreed to defend Tasq and hired defense counsel.

Crown also held a primary general liability policy issued by St. Paul, with coverage limited to $5,000,000, pursuant to which St. Paul held the right, but not the duty, to defend Crown, subject to a $250,000 self-insured retention requirement ("SIR").  Continental initially refused to defend Crown, and for two years funded Tasq's cross-action against Crown.  During

---

[2] Crown tendered its defense to Continental as an additional insured under its lease with Tasq.  While the instant motions designate Tasq as the primary insured, the complaint states that pursuant to Continental's coverage of primary insured First Data Corporation, "Tasq qualified as an insured . . . [and] Crown also tendered its defense as an additional insured under the Continental Casualty policies in connection with the Underlying Action and Continental Casualty accepted Crown's defense, subject to a reservation of rights."  Compl. ¶¶ 8-11.

this time, Crown funded its own defense and filed a cross-action against Tasq.  The cross-actions sought to determine the companies' relative liabilities and indemnity obligations, e.g., whether Crown furnished an adequately maintained forklift, and whether Coupe was properly trained to operate it.

On December 15, 2005, Continental assumed Crown's defense in the *Coupe* action, subject to a reservation of rights, and by securing independent "*Cumis* counsel," third party herein, Mr. George Stephan.[3]  *See Lectrolarm Custom Sys., Inc. v. Pelco Sales, Inc*., 212 F.R.D. 567, 570 (E.D. Cal. 2002) ("Under *San Diego Navy Federal Credit Union v. Cumis Ins. Society, Inc.*, 162 Cal. App. 3d 358 [](1984), an insured has a right to be provided independent counsel by the carrier when a conflict of interest exists between the insured and the carrier.  California courts have upheld the validity of the *Cumis* decision, and the substantive elements of *Cumis* have been codified in California Civil Code Section 2860.").

A year later, Continental, on behalf of both Tasq and Crown, settled the *Coupe* action for $3.5 million.  Dckt. No. 21-1, ¶ 9 (Stipulation of Facts for Cross-Motions for Summary Judgment).  At Crown's insistence, the settlement was silent as to apportionment of fault between Crown and Tasq.[4]  *Id.*

_____

[3]  This date was provided to the court in a letter from Continental dated December 11, 2008, following the court's inquiry at the December 10, 2008 hearing.  Dckt. No. 56.  In response (but subject to errant docketing numbers), on December 12, 2008, St. Paul provided the court a copy of Continental's December 15, 2005 letter to Mr. Stephan, wherein Continental "reserve[d] its right to deny coverage and/or indemnification for all or part of any judgment or settlement which might be obtained. . . ."  Dckt. No. 55.

[4]  St. Paul emphasizes two additional matters that preceded, but purportedly reflect on, the settlement.  Initially, on October 7, 2003, the *Coupe* plaintiffs served an offer to compromise their claims against Crown, pursuant to California Code of Civil Procedure 998, in the amount of $975,000, but Crown declined to accept it.  Dckt. No. 21-1, ¶ 5.  At the hearing, the parties stated that an identical offer was also made to Continental, which also declined.  Later, on November 28, 2006, after Continental assumed Crown's defense and after the initial settlement conference, the Yolo County Superior Court issued a tentative ruling in Crown's favor on its motion for summary judgment against Tasq.  Dckt. No. 23 at 4 (citing St. Paul's Separate Statement of Undisputed Material Facts No. 5).  However, because the *Coupe* action settled, the court did not issue a final ruling on the motion.  Dckt. No. 21-1, ¶ 10 (Stipulation of Facts for Cross-Motions for Summary Judgment).

1      Preceding this settlement, Continental sent two letters to St. Paul informing it of a

2 settlement conference scheduled for October 10, 2006, and inviting St. Paul's participation.  The

3 letters informed St. Paul that Continental may seek from it contribution or indemnification for

4 Crown's obligations.  *See* Dckt. Nos. 21-11 and 21-12.  The first of these letters, dated

5 September 21, 2006, indicated that "[i]t has come to Continental Casualty's attention that St.

6 Paul provided general liability coverage to Crown . . . which was apparently in place at the time

7 of the fatal accident," and stated that Continental was "uncertain if St. Paul already has been

8 notified of this action . . ."  Dckt. No. 21-11 at 1.  The second letter, dated October 9, 2006,

9 stated that "[i]f St. Paul wishes to have any input in the settlement process, you should have a

10 representative present, with authority."  Dckt. No. 21-12 at 1.  St. Paul responded to neither

11 letter.  However, St. Paul has conceded that it became aware of the *Coupe* action at the time it

12 was filed.  *See* Dckt. No. 64 at 5:20-21; Dckt. No. 57, Coles Decl., Ex. A, ¶ 3.

13      Following the settlement, Continental filed the instant action against St. Paul in Yolo

14 County Superior Court on July 18, 2007.  *See* Dckt. No. 1, Ex. A.  Continental represents that the

15 $3.5 million settlement reflected $1 million under Tasq's primary policy, and $2.5 million under

16 its umbrella policy.  Continental now contends that the $2.5 million settlement payment made

17 from the Tasq umbrella policy was paid on behalf of Crown, and seeks this amount from St.

18 Paul.  St. Paul filed its answer in Superior Court, *id.* at Ex. B, and removed the action to this

19 court on August 23, 2007.  Dckt. No. 1-1.

20      Continental filed a motion for partial summary judgment to establish the priority of

21 coverage between Continental's umbrella policy and St. Paul's primary policy as to Crown's

22 liability, if any, arising out of the *Coupe* action and settlement.  *See* Dckt. No. 20.  St. Paul also

23 moved for summary judgment, arguing that the dispute between the insurers is not yet ripe

24 because there has been no legal apportionment of liability between Tasq and Crown, and that

25 even if the claims were ripe, they should be barred by Continental's unclean hands, a "no action"

26 clause in St. Paul's insurance contract, and the SIR.  *See* Dckt. No. 29.

1    The district judge continued the hearing on the parties' cross-motions for summary

2  judgment to permit the parties an opportunity to resolve their discovery disputes, which were

3  heard on December 10, 2008.  Dckt. Nos. 41-53.  After the hearing, and pending a decision on

4  the discovery matters, Continental filed, on December 30, 2008, a motion for sanctions against

5  St. Paul, based in part on documents at issue in the parties' discovery disputes.  Dckt. No. 57.

6  The district judge referred the sanctions motion to the undersigned on February 5, 2009, and the

7  matter was heard on March 25, 2009.  Dckt. Nos. 62, 68.  On May 28, 2009, after attempting

8  unsuccessfully to resolve the pending discovery matters on the parties' papers, the undersigned

9  ordered that all documents withheld on a claim of privilege be submitted for *in camera* review.

10  Dckt. No. 72.  That review has been completed and the court issues the following order.

11  II.  <u>DISCOVERY MOTIONS</u>

12    Pending before this court are four discovery motions regarding Continental's requests for

13  documents from St. Paul, Stephan, and Crown; and St. Paul, Stephan, and Crown's objections

14  thereto.  Specifically, (1) St. Paul moves to quash subpoenas issued to Stephan and Crown which

15  seek communications between St. Paul and Crown and/or Crown's agents (including Stephan)

16  regarding the *Coupe* action, Dckt. No. 42;[5] (2) Stephan and Crown also move to quash those

17  subpoenas, Dckt. No. 47; (3) Continental moves to compel St. Paul to produce documents,

18  including communications between St. Paul and Crown and/or Stephan, and for "monetary

19  sanctions against St. Paul for its alleged dilatory tactics, failure to provide documents, failure to

20  provide a privilege log in a timely manner, and concealing the existence of these responsive and

21

22    [5]  The subpoena to Stephan seeks, *inter alia*, "All communications, including emails,
between Mr. Stephan and St. Paul Surplus Lines Insurance Co., it[s] agents and representatives,
23  regarding the [*Coupe* action]," Dckt. No. 43-4 at 5, and the subpoena to Crown seeks, *inter alia*,
all documents relating or referring to "any communication, written, oral or electronic, between
24  St. Paul and any or all of the following:  Crown Equipment Corporation dba Crown Lift Trucks,
and/or Crown Credit Company and/or any Crown entity agent, personnel, employee, contractor,
25  or anyone acting on behalf of, or purporting to act on their behalf (collectively, 'Crown')
regarding, concerning or referring to the June 29, 2001 fatal accident of Dan Coupe," Dckt. No.
26  43-4 at 22.

1    relevant documents," Dckt. No. 48;[6] and (4) St. Paul moves for a protective order in response to

2    Continental's motion to compel, Dckt. No. 49.  All four motions involve documents which have

3    been withheld by St. Paul, Stephan, and/or Crown on the grounds of attorney-client privilege,

4    attorney work product, and/or the mediation privilege, and which can be divided into two general

5    categories: (1) communications that were to, from, or shared with St. Paul (including

6    communications between Stephan and St. Paul, between Crown and St. Paul, and between

7    Stephan and Crown that were shared with St. Paul[7]); and (2) communications between Stephan

8    and Crown that were not shared with St. Paul.  Those categories of documents, and the

9    respective privilege/protection arguments regarding the documents, are addressed below.

10           A.  Standards

11           Federal Rule of Civil Procedure 26 provides that "[p]arties may obtain discovery

12   regarding any nonprivileged matter that is relevant to any party's claim or defense[.]"  Fed. R.

13   Civ. P. 26(b)(1).  Information that a party claims is privileged or subject to protection as

14   trial-preparation material may be withheld from discovery pursuant to Rule 26(b)(5) if the party

15   expressly makes the claim and provides a detailed privilege log, and if necessary, "[a] party or

16   any person from whom discovery is sought may move for a protective order."  Fed. R. Civ. P.

17   26(b)(5), 26(c)(1).  However, the opposing party may also to move to compel discovery.  Fed. R.

18   Civ. P. 37(a)(1).

19   _____

20           [6] Specifically, Continental moves to compel St. Paul "to produce documents in response
     to its Request for Production of Documents, Set No. One regarding all documents in St. Paul's
21   possession, custody or control, pertaining to the [*Coupe* action], including all communications
     between St. Paul and Crown Equipment Corporation ('Crown') and/or its agents, including
22   Crown's defense counsel, George Stephan."  Dckt. No. 48 at 2.

23           [7] All of the documents listed in St. Paul's privilege log, Dckt. No. 48-3 at 151; all of the
     documents listed in Stephan's privilege log, Dckt. No. 47-2 at 30, 48-3 at 141; and all but two of
24   the documents listed in Crown's privilege log, Dckt. No. 47-2 at 40, 48-3 at 84, fall into this first
     category of documents.  The remaining two documents in Crown's privilege log fall into this
25   second category.
             Although only *five* documents were provided in the privilege log initially submitted to
26   the court by St. Paul, *see* Dckt. No. 48-3, at 151, St. Paul submitted a privilege log listing seven
     documents in response to this court's order directing *in camera* review.

1    Rule 45 governs subpoenas.  In relevant part, Rule 45(c)(3)(A) provides that an issuing

2    court must quash or modify a subpoena if the subpoena "requires disclosure of privileged or

3    other protected matter, if no exception or waiver applies; or . . . subjects a person to undue

4    burden."  Rule 45 further provides that, "[a]t any time, on notice to the commanded person, the

5    serving party may move the issuing court for an order compelling production or inspection."

6    Fed. R. Civ. P. 45(c)(2)(B)(I).

7         B.  <u>Preliminary Arguments</u>

8              1.  <u>Ripeness/Standing</u>

9    St. Paul, Crown, and Stephan argue that Continental lacks standing to pursue the

10   discovery matters because its underlying claims are not yet ripe.  Dckt. No. 46 at 7; Dckt. No. 52

11   at 12.  They argue that Continental's claims will become ripe only if this court finds that Crown

12   bears some liability in the underlying wrongful death action, and that such liability is not

13   indemnified by Tasq.  This argument, and Continental's response, mirror an argument presented

14   by the parties' cross-motions for summary judgment.  That is, Continental wants to first establish

15   priority of coverage, while St. Paul, Crown, and Stephan want to first establish apportionment of

16   liability and indemnity.  However, the order in which those issues will be addressed has already

17   been resolved by the district judge.  The district judge continued the summary judgment motions

18   for the purpose of facilitating discovery of the facts and evidence bearing on the very questions

19   St. Paul, Crown, and Stephan wish to defer.  Discovery has not been bifurcated or phased in this

20   case, and the parties specifically stated in their Joint Status Report that they "do not currently

21   foresee the need to conduct discovery in phases."  Dckt. Nos. 8, 9.

22   Apart from the apparent relevance of the discovery to the pending summary judgment

23   motions, the cases relied upon by St. Paul, Crown, and Stephan in support of their ripeness

24   argument are unhelpful.  The cases reiterate the general Article III standing requirement that

25   federal jurisdiction is limited to actual cases and controversies.  These cases are inapposite to the

26   pending motions.  Rather, the weight of authority favors full discovery at this juncture,

consistent with both the federal rules and California's broad public policies supporting good

faith settlements in multiple tortfeasor actions without first requiring an apportionment of

liability.  *See, e.g.*, *Mullen Lumber Co. v. Chandler*, 185 Cal.App.3d 1127 (1986) (noting

important public policies of maximizing recovery to the injured party, encouraging settlements,

and apportioning liability in subsequent actions for equitable indemnity); *Hartford Accident &*

*Indem. Co. v. Super. Ct.*, 29 Cal.App.4th 435, 440 (1994) ("in cases involving duplicate or

overlapping insurers the courts have prorated the responsibility by focusing on contractual issues

rather than on 'fault' concepts, and have ordered proration based on the proportion each insurer's

coverage bore to the total coverage provided by all policies" (citations omitted)); *N. Ins. Co. of*

*N.Y. v. Allied Mut. Ins. Co.*, 955 F.2d 1353, 1360 (9th Cir. 1992) ("No specific rule governs

[suits among insurers seeking equitable contribution].  Courts should consider the nature of the

claim, the relation of the insured to the insurers, the particulars of each policy and any other

equitable considerations.").  Therefore, the ripeness argument with regard to discovery is without

merit.

### 2. Relevance

St. Paul, Crown, and Stephan also argue that the subpoenas should be quashed because

"Continental has failed to articulate any basis for why the documents sought might be relevant to

any claim in this case."  Dckt. No. 52 at 16.  Continental responds that the documents are

relevant to St. Paul's awareness "of the fact and substance of the settlement agreement," and

therefore to St. Paul's "no consent" defense set forth in its motion for summary judgment.  *Id.* at

27.  Because the communications between St. Paul, Crown, and Crown's counsel (Stephan) are

relevant to St. Paul's knowledge of the *Coupe* action and/or the settlement process therein, the

subpoenas will not be quashed on relevance grounds.[8]

---

[8]  Crown also argues in its motion to quash that the subpoenas served on Crown must be quashed because they were not issued by the appropriate court pursuant to Federal Rule of Civil Procedure 45(a)(2).  Dckt. No. 47 at 6.  However, that argument was not addressed in the parties' joint statement regarding the discovery dispute, Dckt. No. 52, and is therefore deemed

C.   Communications Between (a) Stephan and/or Crown and (b) St. Paul

Most of the documents withheld by St. Paul, Stephan, and Crown involve communications (1) between Stephan and St. Paul regarding the *Coupe* action; (2) between Crown (including individuals in Crown's legal department) and St. Paul regarding the *Coupe* action; and (3) between Stephan and Crown regarding the *Coupe* action that were shared with St. Paul.[9] The analysis for all of those communications is similar and, accordingly, they will be considered together.

1.   Attorney-Client Privilege

a.   Parties' Contentions

St. Paul, Stephan, and Crown all argue that the communications that they have withheld are protected by the attorney-client privilege. Specifically, they contend that communications between Stephan and St. Paul regarding the *Coupe* action are covered by the attorney-client privilege; that communications between Crown's legal department and St. Paul regarding the *Coupe* action are covered by the attorney-client privilege; and that communications between

_____

withdrawn.

    [9] The majority of the withheld documents are in the form of e-mail strings. "Each e-mail/communication consists of the text of the sender's message as well as all of the prior e-mails that are attached to it. . . . What is communicated with each e-mail is the text of the e-mail and all the e-mails forwarded along with it. If an e-mail with otherwise privileged attachments is sent to a third party, . . . the privilege [is lost] with respect to that e-mail and all of the attached e-mails." *United States v. ChevronTexaco Corp.*, 241 F. Supp.2d 1065, 1075, n.6 (N.D. Cal. 2002). Thus, whether the text repeated in an email string remains privileged is determined by analysis of the most recent email. "As *Upjohn Co. v. United States* makes clear, the fact that non-privileged information was communicated to an attorney may be privileged, even if the underlying information remains unprotected. 449 U.S. 383, 395-96 [](1981). As applied in the e-mail discovery context, the court understands *Upjohn* to mean that even though one e-mail is not privileged, a second e-mail which forwards that prior e-mail to counsel might be privileged in its entirety. In this respect, the forwarded material is similar to prior conversations or documents that are quoted verbatim in a letter to a party's attorney." *Muro v. Target Corp.*, 250 F.R.D. 350, 363 (N.D. Ill.2007) (footnote omitted) (Fed. R. Civ. P. 26(b)(5)(A) does not require separate itemization of e-mails in a privilege log). For these reasons, when categorizing and referencing the withheld documents, the court considers the most recently sent e-mail in each of the e-mail strings. Where necessary, the court also considers pertinent attachments and subsequent e-mails.

Stephan and Crown regarding the *Coupe* action (which are covered by the attorney client

privilege) remain privileged (i.e., the privilege is not waived) even though they were shared with

Crown's insurer, St. Paul.  They argue that the attorney-client privilege, as codified in the

California Evidence Code, is liberally construed in favor of the exercise of the privilege and

contend that each of the aforementioned categories of communications should be protected by

that privilege.[10]  Dckt. No. 51 at 31-37; Dckt. No. 52 at 16-22.

The attorney-client privilege St. Paul, Stephan, and Crown seek to assert is based on the

tripartite relationship that exists in an insurance context between insured, defense counsel, and

insurer.  St. Paul, Stephan, and Crown argue that communications among the parties to that

tripartite relationship are protected by the privilege because of the required disclosures among

those parties, and that the privilege that attaches to communications between the insured and

defense counsel is not waived when those communications are shared with the third member of

the tripartite relationship, the insurer (here, St. Paul).  They argue that "[i]n the context of

insurance, the tripartite relationship between insured, defense counsel, and insurer requires

disclosure of information that falls under the protection of Cal Evid. Code section 952;

otherwise, the insured and its defense counsel could not fulfill their 'duty . . . to disclose to the

insurer all information concerning the action . . . .'"  Dckt. No. 51 at 33; Dckt. No. 52 at 19

(quoting *Rockwell Int'l Corp. v. Super. Ct.*, 26 Cal.App.4th 1255, 1264 (1994)).

St. Paul, Stephan, and Crown acknowledge that under California law communications

among retained defense counsel, the insured, and the insurer are protected by the attorney-client

privilege *when* the insurer is defending the insured without reservation (since both the insurer

and the insured are considered to be clients of defense counsel), *Lectrolarm Custom Sys., Inc. v.

Pelco Sales, Inc.*, 212 F.R.D. 567, 571 (E.D. Cal. 2002).  Indeed, this is the heart of the tripartite

relationship.  However, they argue that situation in this case is unique because the insurance

---

[10]  The parties do not dispute that in this diversity action, the California law of
attorney-client privilege governs.  Dckt. No. 51 at 14, 31; Dckt. No. 52 at 17.

1  policy between Crown (the insured) and St. Paul (the insurer) does not require St. Paul to defend

2  Crown but does require, as a condition of coverage, that Crown provide information to St. Paul

3  regarding claims that could potentially reach St. Paul's coverage once the self-insured retention

4  has been satisfied, including copies of complaints and reports on significant developments.

5  Dckt. No. 51 at 34; Dckt. No. 52 at 19.  Essentially, St. Paul, Stephan, and Crown contend that

6  this court should extend the attorney-client privilege to cover communications between Stephan

7  and St. Paul regarding the *Coupe* action; communications between individuals in Crown's legal

8  department and St. Paul regarding the *Coupe* action; and communications between Stephan and

9  Crown regarding the *Coupe* action that were shared with St. Paul, because a failure to do so

10  "would drive a wedge between the insurer and the insured to demand disclosure of confidential

11  communications required as a condition to coverage to third parties, such as Continental here."

12  Dckt. No. 51 at 35; Dckt. No. 52 at 21.

13        Continental counters that the communications at issue are not protected by the attorney

14  client privilege.  Dckt. No. 51 at 13-17; Dckt. No. 52 at 28-32.  Specifically, Continental argues

15  that the tripartite attorney client relationship referenced above is *only* created when there is a

16  joint relationship and/or joint interest in defending the interests of the insured/insurer.

17  Continental contends that because St. Paul's policy was an indemnity only policy, in which St.

18  Paul did not retain counsel for Crown, did not pay for Crown's defense counsel, was not

19  involved in investigating or evaluating the Coupe action, and never acknowledged any duty to

20  defend or indemnify Crown.  It is Continental's position that because St. Paul did not share any

21  joint interest in Crown's defense, there was no tripartite attorney client relationship among St.

22  Paul, Crown, and Stephan and communications between St. Paul and Crown, between St. Paul

23  and Stephan, and between Crown and Stephan but shared with St. Paul, are not protected by the

24  attorney client privilege.  *Id.*  Continental argues that the communications between Crown's

25  legal department and St. Paul were not intended for the information or assistance of Crown's

26  ////

1 attorney, and that therefore, the attorney client privilege cannot and does not apply to those

2 communications.  Dckt. No. 51 at 16-17; Dckt. No. 52 at 31-32.

### b. Discussion

4       In California, evidentiary privileges are statutorily created and must be strictly construed.

5 *See*, *e.g.*, *Wells Fargo Bank v. Super. Ct.*, 22 Cal.4th 201, 208 ("the courts of this state have no

6 power to expand [statutory privileges] or to recognize implied exceptions").  The attorney-client

7 privilege is codified in sections 950 through 962 of the California Evidence Code.  The privilege

8 protects "confidential communication[s] between client and lawyer."  Cal. Evid. Code § 952.  "If

9 a 'confidential communication between client and lawyer' exists, the client has a privilege

10 protecting against disclosure (§ 954), and the attorney has an obligation to refuse disclosure

11 unless otherwise instructed by the client (§ 955)."  *Scripps Health v. Super. Ct.,* 109 Cal.App.4th

12 529, 533 (2003).  The privilege encompasses not only oral and written statements, but the

13 transmission of nonprivileged documents, the disclosure of which may reveal the transmitter's

14 intent or strategy.  *Mitchell v. Super. Ct.*, 37 Cal.3d 591, 600 (1984).  The party claiming the

15 privilege has the burden of demonstrating that the communication was made in the course of an

16 attorney-client relationship.  Cal. Evid. Code § 917(a); *see also, e.g.*, *Wellpoint Health Networks,*

17 *Inc. v. Super. Ct.*, 59 Cal.App.4th 110, 123 (1997).

18       The purpose of the attorney-client privilege is to "encourage full and frank

19 communication between attorneys and their clients and thereby promote broader public interests

20 in the observance of law and administration of justice."  *Upjohn Co. v. United States*, 449 U.S.

21 383, 389 (1981).  "'The privilege is given on grounds of public policy in the belief that the

22 benefits derived therefrom justify the risk that unjust decisions may sometimes result from the

23 suppression of relevant evidence.  Adequate legal representation in the ascertainment and

24 enforcement of rights or the prosecution or defense of litigation compels a full disclosure of the

25 facts by the client to his attorney.'"  *People v. Canfield*, 12 Cal.3d 699, 705 (1974) (quoting *City*

26 *& County of San Francisco v. Super. Ct.*, 37 Cal.2d 227, 235 (1951)).

The attorney-client relationship is more complex in the context of insurance litigation. When there is a single, common goal shared by an insurer and its insured of minimizing or eliminating liability to a third party, California courts have recognized that a unique tripartite relationship exists among those parties (the insurer and the insured) and the defense counsel hired to defend against third-party liability.  In that tripartite relationship, both the insurer *and* the insured are considered the clients of the defense counsel, and an attorney-client privilege is shared among all of them.  As the court explained in *San Diego Navy Federal Credit Union v. Cumis Insurance Society* ("*Cumis*"), 162 Cal.App.3d 358 (1984), "[i]n the usual tripartite relationship existing between the insurer, insured and counsel, there is a single, common interest shared among them.  Dual representation by counsel is beneficial since the shared goal of minimizing or eliminating liability to a third party is the same." *Id*. at 364.  The theory is an extension of California Evidence Code section 952, which provides that confidential communications involve those communications between a client and his or her lawyer in confidence by a means which "discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted . . . ."  Cal. Evid. Code § 952; *see also Am. Mut. Liab. Ins. Co. v. Super. Ct.*, 38 Cal.App.3d 579, 593-594 (1974); *Glacier Gen. Assurance Co. v. Super. Ct.*, 95 Cal.App.3d 836 (1979) (each a medical malpractice action in which the court found that counsel represented both the insured and insurer under a  "joint defense" theory as set forth in Cal. Evid. Code § 962); *see also Great Am. Surplus Lines Ins. Co. v. Ace Oil Co.* 120 F.R.D. 533, 537 (E.D. Cal. 1988) (relying on *American Mutual* to find a common interest between an insurer and its managing general agent who independently retained counsel); *Britz Fertilizers, Inc. v. Bayer Corp.,* 2009 WL 604940 (E.D. Cal. 2009) (relying on *American Mutual* and *Glacier* to find a "tripart relationship" among counsel, defendant, and defendant's insurer which retained defendant's counsel).

California courts have characterized the "tripartite relationship" among insured, insurer, and common defense counsel as follows:  "In California, it is settled that absent a conflict of interest, an attorney retained by an insurance company to defend its insured under the insurer's contractual obligation to do so represents and owes a fiduciary duty to both the insurer and insured." *Gafcon, Inc. v. Ponsor & Assocs.*, 98 Cal.App.4th 1388, 1406-07 (2002).  Thus, "until . . . a conflict arises, the insurer has the right to control defense and settlement of the third party action against its insured, and is generally a direct participant in the litigation." *Id.* at 1407. The relationship is based on a shared interest in defending against third-party liability and begins when the insurer acknowledges a duty to defend the insured and provides a defense to the action. *Lectrolarm v. Pelco*, 212 F.R.D. 567, 571 (2002) ("Where an insurer has agreed that it has a duty to defend and to indemnify its insured, they are both clients of the lawyer . . . and the attorney client privilege applies to protect communications between the lawyer and the insurer.").

However, when a conflict arises between the insurer and insured, such as a dispute over coverage, California law requires the insurance company to hire separate counsel for the insured. "A different situation is presented . . . when some or all of the allegations in the complaint do not fall within the scope of coverage under the policy.  In such a case, the standard practice of an insurer is to defend under a reservation of rights where the insurer promises to defend but states it may not indemnify the insured if liability is found.  In this situation, there may be little commonality of interest." *Cumis*, 162 Cal.App.3d at 364 (footnote omitted).  Under such a scenario, "an insurance company must pay for independent counsel for its insured when there are divergent interests of the insured and the insurer brought about by the insurer's reservation of rights to deny coverage under an insurance policy." *Kroll & Tract v. Paris & Paris*, 72 Cal.App.4th 1537, 1542-43 (1999); *N. Ins. Co. of N.Y. v. Allied Mut. Ins. Co.*,  955 F.2d 1353, 1359 (9th Cir. 1992).  As set forth in California Civil Code section 2860, which substantially codifies the *Cumis* decision, the obligation to provide independent counsel to an insured rests on the insurer with the duty to defend the insured, Cal. Civ. Code § 2860(a), and arises upon an

existing or potential conflict of interest, which the statute recognizes may be present "when an insurer reserves its rights on a given issue and the outcome of that coverage issue can be controlled by counsel first retained by the insurer for the defense of the claim," *id.*, § 2860(b).

In the *Cumis* context, unlike the "usual tripartite relationship," the attorney-client privilege insulates from the defending insurer privileged communications between the insured and its counsel. *Cumis* counsel represents the insured, not the insurance company. "The *Cumis* doctrine requires 'complete independence of counsel' . . . , who represents 'solely the insured' . . . ." *Kroll & Tract*, 72 Cal.App.4th at 1543 (internal citations omitted). While counsel for both the insurer and insured are required to "cooperate fully in the exchange of information that is consistent with each counsel's ethical and legal obligation to the insured," and with the insured's "duty to cooperate with the insurer under the terms of the insurance contract," Cal. Civ. Code § 2860(f), these disclosure and cooperation requirements do not require the disclosure of privileged material. Rather, "it shall be the duty of [*Cumis*] counsel and the insured to disclose to the insurer all information concerning the action *except* privileged materials relevant to coverage disputes," and "[a]ny information disclosed by the insured or by independent counsel is not a waiver of the privilege as to any other party." *Id.* § 2860(d) (emphasis added). "*Cumis* counsel represents the insured independently of the insurer." *Assurance Co. of Am. v. Haven*, 32 Cal.App.4th 78, 90 (1995). The need for *Cumis* counsel arises *only because* there is a conflict or potential conflict of interest between the insured and its insurer. *Id.* (citing Cal. Civ. Code, § 2860(a); *Cumis,* 162 Cal.App.3d at 371, n.7).

(I)      Communications Between Crown and St. Paul and
                   Between Stephan and St. Paul

As a threshold matter, the communications between Crown and St. Paul and those between Stephan and St. Paul do not meet the traditional definition of "confidential communication[s] between client and lawyer," protected by California Evidence Code section 954. A "confidential communication between client and lawyer," as defined in section 952, is

"information transmitted between a client and his or her lawyer in the course of that relationship and in confidence . . . ." Cal. Evid. Code § 952. "Lawyer" means "a person authorized, or reasonably believed by the client to be authorized, to practice law in any state or nation," Cal. Evid. Code § 950, and "Client" means "a person who, directly or through an authorized representative, consults a lawyer for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity. . . ," Cal. Evid. Code § 951. There was no lawyer/client relationship between Stephan and St. Paul or between Crown and St. Paul. St. Paul, Crown, and Stephan acknowledge that "Stephan represented *Crown* in the underlying *Coupe* action." Dckt. No. 52 at 18 (emphasis added). Stephan was not retained by St. Paul on behalf of itself or Crown, St. Paul did not pay Stephan to represent itself or Crown, and Stephan did not purport to represent St. Paul's interests. In fact, St. Paul has acknowledged that it was not involved in and did not assist with the defense of Crown, for which Stephan was retained.

Nor was there a traditional lawyer/client relationship between Crown and St. Paul. "[C]ommunications made by an insured to his liability insurance company, concerning an event which may be made the basis of a claim against him covered by the policy, is a privileged communication, as being between attorney and client, if the policy requires the company to defend him through its attorney, and the communication is intended for the information or assistance of the attorney in so defending him." *Scripps Health v. Super. Ct. of San Diego County*, 109 Cal.App.4th 529, 535 (2003) (quoting *Travelers Ins. Comp. v. Super. Ct.*, 143 Cal.App.3d 436, 448-49 (1983)) (internal quotation marks omitted). St. Paul acknowledges that the policy between it and Crown did *not* require St. Paul to defend Crown and that St. Paul was not involved in the investigation or evaluation of the *Coupe* action. Any communications between Crown and/or Stephan and St. Paul were based on Crown's obligation under its policy with St. Paul to disclose certain information to St. Paul, and were *not* based on any effort by St. Paul to participate in Crown's defense or to assist Stephan in that defense. Accordingly, there was no lawyer/client relationship between Crown and St. Paul or between Stephan and St. Paul.

St. Paul, Crown, and Stephan argue, however, that communications among them are protected by the attorney/client privilege because of the tripartite relationship that exists in the insurance context among insurer, insured, and defense counsel.[11]  They acknowledge that the tripartite relationship is typically present when the insurer is defending the insured without reservation (since both the insurer and the insured are considered to be clients of defense counsel), and acknowledge that St. Paul was not defending Crown in the *Coupe* action, but they argue that the privilege should nonetheless be extended to cover their communications because the insurance policy between Crown and St. Paul required Crown to provide information to St. Paul regarding claims that could potentially reach St. Paul's coverage.  They contend that a failure to extend the privilege to those communications "would place an insured in a position of having to choose between violating the terms of the insurance contract and opening its confidential communications to the world" and would reward Continental for placing its own interests ahead of those of its insured, Crown.  Dckt. No. 52 at 16.

The tripartite relationship among insureds, insurers, and defense counsel arises when there is a single, common goal shared by the insurer and insured of minimizing or eliminating liability to a third party.  *Cumis*, 162 Cal.App.3d at 364.  The rationale for extending the attorney-client privilege to cover the communications among all of the parties to the tripartite relationship is that when defense counsel is "retained by an insurance company to defend its insured under the insurer's contractual obligation to do so," the defense counsel owes a fiduciary duty to *both* the insurer and the insured and *both* the insurer and the insured are the defense counsel's clients.  *Gafcon, Inc. v. Ponsor & Assocs.*, 98 Cal.App.4th 1388, 1406-07 (2002); *see*

---

[11]  St. Paul, Crown, and Stephan's main argument, which assumes as a given that there is a lawyer/client relationship between Crown and Stephan, is that the privilege resulting from that relationship is not waived when their communications are shared with St. Paul.  *See* Dckt. No. 51 at 33; Dckt. No. 52 at 18.  That argument is addressed below regarding communications between Crown and Stephan that were shared with St. Paul.  However, before addressing whether the privilege was waived with regard to the communications between Crown and St. Paul and between Stephan and St. Paul, the court must first consider whether the communications are covered by a particular privilege in the first instance.

1  *also Roush v. Seagate Tech.*, LLC  150 Cal.App.4th 210, 223 (2007) ("joint clients are two or

2  more persons who have retained one attorney on a matter of common interest to all of them, such

3  as where the attorney represents both an insurer and its insureds [in a traditional tripartite

4  relationship].  In such a situation, the attorney has two clients whose primary, overlapping and

5  common interest is the speedy and successful resolution of the claim and litigation.").  It is based

6  on the insurer's "right to control defense and settlement of the third party action against its

7  insured, and [the fact that the insured is] generally a direct participant in the litigation."  *Id.* at

8  1407.

9          The tripartite relationship begins when the insurer acknowledges a duty to defend the

10  insured and provides a defense to the action.  *Lectrolarm v. Pelco*, 212 F.R.D. 567, 571 (2002).

11  Here, St. Paul did not retained Stephan to defend Crown, did not pay for Crown's defense, was

12  not involved in investigating or evaluating the *Coupe* action, and never acknowledged any duty

13  to defend or indemnify Crown.  Crown was Stephan's sole client; St. Paul was not a joint client.

14  Although St. Paul shared a general interest with Crown to avoid liability in the *Coupe* action, St.

15  Paul did not participate in or control the defense and did not express any intent to do so.

16  Therefore, it cannot claim that it shared a "joint interest" in the defense or that it shared a

17  "single, common goal" with Crown.  From the very beginning of the *Coupe* action, St. Paul

18  declined to defend Crown.  St. Paul insisted that it did not have an obligation to contribute to or

19  participate in Crown's defense and it refused to participate in settlement negotiations.  It did not

20  create a "claim" file for the *Coupe* action and destroyed some of the quarterly reports it received

21  from Crown and the letters it received from Continental seeking its participation in the

22  mediation.  Any communications between Crown and/or Stephan and St. Paul were based on

23  Crown's obligation under the policy to disclose certain coverage information to St. Paul, and

24  were *not* based on any effort by St. Paul to participate in Crown's defense or to assist Stephan in

25  that defense.  After sitting on the sidelines while Crown defended itself in the *Coupe* action and

26  then while Continental defended Crown, St. Paul cannot now claim that it had a "joint interest"

and a "common goal" in defending Crown, especially since St. Paul acknowledges that it had the

right to investigate and defend Crown in the action at any time but chose not to do so.

Accordingly, St. Paul, Crown, and Stephan cannot now claim that a tripartite attorney client

relationship existed among them, such that communications between St. Paul and Crown,

between St. Paul and Stephan, and between Crown and Stephan but shared with St. Paul, would

be protected by the attorney client privilege.

    As Continental points out, "an insurer defending without a reservation of rights," is the

typical cornerstone of the tripartite relationship.  *See, e.g., Gafcon*, 98 Cal.App.4th at 1406, and

citations therein.  In *Lectrolarm*, this court stated:  "Where an insurer has agreed that it has a

duty to defend and to indemnify its insured, they are both clients of the lawyer.  The lawyer is

retained to defend both in the underlying action and the attorney client privilege applies to

protect communications between the lawyer and the insurer.  However, where, as here, the

insurer defends under a reservation of rights, denying the duty to indemnify on some or all

claims, the attorney represents only the insured on the denied claims."  *Lectrolarm Custom Sys.,

Inc.*, 212 F.R.D. at 571.  Here, not only was St. Paul not defending Crown without a reservation

of rights, it was not defending Crown at all.  It did not share with Crown the "'primary,

overlapping and common interest [of achieving] the speedy and successful resolution of the

claim and litigation.'"  *Id*. (quoting *Am. Mut. Liab. Ins. Co. v. Super. Ct.*, 38 Cal.App.3d 579,

592 (1974)).

    That the privileged relationship relates only to communications between Stephan and his

client, Crown, and not to St. Paul, is supported by *In re Imperial Corp. of America*, 167 F.R.D.

447 (S.D. Cal. 1995) ("*Durkin I*" or "*Durkin*"), *aff'd on other grounds*, *In re Imperial Corp. of

America*, 92 F.3d 1503 (9th Cir. 1996) ("*Durkin II*"), the case primarily relied upon by

Continental.  *Durkin* involved a derivative shareholder action against, *inter alia*, Imperial

Corporation of America ("ICA"), and its directors and officers.  The directors and officers

tendered the claim to their indemnity insurer, American Casualty, which declined to defend the

19

1  directors and officers.  The directors hired their own defense counsel and then entered into a

2  joint defense agreement with some of the officers and with ICA, in which the various defendants

3  agreed to share confidential information to facilitate their defense of the action.  The directors'

4  defense counsel sent two letters to American Casualty regarding the case and plaintiff's

5  settlement demand, and during that time the parties to the original joint defense agreement

6  entered into a joint defense agreement with American Casualty.  During discovery in the

7  underlying action, the directors and officers sought a protective order to maintain the

8  confidentiality of the two letters that were sent to American Casualty.  They argued that a

9  tripartite relationship existed between the directors, the officers, and their indemnity insurer,

10  American Casualty, since they shared a common interest "in the ultimate outcome of the

11  underlying litigation and specifically in opposing the claimants," such that the letters were

12  protected by the attorney-client privilege even though they were sent to American Casualty.

13  *Durkin I*, 167 F.R.D. at 451.

14          The court rejected the argument that a tripartite relationship existed between the

15  directors, the officers, and their liability insurer.  Specifically, the court found that there was no

16  attorney-client relationship between counsel for the directors/officers and American Casualty,

17  noting that the "letters were not written by or to clients of [the attorney] and do not reveal any

18  directors' or officers' communications to [the attorney]"; "[t]he letters were written for the

19  purpose of apprising American Casualty of the status of the case, not for seeking or imparting

20  legal advice"; "American Casualty did not have a duty to defend the directors and officers and

21  did not defend the directors and officers, nor pay their legal expenses"; and "American Casualty

22  and the directors and officers did not share common legal representation; rather, American

23  Casualty had separate representation."  *Id.* at 452-53.  Therefore, the court found that the letters

24  were not protected from disclosure by the attorney-client privilege.  As suggested by

25  Continental, *Durkin* reinforces the conclusion that because St. Paul played no role in Crown's

26  defense, there was no tripartite relationship among St. Paul, Crown, and Stephan.

1    Further undermining St. Paul, Crown, and Stephan's position is *Rockwell Int'l Corp. v.*

2    *Super. Ct.*, 26 Cal.App.4th 1255 (1994).  *Rockwell,* applying California law, expressly rejected

3    the position set forth in *Waste Mgmt. v. Int'l Surplus Lines,* 144 Ill.2d 178, 194 (1991), that an

4    attorney representing an insured acts for the mutual benefit of the insured and the insurer, even

5    when the insurer has "not provided a defense or otherwise participated in the underlying

6    actions"against the insured, and concluded that such a rule was "inconsistent with California

7    statutory law."  26 Cal. App. 4th at 1267.  The *Rockwell* court explained that "[i]n California, the

8    'joint client' or 'common interest' exception applies only where 'two or more clients have

9    retained or consulted a lawyer upon a matter of common interest,' in which event neither may

10   claim the privilege in an action by one against the other. (Evid. Code, §§ 962, 953, subd. (a),

11   954, subd. (a).)."  *Id.*  The *Rockwell* court went on to state that, under California statutory law,

12   the insurer could not take advantage of the "joint client" rule because the attorney representing

13   the insured, even if selected by the insurer, was not "'retained or consulted' by the [insurer]

14   within the meaning of Evidence Code section 962.  To the contrary, the attorneys were retained

15   to represent [the insured] and only [the insured]."  *Id.*[12]

16   ////

---

[12]   The *Rockwell* court further noted:

[I]n *Bituminous Cas. Corp. v. Tonka Corp*. [140 F.R.D. 381, 387 (D. Minn. 1992)], the court criticized *Waste Management's* extension of the common interest exception because the "rationale which supports the 'common interest' exception to the attorney-client privilege simply doesn't apply if the attorney never represented the party seeking the allegedly privileged materials." And as the court put it in *North River Ins. v. Philadelphia Reinsurance* [797 F.Supp. 363, 367 [D.N.J. 1992], ". . . the common interest doctrine is completely unlashed from its moorings in traditional privilege law when it is held broadly to apply in contexts other than when there is dual representation. The Illinois Supreme Court went too far . . . ." (*See also Remington Arms Co. v. Liberty Mut. Ins. Co.* [142 F.R.D. 408, 417-418 (D. Del. 1992)][the common interest doctrine should not apply where the documents at issue were prepared in an atmosphere of uncertainty as to the scope of any identity of interest shared by the insured and its carrier]; *Pittston Co. v. Allianz Ins. Co.* [143 F.R.D.  66, 68-71 (D. N.J. 1992)].

26 Cal.App.4th at 1267.

St. Paul, Crown, and Stephan argue that unlike *Durkin* and the other cases cited by Continental, Crown was never St. Paul's adversary, Crown never demanded insurance benefits from St. Paul, and St. Paul never disputed coverage.  Dckt. No. 52 at 21.  They also point out that litigation between Crown and St. Paul was not imminent and did not ensue.  *Id.*  However, as discussed above, the tripartite relationship applies when the insurer acknowledges a duty to defend the insured and provides a defense to the action.  Although St. Paul, Crown, and Stephan contend that they shared a joint or common interest in favorably resolving Crown's liability in the *Coupe* action, they never actually defended Crown in the action and never purported to do so.

Moreover, regardless of their argument to the contrary, the interests of St. Paul and Crown actually have been adverse in many significant respects.  This is demonstrated by St. Paul's Answer in the present action.  *See, e.g.*, St. Paul's Ninth Affirmative Defense ("Plaintiff's complaint is barred to the extent that Crown failed to cooperate with St. Paul . . . ."); Tenth Affirmative Defense ("Plaintiff's complaint is barred to the extent that Crown failed to perform its obligations under the St. Paul insurance contract . . . ."); Seventeenth Affirmative Defense ("Plaintiff's complaint is barred due to Crown's waiver of any right to recovery under the St. Paul insurance contract."), Dckt. No. 1-11 at 32, 33.  Oral argument on these matters also revealed that Crown has independent concerns which may, if decided adversely, benefit St. Paul to Crown's detriment.[13]

Additionally, California case law regarding the appointment of *Cumis* counsel illustrates why declining to recognize a tripartite relationship among St. Paul, Crown, and Stephan is required here.  In California, when a conflict of interest arises between an insurer and its insured,

_____

[13]  For example, to the extent disclosure of the disputed documents may tend to prove Crown's liability in the underlying accident and/or responsibility for indemnifying Tasq, Crown may be adversely impacted as to its loss history, which may, in turn, result in increased premiums benefitting St. Paul.  Additionally, St. Paul's exposure in this case is reduced by the amount of Crown's SIR ($250,000) (although, at the hearing on this matter, Continental stated that it would pay Crown's SIR).  Finally, any finding or acknowledgment by Crown of liability in the instant action may have an adverse impact on other litigation involving similar factual issues concerning its equipment (other litigation in which St. Paul may or may not be involved).

such as when the insurer agrees to defend upon a reservation of rights, *Cumis* counsel is required to represent the insured.  At that pont, the "joint client" structure underlying the tripartite relationship clearly evaporates.  *See, e.g.*, *First Pacific*, 163 F.R.D. at 580-81 ("as a matter of law," the insured is *Cumis* counsel's "only client," and thus "[c]learly the 'joint client' doctrine . . . does not apply").  In this case, when Continental agreed to defend Crown but reserved its rights, Stephan was appointed as *Cumis* counsel.  At that point, it was abundantly clear that no tripartite relationship could have existed among Continental, Crown, and Stephan.[14]  St. Paul essentially takes the position that because it never had a duty to defend Crown, it never reserved its rights under its policy with Crown, and therefore, there was never a conflict of interest between Crown and St. Paul (such that there remained a tripartite relationship among St. Paul, Crown, and Stephan).  However, while the conflict of interest is explicit between an insured and a defending insurer that reserved its rights, such a conflict is also objectively manifested between an insured and a non-defending insurer that retains its own interests in the outcome of the litigation while sitting on the sidelines.  That St. Paul declared up front it would never defend, whereas Continental ultimately agreed to defend but with a reservation of rights, does not lessen the conflict.  Given that a clear conflict of interest existed between Crown and Continental when Continental agreed to defend Crown but reserved its rights (such that *Cumis* counsel was required), it is counterintuitive to suggest that St. Paul did not have a similar conflict of interest with Crown when it exercised its option to sit on the sidelines.

////

---

[14]  This court's *in camera* review of Crown's quarterly reports demonstrates that Stephan represented Crown in the *Coupe* action both before and after his *Cumis* designation and retention.  It is Continental's further position that even if a tripartite attorney-client relationship initially existed among St. Paul, Crown and Stephan, it necessarily ceased when Continental retained Stephan as Crown's *Cumis* counsel.  Continental contends that thereafter, if any insurer shared a common interest with Crown, it was Continental, not St. Paul, which declined to participate both in Crown's defense and in the settlement of the *Coupe* litigation.  However, as stated herein, the court finds there was never such an attorney-client relationship.  Therefore, the court need not address Continental's argument.

St. Paul, Crown, and Stephan argue that the privilege *should* be extended to cover the communications at issue since the policy between St. Paul and Crown did not require St. Paul to defend Crown but did give St. Paul the right to investigate or defend and did require Crown to provide information to St. Paul about the *Coupe* action.  They argue that a failure to extend the privilege to those communications "would place an insured in a position of having to choose between violating the terms of the insurance contract and opening its confidential communications to the world."  Dckt. No. 52 at 16.  However, St. Paul, Crown, and Stephan overstate the "dilemma" that Crown faced by having an interest in maintaining its attorney-client privilege and in providing the required disclosures to St. Paul.  In the *Cumis* context, California Civil Code section 2860 makes clear that necessary disclosures can still be made to the insurer, without disclosing information covered by the attorney-client privilege between the insured and *Cumis* counsel.  While counsel for both the insurer and insured are required to "cooperate fully in the exchange of information that is consistent with each counsel's ethical and legal obligation to the insured," and with the insured's "duty to cooperate with the insurer under the terms of the insurance contract," Cal. Civ. Code § 2860(f), these disclosure and cooperation requirements do not require the disclosure of privileged material.  *See also Haven,* 32 Cal.App.4th at 90 ("[T]he duties specified in Civil Code section 2860 that *Cumis* counsel owes the insurer are limited to the duties to disclose, inform, consult and cooperate regarding *nonprivileged* information.") (emphasis added).  Rather, "it shall be the duty of [*Cumis*] counsel and the insured to disclose to the insurer all information concerning the action *except* privileged materials relevant to coverage disputes," and "[a]ny information disclosed by the insured or by independent counsel is not a waiver of the privilege as to any other party."  Cal. Civ. Code § 2860(d) (emphasis added).

More importantly, evidentiary privileges are statutorily created in California and must be strictly construed, and the party claiming the privilege has the burden of demonstrating that the communications at issue are covered by that privilege.  *Wells Fargo Bank*, 22 Cal.4th at 208; Cal. Evid. Code § 917(a).  St. Paul, Crown, and Stephan acknowledge that the attorney-client

privilege has never been extended to cover communications among an insured, defense counsel, and an insurer that is not defending its insured without reservation, let alone an insurer that is not defending its insured at all.  This court does not find any justification for creating a new privilege to cover those communications.  *See Lectrolarm Custom Sys., Inc.*, 212 F.R.D. at 571 ("Federal courts have never recognized a blanket privilege regarding insured-insurer communications.") (citing *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. RTC*, 5 F.3d 1508, 1514-15 (D.C. Cir. 1993) and *Durkin v. Shields*, 167 F.R.D. 447, 451 (S.D. Cal.1995)).  Therefore, communications between St. Paul and Crown and between St. Paul and Stephan are not covered by the attorney-client privilege.[15]

                (ii)    <u>Communications Between Crown and Stephan that Were Shared with St. Paul</u>

Several of the communications at issue in this dispute are letters and emails between Crown and Stephan, but that were also addressed or copied to St. Paul.  The parties do not dispute that there is an attorney-client relationship between Stephan and Crown.  They agree that had those communications between Stephan and Crown not been shared with St. Paul, they would be protected by the attorney-client privilege.  The dispute here is over the effect of sharing the communications with St. Paul.

St. Paul, Stephan, and Crown argue that the privilege between Crown and Stephan was not waived when communications between them were shared with St. Paul, because of the tripartite relationship among St. Paul, Crown, and Stephan.  However, as discussed above, there was no protected tripartite relationship among St. Paul, Crown, and Stephan.  St. Paul was not a necessary party to the representation of Crown and did not share in the attorney-client privilege between Crown and Stephan.  Communications between St. Paul and Crown and between St.

---

[15]   Additionally, although St. Paul, Crown, and Stephan argue that Continental's access to the documents should be circumscribed by Continental's conflicts with Crown, Dckt. No. 52 at 22, the party withholding documents on the basis of a privilege has the obligation to establish that privilege.

Paul and Stephan are not covered by the privilege. Although the difference is tenuous (and not clearly delineated by any of the parties), the issue remains whether communications between Crown and Stephan, which would otherwise be covered by the privilege, are not privileged (and/or the privilege was waived) because the communications were shared with St. Paul.

Confidential communications are defined as "information transmitted between a client and his or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, *discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary* for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted . . . ." Cal. Evid. Code § 952 (emphasis added). The elements of client awareness and disclosure to an unnecessary party defeat the privilege here. It is clear from reviewing the communications at issue that when communications between Crown and Stephan were either addressed or copied to St. Paul, the fact that St. Paul was receiving the communication was readily apparent. Thus, there can be no dispute that Crown, as the client, was aware that the information was being disclosed to a third party; i.e. St. Paul. Again, as discussed above, and as is apparent from the communications, St. Paul's "presence" in those communications was *not* to further Crown's interests in a consultation with Stephan, and disclosure of those communications to St. Paul was not "reasonably necessary for the transmission of the information or the accomplishment of the purpose for which [Stephan was] consulted." Therefore, it appears that because the communications were shared with St. Paul, they do not amount to "confidential communications" within the meaning of California Evidence Code section 952 and are not protected by the privilege set forth in Section 954.

St. Paul argues here that the sharing of privileged information between the insured (Crown) and its liability insurer (St. Paul) does not waive the privilege as to that information. St. Paul relies on *Lectrolarm Custom Sys., Inc. v. Pelco Sales, Inc*., 212 F.R.D. 567, 570, a patent action in which the plaintiff sought disclosure of communications between defendant Pelco and

1    its liability insurer, Fireman's Fund, which was funding part of Pelco's *Cumis* defense subject to

2    a reservation of rights.  While recognizing that Fireman's Fund did not have an attorney-client

3    relationship with Pelco's *Cumis* counsel (noting "the inherent tension between the carrier's

4    interests and the interests of the insured"), the court found that the sharing of privileged

5    information between Pelco and Fireman's Fund did not waive the privilege.  First and foremost

6    in the analysis was the finding that the plaintiff's discovery requests were "unreasonable,

7    duplicative, overly broad and propounded for the improper purpose of harassment."

8    Secondarily, the court found that California Civil Code section 2860 protects confidential

9    communications between the insured and insurer, where the insured "was faced with the

10   'decision' to either provide the information to Fireman's Fund or face denial of defense and

11   coverage for failure to cooperate."  212 F.R.D. at 570-71.  That proposition is hardly remarkable

12   and is not the question the court faces here.  Obviously, an insured must provide coverage

13   information to the insurer, and to the extent the *Lectrolarm* analysis might permit a somewhat

14   broader scope of disclosure to the insurer in the face of a threatened loss of coverage, it does not

15   speak to the question of providing information to a non-defending insurance company sitting on

16   the sidelines.  While *Lectrolarm* would permit the disclosure of privileged information from

17   Crown to Continental, as Crown's defending insurer, the present scenario, where the subject

18   information was disclosed by the insured to its non-defending insurer, to the exclusion of its

19   defending insurer, is far different.

20        The *Cumis* statute requires the insured's cooperation with its insurer on questions

21   relevant to coverage.  Thus, one would expect the requisite level of cooperation between Crown

22   and the insurer (and certainly the insurer who provided *Cumis* counsel, Continental) as to

23   coverage issues.  But St. Paul is attempting to rely on the *Lectrolarm* reasoning to require the

24   insured's cooperation beyond coverage issues and to make disclosures pertaining to the litigation

25   itself.  St. Paul adds that even though it chose not to defend Crown "[t]he same considerations

26   apply here," because "Crown is contractually required to share information about claims with St.

27

Paul even though St. Paul has no contractual obligation to defend Crown."  Dckt. No. 51 at 38.
Again, that point is hardly controversial.  Of course the insured must cooperate on issues of
coverage.  The point missed by St. Paul is that *Lectrolarm* rested on a finding of common
interest between the insured and its "partially" defending insurer, *vis-a-vis* a mutually adverse
party, the plaintiff.  So limited, *Lectrolarm* supports a literal construction of the *Cumis* statute
authorizing the disclosure of "any information" "by the insured or by independent counsel," *to a
defending insurer*, without effecting "a waiver of the privilege as to any other party."  212
F.R.D. at 570 (quoting Cal. Civ. Code § 1860(d), without further analysis).  Here, St. Paul was
not Crown's defending insurer.  While there is nothing in the *Cumis* statute to prevent Crown's
disclosure of contractually required, *nonprivileged* information to St. Paul, as well as to
Continental (and hence no basis for creating the "wedge" feared by St. Paul) the sharing of
privileged information under the circumstances presented here waives any privilege that may
have existed.

        For these reasons, the court finds that communications between Crown and Stephan that
were shared with St. Paul are not protected by the attorney-client privilege and must be
disclosed.

                        2.  <u>Work Product Protection</u>

        St. Paul, Stephan, and Crown also contend that the withheld documents are protected
attorney work product under Federal Rule of Civil Procedure 26(b)(3).[16]  Dckt. No. 51 at 37;
Dckt. No. 52 at 22.  Essentially, they repeat their argument that "[a]n order to St. Paul, Crown
and Crown's counsel to disclose the substance of confidential communications would place
Crown in the untenable position of choosing between its obligations under [its insurance policy
with St. Paul] and the possibility that coverage will be denied."  Dckt. No. 51 at 38.

////

_____

        [16] Federal law governs the application of the work product doctrine.  *See* Dckt. No. 51 at
17, 37; *First Pacific,* 163 F.R.D. at 576.

1    Continental counters that communications between Crown and St. Paul are not protected

2    under the attorney work product doctrine.  Dckt. No. 51 at 17-18; Dckt. No. 52 at 32.

3    Continental contends that St. Paul was not a party to the *Coupe* action and did not participate in

4    Crown's defense; therefore, any document prepared by St. Paul, even if prepared by its in-house

5    counsel, could not have been created in anticipation or purpose of the *Coupe* litigation.  *Id.*

6    Additionally, since there was no tripartite relationship between Crown, Stephan, and St. Paul, St.

7    Paul was not a joint client of Stephan and has no right to assert any attorney work product on

8    Stephan's behalf.

9        Rule 26(b)(3) provides that "[o]rdinarily, a party may not discover documents and

10   tangible things that are prepared in anticipation of litigation or for trial by or for another party or

11   its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or

12   agent)."  Fed. R. Civ. P. 26(b)(3).  Some of the documents that St. Paul, Stephan, and Crown

13   have withheld as attorney work product were prepared by St. Paul.  As Continental points out,

14   St. Paul was not a party to the *Coupe* action and by its own admission, did not participate in

15   Crown's defense; therefore, any document prepared by St. Paul, even if prepared by its in-house

16   counsel, could not have been created in anticipation of, or for the purpose of, the *Coupe* action

17   litigation.  Such documents are not, therefore, protected work product.

18       With regard to documents that were prepared by either Crown or Stephan, to which

19   Crown and/or Stephan asserts work product protection, once the document was shared with St.

20   Paul, the work product protection was waived.  "'[T]he voluntary disclosure of attorney work

21   product to a third party substantially increases the possibility of an opposing party obtaining the

22   information . . . defeat[s] the policy underlying the privilege.' "  *Great Am. Assur. Co. v. Liberty*

23   *Surplus Ins. Corp.*,  2009 WL 3052680, 5 (N.D. Cal. 2009) (quoting *Bd. of Trs. of the Leland*

24   *Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 237 F.R.D. 618, 624, n.3  (N.D. Cal. 2006))

25   (internal punctuation omitted); *see also United States v. Bergonzi,* 216 F.R.D. 487, 497-98 (N.D.

26   Cal. 2003) ("Work product protection is waived where disclosure of the otherwise privileged

documents is made to a third party, and that disclosure enables an adversary to gain access to the information. . . .  Once a party has disclosed work product to one adversary, it waives work product protection as to all other adversaries."); *Hartford Fire Ins. Co. v. Garvey*, 109 F.R.D. 323, 328 (N.D. Cal.1985) (disclosure to an adverse party is inherently inconsistent with the adversary system and waives both work product immunity and the attorney-client privilege); *Atari Corp. v. Sega of Am.*, 161 F.R.D. 417, 420 (N.D. Cal. 1994) ("voluntary disclosure inconsistent with the confidential nature of the work product privilege waives the privilege"). As discussed above, St. Paul did not share a protected tripartite relationship with Crown and Stephan, and the interests of St. Paul and Crown have also been adverse in many significant respects.  Therefore, St. Paul amounted to both a third party and a potential adversary, and Crown and Stephan's disclosure of any work product to St. Paul waived any work product protection attached thereto.[17]

---

[17]   St. Paul, Crown, and Stephan rely on *First Pacific Networks, Inc. v. Atlantic Mut. Ins. Co.*, 163 F.R.D. 574 (N.D. Cal. 1995), in support of their argument that disclosure of confidential communications to St. Paul did not waive the privilege that existed between Crown and Stephan.  *First Pacific* held that an insured and/or its *Cumis* counsel may share privileged information with one of two defending insurers, without waiving the privilege, and hence without having to disclose the information to the other insurer.  Although the court in *First Pacific* emphasized that there was no common interest or attorney-client relationship between the insured and its insurers, it found that section 2860(d) authorized "an insured to . . . share some otherwise privileged communications with one carrier but not with another."  163 F.R.D. at 583.  Recognizing that "a carrier has no ability to penetrate privileged communications between insured and its counsel," and that "an insured is under no duty to share any such communications with a carrier that is funding a defense under a reservation of rights," *First Pacific* nonetheless opines that California law would permit an insured to share some privileged communications with one carrier without having to disclose it to another carrier.  *Id.* (citing *Haven*, 32 Cal.App.4th at 86-88; *Rockwell*, 26 Cal.App.4th at 1264, and *Cumis*, 162 Cal.App.3d at 366).  Under that analysis, section 2860(d) is viewed as suggesting that an insured may share some privileged communications with one carrier "without thereby waiving the insured's power to decide whether or not to share those same communications with another carrier."  163 F.R.D. at 584.  Acknowledging that this scenario may be "unfair or unwise as a matter of public policy," the court in *First Pacific* found the language of the statute "unambiguous."  *Id.* at 583.  In that court's view, "it is possible that the drafters and enactors of section 2860 failed to anticipate the situation I face here, [and] the sparse legislative history of section 2860 makes it virtually impossible to identify the range of circumstances contemplated by those legislators."  *Id.*

Whatever the merits of the *First Pacific* construction of section 2860, the instant case is factually distinguishable.  The information at issue here was shared by the insured with its non-defending insurer, not its defending insurer.  More fundamentally, the analysis in *First Pacific*

1    California recognizes a common interest "exception to the general rule that a privilege is

2    waived upon voluntary disclosure of [ ] privileged information to a third party." *OXY Resources*

3    *California, LLC v. Super. Ct.*, 115 Cal.App.4th 874, 887-88 (2004)).   Under that exception,

4    "work product protection 'is not waived except by a disclosure wholly inconsistent with the

5    purpose of the privilege, which is to safeguard the attorney's work product and trial

6    preparation.'" *Id.* at 889.   "Under the common interest doctrine, an attorney can disclose work

7    product to an attorney representing a separate client without waiving the attorney work product

8    privilege if (1) the disclosure relates to a common interest of the attorneys' respective clients; (2)

9    the disclosing attorney has a reasonable expectation that the other attorney will preserve

10   confidentiality; and (3) the disclosure is reasonably necessary for the accomplishment of the

11   purpose for which the disclosing attorney was consulted." *Meza v. H. Muehlstein & Co.*, 176

12   Cal.App.4th 969 (2009).   Here, the common interest exception to work product waiver does not

13   apply because, as discussed above, St. Paul did not defend or intend to defend Crown in the

14   *Coupe* action, and therefore any disclosure of work product to St. Paul was not "reasonably

15   necessary for the accomplishment of the purpose for which the disclosing attorney was

16   consulted," namely, Crown's defense.

17       Accordingly, the court finds that communications and/or documents prepared by St. Paul

18   and those prepared by Crown and/or Stephan that were shared with St. Paul, are not protected

19   work product.[18]

20   ────────────────────

21   stops short of considering the *Cumis* statute as a whole.   It appears to accord little regard to the
     overriding principles associated with the waiver of work product protections, particularly

22   established federal law dictating that the disclosure of work product to an actual or potential
     adversary waives the protection.   Thus, the *First Pacific* construction of section 2860 is of little

23   assistance in addressing the very different circumstance presented here.

24       [18] Had Stephan and Crown not shared the information with St. Paul, it would remain
     protected.   *See, e.g., Clavo v. Zarrabian*, 2003 WL 24272641, at *2 (C.D. Cal. 2003)

25   ("[c]ommunications between in-house and outside counsel are privileged if based on a
     confidential client communication"); *Equity Residential v. Kendall Risk Mgmt., Inc.,* 246 F.R.D.

26   557, 567 (N.D. Ill.2007) ("[c]lient confidences can be shared among multiple attorneys who
     represent the same client").   However, by sending copies to Crown in-house counsel of his e-

3.  <u>Mediation Privilege</u>

St. Paul, Stephan, and Crown contend that Crown's mediation privilege is also applicable to a few of the documents that they have withheld.  Dckt. No. 51 at 38; Dckt. No. 52 at 24.  They argue that California Evidence Code section 1119 is applicable in this diversity action and protects against the production of documents created by Crown and Stephan during the course of the mediation and containing information regarding what was discussed during the mediation.  They contend that "at least one of the communications between Crown and [Stephan] that Continental seeks to discover occurred during the course of or pursuant to a mediation, was a communication that would not have existed but for the mediation, and was made with the expectation by Crown and Mr. Stephan that it would remain confidential and not discoverable." *Id.*

Continental counters that there is no federal mediation privilege and that California's mediation privilege, Cal. Evid. Code § 1119, is only applied in a federal action as a matter of comity because it may be consistent with federal interests.  Dckt. No. 51 at 18; Dckt. No. 52 at 33-34.  Continental also argues that the mediation privilege is not absolute and that it only protects statements and documents within "the course of mediation," meaning statements made amongst the parties and the mediator, as well as documents created for the sole purpose of mediation.  *Id.*  Continental contends that St. Paul was neither a party to the *Coupe* action nor a party to the mediation since it did not participate in the mediation, and cannot claim that it had any interest in the mediation or settlement since it also claims that the action was not even tendered.  *Id.*

Although not recognized as a privilege per se, California statutes protect the confidentiality of mediation negotiations and related oral and written materials.  Cal. Evid. Code

mails to St. Paul, Stephan did not cloak the primary e-mail with protection. *See United States v. ChevronTexaco Corp.*, 241 F. Supp.2d at 1075, n.6 (if an e-mail with otherwise privileged attachments is sent to a third party, the privilege is lost with respect to that e-mail and all of the attached e-mails).

§ 1126 ("Anything said, any admission made, or any writing that is inadmissible, protected from disclosure, and confidential under this chapter before a mediation ends, shall remain inadmissible, protected from disclosure, and confidential to the same extent after the mediation ends."); *Simmons v. Ghaderi*, 44 Cal.4th 570, 583 (2008) ("[T]he mediation confidentiality statutes unqualifiedly bar disclosure of certain communications and writings produced in mediation absent an express statutory exception.").  The purpose of the confidentiality is to protect against the disclosure of oral and written communications made during mediation.  That confidentiality is intended to promote "confidence and trust among participants." *Folb v. Motion Picture Indus. Pension & Health Plans*, 16 F. Supp.2d 1164, 1176 (C.D. Cal. 1998).  Here, however, St. Paul's reliance on the mediation confidentiality is misplaced.  St. Paul did not participate in the mediation and is not part of a tripartite relationship with Crown and Stephan, and cannot therefore claim that information Crown or Stephan shared with St. Paul about what occurred at the mediation is privileged.[19]  Additionally, neither Stephan nor Crown (nor St. Paul, on their behalf) may contend that any communications they had with St. Paul about what occurred in the mediation are covered by the mediation privilege.  By divulging communications made by Continental in the mediation or in settlement negotiations, Crown and/or Stephan violated their duty of confidentiality with Continental, and therefore may not now use the mediation privilege to protect their communications with St. Paul.

    4. <u>Conclusion</u>

    Accordingly, because communications between Stephan and St. Paul regarding the *Coupe* action; between Crown (including individuals in Crown's legal department) and St. Paul regarding the *Coupe* action; and between Stephan and Crown regarding the *Coupe* action that

---

[19]  Even cases construing the phrase "parties to the mediation," as used in California Evidence Code section 1121, to include insurers, limit this application to actual participants in the mediation, whose knowledge of the proceedings is protected *from* disclosure. *See, e.g.*, *Travelers Cas. & Sur. Co. v. Super. Ct.*, 126 Cal.App.4th 1131, 1146, n.18 (2005); *Houck Const., Inc. v. Zurich Specialties London Ltd.*, 2007 WL 1739711, at *2 (C.D. Cal. 2007).

1  were shared with St. Paul, are not protected by the attorney client privilege, the work product

2  doctrine, or the mediation privilege, those documents and all attachments thereto shall be

3  produced to Continental.

4         Stephan argues that the subpoena served on him must be quashed because the documents

5  sought from him can be obtained from Crown, and thus Continental cannot make the required

6  showing of substantial need before seeking discovery from an attorney of record under

7  California law.  Dckt. No. 47 at 10; Dckt. No. 52 at 19.  Essentially, Stephan's argument is that

8  the communications sought from Stephan "are protected by the attorney-client privilege and

9  work product doctrine," and "Continental has not shown that it is unable to obtain the

10  information it seeks in any way other than serving a subpoena on Mr. Stephan.  Indeed, the

11  documents sought from Mr. Stephan by Continental are in Crown's possession."  *Id.*  A review

12  of the documents submitted for *in camera* review reveals that the only documents referenced in

13  Stephan's privilege log that will not be otherwise produced by St. Paul or Crown in accordance

14  with this order are the first document listed in Stephan's privilege log (an email from Stephan to

15  Coles and Crown dated 12/13/06 at 4:33 p.m.) and the sixth document listed therein (an email

16  from Stephan to Coles and Crown dated 3/2/07).  Pursuant to the analysis above, the first

17  document should be produced to Continental.  However, the sixth document is an email from

18  Stephan informing Coles and Crown of his updated contact information and is irrelevant to the

19  claims and defenses in this action.  Therefore, Stephan's motion to quash will be denied only as

20  to the first document in Stephan's privilege log, and will be granted as to the remainder.

21         D.  Communications Between Stephan and Crown

22         As noted above, it is undisputed that there is an attorney-client relationship between

23  Stephan and Crown.  Therefore, communications between them, which were not shared with St.

24  Paul or any other third party, remain privileged.

25         There are two documents identified in Crown's privilege log that fall into this category

26  (which Continental does not address).  The twentieth document identified in the privilege log,

34

1  which is an email from Crown's in-house counsel to Stephan dated December14, 2006 at 2:40

2  a.m., contains a legal opinion relative to settlement negotiations, and was not copied to St. Paul

3  or any other third party.  While Crown does not claim any privilege with respect to the

4  attachments, *see* Dckt. No. 47-2 at 46, the test of twentieth document identified in Crown's

5  privilege log is protected and shall remain confidential.

6        Additionally, the twenty-eighth document identified in the privilege log, which is an

7  email from Stephan to Crown's in-house counsel dated April 20, 2007 at 12:27 p.m., was not

8  copied to St. Paul or any other third party.  Although the email appears to be of little substance, it

9  shall nonetheless remain confidential.  Additionally, because the attachments to that email will

10  be disclosed by St. Paul (entry number seven in St. Paul's privilege log) pursuant to this order,

11  neither document twenty-eight, nor its attachments need to be produced by Crown.

12        Therefore, Crown's motion to quash will be granted only as to those documents, and will

13  be denied as to the remainder, for the reasons addressed above.

14  III.  <u>SANCTIONS</u>

15        A.  <u>Plaintiff's Request for Sanctions Based on Plaintiff's Motion to Compel</u>

16        Continental seeks sanctions, pursuant to Federal Rule of Civil Procedure 37(a)(5)(A), to

17  cover the costs of its motion to compel.  Dckt. No. 48 at 18.  Continental argues that St. Paul

18  withheld responsive documents and delayed in producing a privilege log, causing prejudice to

19  Continental.  *Id.*

20        Federal Rule of Civil Procedure 37(d)(1)(A) provides that a court "may, on motion, order

21  sanctions if: . . . a party, after being properly served with . . . a request for inspection under Rule

22  34, fails to serve its answers, objections, or written response."  Rule 37(d)(3) further provides

23  that "the court *must* require the party failing to act, the attorney advising that party, or both to

24  pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure

25  was substantially justified or other circumstances make an award of expenses unjust."  *See also*

26  Fed. R. Civ. P. 37(a)(5)(A) (providing that if a motion to compel is granted, unless certain

exceptions are present, "the court must, after giving an opportunity to be heard, require the party

or deponent whose conduct necessitated the motion, the party or attorney advising that conduct,

or both to pay the movant's reasonable expenses incurred in making the motion, including

attorney's fees."); Fed. R. Civ. P. 37(a)(5)(C) (providing that if a motion to compel is granted in

part and denied in part, the court "may, after giving reasonable opportunity to be heard,

apportion the reasonable expenses for the motion."

Although the majority of plaintiff's motion to compel is granted, the court declines to

award plaintiff sanctions for the cost of bringing its motion.  Both Continental and St. Paul

acknowledge that these issues presented novel facts and new legal questions on which there has

been little published authority for guidance.  Thus, there was at least "substantial justification"

for defendant's position even though it did not prevail.

     B.  <u>Plaintiff's Motion for Sanctions for Spoliation of Evidence</u>

       1.  <u>Background</u>

Continental also moves for "evidentiary and/or issues sanctions" against St. Paul based

on the latter's failure to create, maintain and preserve a litigation or claim file relative to the

*Coupe* wrongful death action.  Dckt. No. 57-2 at 2; Dckt. No. 57.  The motion was referred to the

undersigned pursuant to 28 U.S.C. § 636(b)(1)(A).  *See* Dckt. No. 61.  The motion was heard on

March 25, 2009.  Jeffrey A. Dollinger appeared on behalf of Continental; Marc J. Derewetzky

appeared on behalf of St. Paul.

Continental contends that St. Paul should have: (1) created a *Coupe* litigation or claim

file commencing upon Crown's notification that the action had been filed (June 2002), and/or

upon Continental requesting St. Paul's participation in mediation (September and October 2006),

and maintained all relevant documents therein; (2) retained the September and October 2006

letters from Continental; and (3) retained all quarterly reports and cover letters from Crown.

Continental argues that the failure to maintain this evidence demonstrates a deliberate effort to

avoid retaining materials adverse to St. Paul.

1     Continental requests an order precluding St. Paul from asserting any defenses that may

2  otherwise have been rebutted by Continental based on such evidence.  This includes precluding

3  St. Paul from asserting any "defenses that would otherwise be weakened by the destroyed

4  evidence." *Id.* at 11.  St. Paul's defenses include those asserted in opposition to Continental's

5  motion for partial summary judgment as to the priority of Crown's insurance policies (St. Paul's

6  policy versus the Tasq/Continental policies), in support of St. Paul's own motion for summary

7  judgment on the ground that Continental's claims are either unripe or barred, and in support of

8  St. Paul's affirmative defenses set forth in its Answer. Continental explains:

9

> The Destroyed Documents would have further advanced
> Continental's ability to rebut St. Paul's MSJ contentions including
> defenses based upon provisions in the St. Paul insurance policy;
> defenses based upon whether any liability was properly
> attributable to Crown; defenses based upon any contention that St.
> Paul's ultimate contribution liability to Continental should be
> reduced or limited in relation to any alleged limitation in liability
> attributable to Crown; that St. Paul's SIR was not satisfied; that the
> conditions of its "no action" clause were met; or that Continental
> has engaged in improper claims handling.

15  Dollinger Decl., Dckt. No. 57-3, at 5, ¶ 19.[20]

16     St. Paul argues that it had no obligation to open a *Coupe* claim file or maintain related

17  documents; that all purportedly missing documents still exist and are the subject of the above

18  pending discovery motions; that allegations of any other missing documents are purely

19  ───────────────

20     [20]  Specifically, Continental seeks an order precluding St. Paul from asserting the
following defenses:

21     (a)    based upon any provision in the St. Paul insurance policy;
       (b)    based upon whether any liability was properly attributable to Crown;
22     (c)    based upon any contention that St. Paul's ultimate contribution liability to
              Continental should be reduced or limited in relation to any alleged limitation in
23            liability attributable to Crown;
       (d)    that St. Paul's SIR was not satisfied;
24     (e)    that the conditions of its "no action" clause were not met; and
       (f)    that Continental has engaged in improper claims handling or has acted with
25            "unclean hands."

26  Continental's Proposed Order, Dckt. No. 57-10 at 2.

1    speculative; and that Continental has failed to meet the standards for obtaining sanctions based

2    on spoliation, including a failure to demonstrate the relevance of the purported documents, or

3    prejudice due to their absence.  Dckt. No. 64.

4              2. Standards

5        Continental contends that St. Paul had an affirmative duty to compile and preserve all

6    potentially relevant evidence, as well as to refrain from destroying such evidence.  "The duty to

7    preserve relevant evidence can arise even before the commencement of litigation, and sanctions

8    may be imposed if Defendants knew or should have known that the evidence destroyed was

9    potentially relevant."  *United States v. Maxxam, Inc.,* 2009 WL 817264, at *7 (N.D. Cal. Mar.

10   27, 2009).  The destruction of evidence need not occur after the specific evidence at issue was

11   requested; rather, "[s]anctions may be imposed against a litigant who is on notice that documents

12   and information in its possession are relevant to litigation, or potential litigation, or are

13   reasonably calculated to lead to the discovery of admissible evidence, and destroys such

14   documents and information."  *Maxxam, Inc.*, 2009 WL 817264, *7 (quoting *Wm. Thomas Co. v.*

15   *General Nutrition Corp., Inc.*, 593 F. Supp. 1443, 1455 (C.D. Cal. 1984)); *see also United States*

16   *v. Kitsap Physicians Serv*., 314 F.3d 995, 1001 (9th Cir. 2002) (a party engages in "willful

17   spoliation" if that party has "some notice that the documents were potentially relevant to the

18   litigation before they were destroyed.").

19       The court has the inherent authority to impose evidentiary sanctions based on destruction

20   or spoliation of evidence.  *Glover v. BIC Corp*., 6 F.3d 1318, 1329 (9th Cir. 1993).  There are

21   three types of evidentiary sanctions that may be imposed for the destruction of evidence: (1) a

22   court can instruct the jury that it may infer that evidence made unavailable by a party was

23   unfavorable to that party; (2) a court can exclude witness testimony based on the spoliated

24   evidence; and (3) the court can dismiss the claim of the party responsible for the spoliation.

25   *Nursing Home Pension Fund v. Oracle Corp.*, 254 F.R.D. 559, 563 (N.D. Cal. 2008).  "In

26   determining whether and what type of sanctions to issue, the Third Circuit has explained that

1  courts should consider three factors: 1) 'the degree of fault of the party who altered or destroyed

2  the evidence,' 2) 'the degree of prejudice suffered by the opposing party,' and 3) 'whether there

3  is a lesser sanction that will avoid substantial unfairness to the opposing party.'" *Id.* (citing

4  *Schmid v. Milwaukee*, 13 F.3d 76, 79 (3d Cir. 1994)).

5      3. Discussion

6      At the heart of this dispute is the question whether St. Paul was required at any time to

7  open a litigation or claim file consistent with California Insurance Code section 790.03(h),[21] and

8  California Code of Regulations, Title 10, Section 2695.3,[22] when it received notification from

9  Crown that the *Coupe* action had been filed (June 2002), or when it received letters from

10  Continental seeking St. Paul's participation in settlement negotiations (in September and October

11  2006).  St. Paul asserts that it was not required to open any file in the *Coupe* action unless and

12  until Crown tendered its defense by paying the $250,000 SIR.[23]  Crown agrees with St. Paul's

13  position, and thus makes no independent assertions that St. Paul has failed to comply with the

14  ─────────────────

15      [21]  California Insurance Code section 790.03(h) defines the following practices as "unfair
    methods of competition and unfair and deceptive acts or practices in the business of insurance":

16  "(h) Knowingly committing or performing with such frequency as to indicate a general business
    practice any of the following unfair claims settlement practices: . . . (2) Failing to acknowledge

17  and act reasonably promptly upon communications with respect to claims arising under
    insurance policies.  (3) Failing to adopt and implement reasonable standards for the prompt

18  investigation and processing of claims arising under insurance policies."

19      [22]  California Code of Regulations, Title 10, Section 2695.3(a), provides in pertinent part
    that "[e]very [insurer] licensee's claim files shall be subject to examination by the Commissioner

20  or by his or her duly appointed designees.  These files shall contain all documents, notes and
    work papers (including copies of all correspondence) which reasonably pertain to each claim in

21  such detail that pertinent events and the dates of the events can be reconstructed and the
    licensee's actions pertaining to the claim can be determined . . . ."  Subsection (b) states that

22  insurers *shall* "(1) maintain claim data that are accessible, legible and retrievable for examination
    [and make the data] available for all open and closed files for the current year and the four

23  preceding years; (2) record in the file the date the licensee received, date(s) the licensee
    processed and date the licensee transmitted or mailed every material and relevant document in

24  the file; and (3) maintain hard copy files or maintain claim files that are accessible, legible and
    capable of duplication to hard copy . . . for the current year and the preceding four years."

25      [23]  Notwithstanding this position, St. Paul's counsel stated at the hearing that St. Paul

26  "purged" its "file" after the *Coupe* case settled and opened a new file when Continental filed the
    instant action against St. Paul.

1    terms of their contract or otherwise failed to deal fairly and in good faith with Crown.

2        The obligation of an insurer to open a litigation or claim file is necessarily triggered,

3    respectively, by a reasonable assessment that potential litigation is likely or by an insured's

4    tendering of a claim.  In the absence of the latter, as here, the relevant question is whether St.

5    Paul should reasonably have concluded that the *Coupe* action would lead to litigation requiring

6    St. Paul's participation.  *See In re Napster, Inc. Copyright Litig.,* 462 F. Supp.2d 1060, 1067

7    (N.D. Cal. 2006); *Wm. Thomas Co.*, 593 F. Supp. at 1455 (authorizing sanctions against a party

8    for destruction of documents that the party knew or reasonably should have known were relevant

9    to actual or potential litigation).  St. Paul asserts that, in the absence of Crown tendering a claim,

10   it did not anticipate litigation because it was the practice of Crown to handle its own defense

11   against potential liability within the SIR limits.  St. Paul argues that Crown's contract with Tasq

12   required Tasq to defend Crown, and that Crown's litigation strategy in the *Coupe* action was

13   reasonably based on the premise that Tasq had breached the substantive provision of its contract

14   with Crown and would therefore bear most if not all of the costs associated with any recovery.

15   As stated by St. Paul in its memorandum in support of its motion for summary judgment:

16              Under the terms of the St. Paul insurance contract, Crown has the
             obligation to defend all claims within the SIR.  In practice, Crown
17           would notify St. Paul of all lawsuits filed against Crown seeking
             damages that might be covered under the St. Paul insurance
18           contract.  St. Paul would rely on Crown's expertise in determining
             which claims might result in liability against Crown that exceeded
19           the SIR.  For such claims, St. Paul would open a claim file,
             conduct an investigation and set reserves as appropriate. []
20           Although Crown would provide St. Paul with quarterly reports
             regarding all claims in litigation, St. Paul would closely monitor
21           only those claims that Crown had tendered because the exposure to
             Crown appeared to exceed $250,000.  Crown did not tender the
22           Underlying Action to St. Paul because Crown did not believe that
             it had liability in that action.

23

24   Dckt. No. 23, at 6-7.

25       The argument that an insurer could reasonably conclude it may have little or no liability

26   in a wrongful death action alleging defects in the machinery it insures is, to say the least,

                                                40

1  problematic.  Yet, the court has been unable to find California authority clarifying *when* an

2  insurer becomes obligated to open a file pursuant to the above-cited provisions, particularly

3  when the subject policy contains an SIR, and when the insured has additional carriers.  Nor have

4  the parties directed the court to any authority other than the express wording of Cal. Code Reg.

5  tit. 10, § 2695.3.  Thus, there does not appear to be any California case authority to support the

6  conclusion that St. Paul was obliged to open a *Coupe* claim or litigation file when it received

7  notification that the underlying action had been filed (June 2002).

8      Continental also contends, however, that St. Paul was obliged to open a file and preserve

9  documents when it received Continental's September and October 2006 letters requesting St.

10  Paul's participation in mediation and informing St. Paul that Continental may pursue a

11  subsequent contribution action against it.  The court finds St. Paul's destruction of Continental's

12  letters both inexplicable and inconsistent with its obligation to maintain documents relevant to

13  potential litigation.  St. Paul argued at the hearing that there has been no prejudice to Continental

14  because it authored the letters and still has access to them.  Continental responded that the

15  location and handling of received documents holds evidentiary value, e.g., indicating what St.

16  Paul knew and when; containing marginal or post-it notes indicating St. Paul's reaction and

17  response to the letters; providing a starting point for depositions.  St. Paul also argued that these

18  or any other documents it failed to preserve were necessarily irrelevant to this litigation, because

19  it "doesn't matter" what St. Paul thought.  However, "because the relevance of destroyed

20  documents cannot be clearly ascertained because the documents no longer exist, a party can

21  hardly assert any presumption of irrelevance as to the destroyed documents."  *Leon v. IDX Sys.*

22  *Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) (citation, punctuation and internal quotation marks

23  omitted).

24      Applying the standards enunciated in *Nursing Home* for assessing the propriety of

25  imposing sanctions under these circumstances, *see* 254 F.R.D. at 563-564, the court finds that:

26  ////

(1) St. Paul's destruction of Continental's 2006 letters was inconsistent with its obligation to preserve evidence that St. Paul knew or should have known were actually or potentially relevant to current or reasonably anticipated litigation ("[t]he court need not find bad faith . . . willfulness of fault can suffice," 254 F.R.D. at 563); (2) the destruction of this evidence is prejudicial to Continental for the reasons it asserts, as referenced above, and buttressed by this court's finding that St. Paul held no litigation privileges during this period warranting the withholding of this evidence; and (3) the destroyed letters, particularly if further written upon, may have been relevant to the claims and defenses in this action that depend on what St. Paul knew and when, proving or disproving that Crown and St. Paul acted in concert to defeat Continental, and the reasoning behind Crown's insistence that the settlement agreement exclude apportionment of liability between Crown and Tasq.  However, as St. Paul argues, the letters that St. Paul discarded are still available to Continental (Continental authored them) and Continental has not established bad faith by St. Paul.  Therefore, these findings warrant no more than an adverse inference as to these issues, i.e. an inference in Continental's favor on factual disputes that depend upon proving or disproving (1) what St. Paul knew and when; and (2) that Crown and St. Paul acted in concert to defeat Continental, including Crown's insistence that the settlement agreement exclude apportionment of liability between Crown and Tasq.  Neither dismissal of a claim or defense, nor the exclusion of witness testimony is warranted by this limited destruction of evidence.  *See Nursing Home*, 254 F.R.D. at 565.

Finally, Continental asserts that St. Paul improperly destroyed the quarterly reports submitted to it by Crown.  As previously concluded by the court, Continental is entitled to obtain those reports from Crown.  The court's *in camera* review of those reports validates St. Paul's representation that the reports are cumulative, and therefore retention of old quarterly reports was unnecessary.  Moreover, pursuant to the rulings above, Continental will receive all of the quarterly reports retained by Crown, and will be able to confirm that representation, as well.

////

1   While Continental will again be deprived of associated evidence, e.g., markings made by St. Paul

2   on the reports, the cumulative nature of the reports supports the position of St. Paul that it needed

3   only to retain the most recent report, warranting the discarding of prior reports.

4       For the foregoing reasons, this court grants Continental's motion for sanctions in limited

5   part and denies the remainder.

6       C.  Defendant's Request for Monetary Sanctions

7       In its opposition to Continental's request for evidentiary sanctions based on St. Paul's

8   alleged spoliation of evidence, St. Paul requests monetary sanctions.  Dckt. No. 64 at 19.  St.

9   Paul contends that "Continental's motion is frivolous and in bad faith because it seeks sanctions

10  for (1) discarding document that still exist and are available; (2) destroying documents that never

11  existed and (3) discarding documents whose relevance Continental has not and cannot establish."

12  *Id.*  St. Paul argues that because "Continental's position is not supported in law or fact," the

13  court should "impose sanctions of $15,699.60 on Continental and its counsel to reimburse St.

14  Paul for the cost of opposing its frivolous motion."  *Id.*

15      Continental counters that the motion for evidentiary sanctions was not only in good faith,

16  but St. Paul "forced Continental to bring it through its recalcitrance in discovery and its repeated

17  and willful destruction of documents."  Dckt. No. 67 at 11.  Although the majority of

18  Continental's motion for evidentiary sanctions is denied, it was not frivolous and was not

19  brought in bad faith.  Therefore, St. Paul's request for monetary sanctions is denied.

20  IV.  CONCLUSION

21      For the foregoing reasons, IT IS HEREBY ORDERED that:

22      1.  Continental's motion to compel production of documents, Dckt. No. 48, is granted;

23      2.  Continental's motion for discovery sanctions, Dckt. No. 48, is denied;

24      3.  St. Paul's motion for protective order, Dckt. No. 49, is denied;

25      4.  St. Paul's motion to quash third-party subpoenas, Dckt. No. 42, is granted in part and

26  denied in part;

5.  The motion of third parties Crown Equipment and George Stephan, to quash subpoenas issued against them, Dckt. No. 47, is granted in part and denied in part; and

6.  The following documents, with attachments, shall be produced to Continental within fourteen days of the filing date of this order:

a.  St. Paul shall produce all documents listed in its privilege log;

b.  George Stephan shall produce the first document listed in his privilege log; and

c.  Crown shall produce all documents listed in its privilege log with the exception of the twentieth document, the twenty-eighth document, and the attachments to the twenty-eighth document (those documents that were not shared with St. Paul or any other third party).

7.  All parties providing further production shall also, within fourteen days of the filing date of this order, provide supplemental responses to Continental's discovery requests, and certify under penalty of perjury that all responsive documents have been produced.

8.  Continental's motion for evidentiary sanctions, Dckt. No. 57, is granted in part and denied in part, and in all future motions and proceedings involving this litigation, an adverse inference will be drawn in Continental's favor on any factual dispute, claim or defense that depends on proving or disproving (1) what St. Paul knew and when; and (2) that Crown and St. Paul acted in concert to defeat Continental, including Crown's insistence that the settlement agreement exclude apportionment of liability between Crown and Tasq; and

9.  Defendant's request for monetary sanctions, Dckt. No. 64, is denied.

Dated:  March 30, 2010.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE