UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

CONTINENTAL CASUALTY
COMPANY,

       Plaintiff,

    v.

ST. PAUL SURPLUS LINES
INSURANCE COMPANY; and DOES 1
through 10, inclusive,

       Defendants.

No. 2:07-cv-01744-MCE-EFB

**MEMORANDUM AND ORDER**

----oo0oo----

This case arises from a wrongful death action in which two different insurers, Continental Casualty Company ("Continental") and St. Paul Surplus Lines Insurance Company ("St. Paul") both provided certain insurance coverage.  St. Paul issued a general liability issue policy with limits of $5,000,000 to Crown Equipment Corporation ("Crown"), the company that manufactured a forklift the decedent was operating at the time he was killed. The accident itself occurred at the premises utilized by Tasq Technology, Inc. ("Tasq").

1

Tasq was an additional named insured under a $1,000,000 general liability insurance policy issued by St. Paul.  Continental also insured Crown as an additional insured under its policy. Finally, Continental provided a $25,000,000 umbrella policy to cover additional liability exceeding the limits of its primary policy.

Through the present action for declaratory relief, Continental seeks judicial determination that the St. Paul policy, as a primary policy, has been exhausted with respect to any liability accruing to Crown before Crown has any additional obligation to provide coverage under its umbrella policy to Crown.  In settling the underlying wrongful death lawsuit, Continental paid the entire $1,000,000 limit of its primary policy along with $2,500,000 of its umbrella policy to settle all claims against both Crown and Tasq.  St. Paul refused to contribute to that settlement despite its $5,000,000 in general liability coverage inuring to Crown's benefit as enumerated above.

Now before the Court are cross motions for summary judgment, filed on behalf of both Continental and St. Paul with respect to the applicable priority of coverage.  The parties have agreed that the question of priority should be decided before any apportionment of negligence is addressed for purposes of assigning any particular monetary liability to either Crown or Tasq, respectively.

As set forth below, this Court determines that the St. Paul policy is primary and must be exhausted as to Crown's liability before coverage under Continental's excess policy is triggered.

1  The Court is unpersuaded by St. Paul's various arguments as to why

2  coverage under its policy should not apply.  Continental's

3  corresponding motion for partial summary judgment will accordingly

4  be granted.  St. Paul's cross motion for summary judgment, or

5  alternatively for partial summary judgment, will be denied.[1]

6

7                              **BACKGROUND**

8

9      Daniel Coupe, an employee of West Coast Conveyer and

10  Equipment, was killed on June 19, 2001 while operating a forklift

11  manufactured by Crown at a Tasq warehouse located in Roseville,

12  California.  The forklift implicated in Mr. Coupe's death was

13  leased by Tasq from Crown Credit Company.  Mr. Coupe's employer

14  had contracted with Tasq to install shelving at Tasq's warehouse.

15  Mr. Coupe died after the Crown stand-up forklift he was using

16  allegedly malfunctioned and pinned Coupe between the forklift and

17  the shelving racks in Tasq's warehouse.

18      Daniel Coupe's survivors filed a wrongful death lawsuit on

19  June 25, 2002 alleging both negligence and products liability

20  claims against Crown and claims sounding in negligence against

21  Tasq.  The master lease agreement pertaining to the forklift at

22  issue, which was entered into between Tasq and Crown Credit

23  Corporation, provided that Crown would not be liable to Tasq for

24  any defect in the forklift for any liability arising out of

25  Tasq's possession, use or operation of the forklift.

26

27          [1] Because oral argument was not be of material assistance,
    the Court ordered this matter submitted on the briefs.  E.D. Cal.
28  Local Rule 230(g).

1   See Lease, Ex. I to Stip. of Facts on Cross-Motions, ¶¶ 4.02-

2   4.03.  The lease also obligated Tasq to maintain comprehensive

3   general liability coverage with a combined $2,000,000 single

4   limit against any bodily injury or property damage arising out

5   of, or in any related to, Tasq's possession, use or operation of

6   the forklift.  Id. at 6.03.  The lease further required that

7   insurance to name Crown as an additional insured.  Id.

8       Consistent with the terms of the lease, Tasq's insurance

9   coverage with Continental exceeded the $2,000,000 (at $3,500,000

10  between the primary and umbrella policies) and further named

11  Crown as an additional insured.  As stated above, Crown also had

12  its own general liability policy through St. Paul.  That policy

13  had a self-insured retention limit of $250,000 which had to be

14  paid on Crown's behalf before any additional coverage under the

15  St. Paul policy accrued.  The St. Paul policy covered liability

16  only and did not provide a defense.

17      In providing primary coverage, the Continental policy

18  provided a per occurrence limit of $1,000,000 with an insuring

19  clause that stated in pertinent part as follows:

20      "We will pay those sums that the insured becomes
        legally obligated to pay, as damages because of 'bodily
21      injury' or 'property damage to which this insurance
        applies.  We will have the right and duty to defend the
22      insured against any 'suit' seeking those damages."

23  Continental General Liability Policy, Ex. B to Stipulation of

24  Facts, p. 82.  The Continental umbrella policy, in turn, agreed

25  to pay on behalf of an insured all sums up to its $25,000,000

26  policy limit that are in excess of either scheduled or

27  unscheduled underlying, or primary, coverage.  The Continental

28  umbrella policy states:

4

SECTION III- LIMITS OF INSURANCE
...

   3. We shall only be liable for the "ultimate net loss" <u>in excess of</u>:

      a. The applicable limits of "scheduled underlying insurance" in item **5** of the Declarations for "incidents" covered by "scheduled underlying insurance", <u>plus</u> the limits of any "unscheduled underlying insurance" which also provides coverage for such "incidents".

Continental Umbrella Policy, Ex. C. to Stipulation of Facts, p. 21 (emphasis added). The policy goes on to define "ultimate net loss" as not including litigation-related costs or expenses. "Scheduled underlying insurance" is the Continental primary policy on which the umbrella coverage rests, and "unscheduled underlying coverage would, on its face, appear to include the St. Paul general liability policy issued to Crown, since the term is defined as meaning "insurance policies available to an insured" (here Crown) whether primary, excess, or otherwise. <u>Id.</u>

  The St. Paul general liability policy, for its part, also agrees to pay "amounts any protected person is legally required to pay as damages for covered bodily injury or property damage that... happens while this agreement is in effect..." St. Paul General Liability Policy, Ex. D to Stipulation of Facts, p. SP 0014-15. With respect to other primary insurance, the St. Paul provides:

///

///

///

///

///

5

1   "When there is other primary insurance, we'll share
    with that insurance the amounts you're legally required
2   to pay as damages.....

3   However, we'll apply this agreement as excess insurance
    over the part or parts of any other insurance which
4   provide:
    ...
5   protection to you as an additional insured or
    additional protected person if you agree that we may
6   apply this agreement as excess insurance."

7   Id. at SP 0035.  Based on the above provision, and given its

8   representation that pursuant to said terms, Crown has agreed that

9   St. Paul's policy is excess to the Continental policies, St. Paul

10  maintains that its policy is indeed excess in the calculus of

11  determining the priority of coverage for the subject loss.

12  Additionally, in part due to the purported status of the St. Paul

13  policy as excess, St. Paul also argues that the lease's indemnity

14  agreement also prevents its coverage from accruing until after

15  both the Continental policies.

16      Once the underlying wrongful death lawsuit was instituted,

17  Continental assumed the defense of its named insured, Tasq.

18  Crown did not seek a defense from its own primary insurer, St.

19  Paul, because the St. Paul policy did not include any defense

20  obligation, but did tender its defense to Continental.  Although

21  Continental initially denied Crown's defense tender, it

22  ultimately defended both Tasq and Crown in the underlying action

23  under a reservation of rights.  It appointed counsel to defend

24  Tasq and funded the separate cost of Crown's separate defense

25  counsel (Tasq and Crown having cross complained against each

26  other, each arguing that the other was legally responsible for

27  Mr. Coupe's death).

28  ///

6

1   After more than four years of litigation, and as trial of

2   the underlying wrongful death case approached, Continental

3   decided to attempt a mediated settlement of the claim.  On

4   September 21, 2006, some three weeks before the scheduled

5   October 10, 2006 mediation, Continental wrote to St. Paul and

6   invited St. Paul to attend the mediation.  Continental further

7   advised St. Paul that it would look to St. Paul for contribution

8   of any expenditures it made to settle the claim against St.

9   Paul's insured, Crown.  St. Paul did not respond either to

10  Continental's September 21, 2006 letter, or to follow-up

11  correspondence to the same effect sent the day before the

12  October 10, 2006 mediation.  Nor did St. Paul participate in the

13  mediation.  While, as stated above, a settlement on behalf of

14  both Crown and Tasq was ultimately reached for the amount of

15  $3,500,000,[2] and although Continental accordingly obtained a full

16  dismissal, with prejudice, on behalf of both entities, St. Paul

17  never contributed anything towards the settlement.  To date, no

18  determination of the relative fault for Daniel Coupe's death as

19  between Tasq and Crown has occurred.

20  ///

21  ///

22  ///

23  ///

24

25       [2] Although St. Paul argues that Continental's settlement was
    made on the eve of a potentially negative state court decision
26  with respect to Tasq's duty to indemnify Crown under the terms of
    the lease, as set forth in more detail below, indemnification
27  under the terms of the lease is a concept distinct from the
    priority of coverage in this case, and the lease terms are not
28  controlling in that regard.

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Under summary judgment practice, the moving party

> "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Rule 56(c)).

Rule 56 also allows a court to grant summary adjudication on part of a claim or defense. See Rule 56(a) ("A party seeking to recover upon a claim...may...move...for a summary judgment in the party's favor upon all or any part thereof."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995); France Stone Co., Inc. v. Charter Township of Monroe, 790 F. Supp. 707, 710 (E.D. Mich. 1992).

The standard that applies to a motion for summary adjudication is the same as that which applies to a motion for summary judgment. See Rule 56(a), 56(c); Mora v. ChemTronics, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

1    If the moving party meets its initial responsibility, the
2 burden then shifts to the opposing party to establish that a
3 genuine issue as to any material fact actually does exist.
4 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
5 585-587 (1986); First Nat'l Bank v. Cities Ser. Co., 391 U.S.
6 253, 288-289 (1968).

7    In attempting to establish the existence of this factual
8 dispute, the opposing party must tender evidence of specific
9 facts in the form of affidavits, and/or admissible discovery
10 material, in support of its contention that the dispute exists.
11 Rule 56(e).  The opposing party must demonstrate that the fact in
12 contention is material, i.e., a fact that might affect the
13 outcome of the suit under the governing law, and that the dispute
14 is genuine, i.e., the evidence is such that a reasonable jury
15 could return a verdict for the nonmoving party.  Anderson v.
16 Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v.
17 Local No. 169, Assoc. of Western Pulp and Paper Workers, 971 F.2d
18 347, 355 (9th Cir. 1987).  Stated another way, "before the
19 evidence is left to the jury, there is a preliminary question for
20 the judge, not whether there is literally no evidence, but
21 whether there is any upon which a jury could properly proceed to
22 find a verdict for the party producing it, upon whom the onus of
23 proof is imposed."  Anderson, 477 U.S. at 251 (quoting
24 Improvement Co. v. Munson, 14 Wall. 442, 448 (1872)).
25 ///
26 ///
27 ///
28 ///

1    As the Supreme Court explained, "[w]hen the moving party has

2    carried its burden under Rule 56(c), its opponent must do more

3    than simply show that there is some metaphysical doubt as to the

4    material facts ... Where the record taken as a whole could not

5    lead a rational trier of fact to find for the nonmoving party,

6    there is no 'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at

7    586-87.  In judging evidence at the summary judgment stage, the

8    court does not make credibility determinations or weigh

9    conflicting evidence.  <u>Anderson</u>, 477 U.S. at 255, <u>see also</u>

10   <u>Matsushita</u>, 475 U.S. 587.


12                            **ANALYSIS**

13   **A.   St. Paul's Primary Policy Insuring Crown Applies Before
          Any Duty On Continental's Part To Indemnify Crown From**
14       **Its Umbrella Policy Is Triggered**


16       Under principles of equitable contribution, an insurer has a

17   separate claim against other insurers who share the same risk for

18   payment of a loss involving their mutual insured.  <u>Fireman's Fund</u>

19   <u>Ins. Co., v. Maryland Cas. Co.</u>, 65 Cal. App. 4th 1279, 1293

20   (1988).  Equitable contribution is intended to equalize the

21   common burden shared by coinsurers and to prevent one insurer

22   from profiting at the expense of others.  <u>Id.</u>

23       Here, the language of the St. Paul policy itself would

24   appear to indicate on its face that the policy was intended to be

25   primary.  A prima facie showing in that regard is made simply by

26   the policy's reference to "<u>other</u> primary insurance".  <u>See</u> St.

27   Paul Policy, Ex. D to Stipulation of Facts, pp. SP 0035 and SP

28   0046. (emphasis added).

                                  10

1   St. Paul would not have used the term "other primary insurance"
2   if it did not view its own policy as primary.  Insurance
3   contracts, like any other contract, must be construed in
4   accordance with their plain meaning pursuant to ordinary rules of
5   contractual interpretation.  See AIU Ins. Co. v. Superior Court,
6   51 Cal. 3d 807, 822 (1990).  "If contractual language is clear
7   and explicit, it governs."  Reliance Nat'l Indem. Co. v. General
8   Star Indem. Co., 72 Cal. App. 4th 1063, 1074 (1999).

9         St. Paul tries to avoid the import of its own
10  characterization of the policy as primary by pointing to a
11  provision that the policy can nonetheless be deemed excess
12  provided its own insured agrees "that we may apply this agreement
13  as excess insurance".  St. Paul Policy, Exh. D to Stipulation of
14  Facts, p. SP 0035.  That attempt fails.  St. Paul's language as
15  cited above amounts to an impermissible "escape clause" that
16  cannot be enforced when broadly used to escape defense and
17  indemnity obligations whenever other insurance exists.  See
18  Century Surety v. United Pacific Ins. Co., 109 Cal. App. 4th
19  1246, 1260 (2003).  Although such clauses may be acceptable when
20  drafted narrowly, if an insurer's coverage grant in fact
21  evaporates in the presence of other insurance, it amounts to the
22  prohibited escape clause.  Because the terms of the St. Paul
23  policy gives St. Paul the power to essentially collude with its
24  own insured in deeming its policy excess, the Court believes the
25  language to be akin to a prohibited escape clause and
26  consequently finds it unenforceable.
27  ///
28  ///

11

Such a potentially unbridled ability to change the policy's very purpose could not have been the intent of the case law in approving narrow exceptions to a policy's characterization as primary.

Nor does the St. Paul policy's use of a self-insured retention alter the primary nature of the policy.  To the extent that Crown is responsible for a self-insured retention before the St. Paul policy is triggered, that retention cannot be considered insurance.  See Montgomery Ward & Co., Inc. v. Imperial Cas & Indem. Co., 81 Cal. App. 4th 356, 370 (2000).  Since the St. Paul policy allows any party (including, in this instance, Continental) to satisfy that responsibility, once the retention amount is satisfied a policy like St. Paul's becomes primary. See California Pacific Homes, Inc. v. Scottsdale Ins. Co., 70 Cal. App. 4th 1187, 1193-94 (1999).

Turning back to contractual interpretation, another seminal guidepost in that regard is to "give effect to the mutual intentions of the parties.." Bank of the West v. Superior Court, 2 Cal. 4th 1254, 1264 (1992); see also Cal. Civ. Code § 1636. This brings us to the question of what the parties to the insurance agreements at issue herein sought to do when the policies were obtained.  As recognized by the court in Reliance Nat'l Indem. Co. v. General Star Indem. Co., 72 Cal. App. 4th 1063, 1080-81 (1999), primary and excess insurer "do not share the same level of coverage."  In JPI Westcoast Constr., L.P. v. RJS & Assoc., Inc., 156 Cal. App. 4th 1448 (2007) ("JPI"), the court articulated the basic differences between the two kinds of coverage, stating as follows:

> "California insurance law recognizes a fundamental distinction between primary and excess coverage: 'Primary coverage is insurance coverage whereby, under the terms of the policy, liability attaches immediately upon the happening of the occurrence that gives rise to liability... 'Excess' or secondary coverage is coverage whereby, under the terms of the policy, liability attaches only after a predetermined amount of primary coverage has been exhausted.... The 'excess' insurance referred to in this definition is that secondary insurance which provides coverage after other identified insurance is no longer on the risk..... In short, excess insurance is insurance that is expressly understood by both the insurer and insured to be secondary to specific underlying coverage which will not begin until after that underlying coverage is exhausted and which does not broaden that underlying coverage."

Id. at 1460 (internal citations omitted).  The JPI opinion goes on to note the difference between how premiums are calculated on the two kinds of coverage.  As the court states, the risks bargained for and purchased are intrinsically distinct:

> "[Primary insurers] calculate[] and accept[] premiums with knowledge that they might be called upon to satisfy a full judgment..... By contrast, an excess insurer does not accept premiums with the full knowledge that it will be called upon to satisfy a full judgment.  The California Supreme Court has noted: 'The policyholder pays for two kinds of liability coverage, each at a different rate.  The premium charged by the primary insurer supports more localized claims adjustment facilities than those of the excess carrier.'"

Id. at 1462-63 (internal citations omitted).  Consequently, a primary carrier must pay its limits before an umbrella carrier becomes obligated to contribute.  Reliance National, 72 Cal. App. 4th at 1083.  Under the so-called rule of "horizontal exclusion", all applicable primary policies must accordingly exhaust "before any excess will have coverage exposure."  Community Redevelopment Agency v. Aetna Cas. & Surety Co., 50 Cal. App. 4th 329, 340 (1996).

13

In sum, then, because the Court finds the St. Paul policy to offer primary coverage to its insured, Crown, any excess coverage available to Crown under the Continental umbrella is not triggered unless and until St. Paul's primary policy is fully depleted for purposes of covering Crown's liability, if any, for Daniel Coupe's death.

### B. The Indemnification Agreement Contained In The Subject Equipment Lease Does Not Alter The Priority Of Coverage

St. Paul also argues that irrespective of the applicable policy provisions, the indemnity provisions of the lease between Crown and Tasq make Tasq, and not Crown, responsible for satisfying any liability for the underlying claim.  St. Paul's argument, however, in the end hinges on its claim, already rejected below, that the St. Paul policy is excess.  The case St. Paul cites in support of its proposition that the indemnity agreement is in fact controlling, Rossmoor Sanitation, Inc. v. Pylon, Inc., 13 Cal. 3d 622 (1975), is distinguishable because it involved a dispute between two primary carriers.  Here, on the other hand, the dispute is between two different layers of coverage: St. Paul's primary policy and the umbrella policy issued by Continental.  The effect of an indemnity agreement in that context was squarely addressed in the JPI decision, which addressed that precise scenario.  In JPI, like this case, the governing contract between the two parties contained an indemnity provision.  JPI, 156 Cal. App. 4th at 1451-52.

///

///

14

In moving for summary judgment, JPI (the beneficiary of the indemnity agreement) relied on Rossmoor in arguing that the indemnity clause controlled the priority of coverage between the two involved carriers. Id. at 1455. The trial court rejected JPI's reliance on Rossmoor, finding that the primary carrier had to pay (despite the indemnity provision) before the excess carrier was obliged to contribute. On appeal, California's First District agreed that Rossmoor did not control, finding "[t]he key distinction between Rossmoor and the case at bar" to be the fact that "Rossmoor involved a dispute between two primary carriers", as opposed to the circumstances before the JPI court which involved a subrogation claim by a secondary or excess carrier against a primary insurer. Id. at 1460. The JPI cited with approval the reasoning employed by the earlier Reliance National decision, which it deemed factually analogous:

> "If we were to accept the arguments of Reliance [the other primary carrier], the basic rules construing primary and excess policies would be altered. A primary insurer would be allowed to charge a higher premium for insuring a greater risk; however, then the primary insurer would be allowed to shift the loss to an excess carrier which charged a lower premium. This is not a case between two primary carriers which have each received premiums for bearing the loss which ultimately occurred; rather, this is an action between an excess and a primary carrier. While the loss at issue must be borne by Reliance [the other primary carrier], it is nothing more than what is bargained for, particularly given the absence of any understanding that an indemnity agreement would exist [between the parties]. Under the circumstances, Rossmoor, a case involving a subrogation and indemnity dispute between two primary carriers and their insured is not controlling in the present case."

///

///

///

Reliance National, 72 Cal. App. 4th at 1082-83, as cited by JPI, 156 Cal. App. 4th at 1463.  Consequently, the JPI case concluded that the umbrella carrier was entitled to full reimbursement from a primary insured for sums paid out on behalf of a mutual insured regardless of the terms of the underlying indemnity agreement between the insureds.  That holding is conclusive with respect to the present matter.  The terms of an indemnity agreement cannot trump general rules governing the application of primary, as opposed to excess, coverage.

### C. The Court Cannot Determine That Continental's Payments To Settle The Underlying Lawsuit Were Voluntary To The Extent They Were Made On Crown's Behalf

In an additional attempt to avoid bearing any potential responsibility under its primary policy for the underlying claim, St. Paul also claims that because Continental had no obligation to pay anything on Crown's behalf to settle the underlying lawsuit, it cannot recover any gratuitous payments it made in that regard from St. Paul.  St. Paul correctly points out that in order to recover from St. Paul, it must first establish that it had an obligation to pay on behalf of Crown and was not acting as a mere "volunteer".  Fireman's Fund Ins. Co. v. Maryland Cas. Co., 65 Cal. App. 4th at 1291-93.  To the extent an insurer indemnified a party not because of any obligation to do so, but instead as a volunteer, it cannot recover from another carrier on a theory of equitable subrogation.

///

///

16

1   <u>Id.</u> at 1292 (to recover on equitable subrogation grounds, the

2   insurer must show it "has paid the claim of its insured to

3   protect its own interest and not as a volunteer").

4        St. Paul points to provisions in the Continental policies

5   which limit the coverage afforded to an additional insured under

6   a written contract or agreement to liability arising out of

7   premises that Tasq, as the named insured, owned, rented, leased

8   or occupied.  <u>See</u> St. Paul's Opp'n to Continental's Mot., pp. 4-5

9   (delineating the applicable provisions of Continental's primary

10  and umbrella policies in this regard).  According to St. Paul,

11  because Continental cannot show that any potential liability of

12  Crown's arose out of the use of the Tasq premises as opposed to

13  the operation, use and/or maintenance of the forklift

14  manufactured by Crown, Crown in fact cannot qualify as an

15  additional insured under the Continental policies.

16       The problem with this contention is that it requires the

17  weighing of factual issues in the context of liability, as

18  opposed to the subject matter of the present motions which bear

19  simply on the priority of coverage.  Consequently said arguments

20  do not preclude summary adjudication in Continental's favor with

21  respect to St. Paul's status as a primary insurer.  Nor can

22  St. Paul establish as a matter of law that under the

23  circumstances of the subject accident the condition of Tasq's

24  premises are implicated.  That is a liability determination

25  predicated on factual findings not amenable to disposition on

26  summary judgment.

27  ///

28  ///

17

**D.    St. Paul's "No Action" Clause Does Not Bar Continental's Claims**

The St. Paul policy contains a so-called "no action" clause which by its terms precludes any action against an insurer on a liability claim unless and until the insured's liability to claimants (here, Mr. Coupe's heirs) has been determined either by final judgment or pursuant to a settlement approved by the insurer. St. Paul's policy provides as follows:

> "No one can sue us on a liability claim until the amount of the protected person's liability has been finally decided either by a trial or by a written agreement signed by the protected person, by us and by the party making this claim. Once liability has been determined by judgment or by written agreement, the party making the claim may be able to recover under this policy, up to the limits of coverage that apply. But that party can't sue us directly or join us in a suit against the protected person until liability has been so determined."

St. Paul Policy, Ex. D to Stipulated Facts, p. SP 009.

As St. Paul also points out, however, the purpose of a "no action" clause it to prevent abuse, collusion and/or fraud against the insurer in the settlement of claims against an insured. See Rose v. Royal Ins. Co., 2 Cal. App. 4th 709, 715 (1991). A "no action" clause operates to preclude an insurer from being bound by the terms of a stipulated judgment or a settlement agreement to which it has not consented. See, e.g., Safeco Ins. Co. v. Superior Court, 71 Cal. App. 4th 782, 787 (1999). According to St. Paul, because all of Continental's claims are derivative of Crown's purported, but unproven, liability to the wrongful death claimants in the underlying lawsuit, the "no action" clause completely bars all of Continental's claims in this action.

18

1    The present matter does not, however, involve any collusive
2    attempt to enforce a stipulated judgment reached behind St.
3    Paul's back against St. Paul.  Nor does it attempt to bind St.
4    Paul to the terms of a settlement agreement to which it did not
5    consent.  To the contrary, the terms of the settlement agreement
6    contained no apportionment of liability vis-a-vis Crown and
7    Tasq.[3]  In addition, St. Paul was invited, twice, to participate
8    in the mediation that resulted in the settlement but chose not to
9    do so.  Finally, it must be noted that the magistrate judge
10   assigned to this case, in ruling upon a motion to compel seeking
11   sanctions against St. Paul for concealing the existence of
12   communications between St. Paul and Crown and/or George Stephan
13   (Crown's counsel in the underlying case) ordered, among other
14   things, that "in all future motions and proceedings involving
15   this litigation, an adverse inference will be drawn in
16   Continental's favor on any factual dispute, claim, or defense
17   that depends on proving or disproving (1) what St. Paul knew and
18   when; and (2) that Crown and St. Paul acted in concert to defeat
19   Continental, including Crown's insistence that the settlement
20   agreement exclude apportionment of liability between Crown and
21   Tasq."  See Continental's Statement of Undisputed Fact No. 34.
22   ///
23   ///
24   ///

25   _____

26        [3] While St. Paul infers that settlement was reached on the
     eve of a state court ruling that appeared to be in its favor,
27   that decision pertained to the terms of the lease between Crown
     and Tasq and did not involve the question now before this Court
28   as to the priority of coverage between the parties' insurers, who
     were obviously not privy to the terms of the subject lease.

That inference in and of itself prevents St. Paul from establishing, as a matter of law on summary judgment, that it was unaware of the settlement reached such that the "no action" clause applies to bar Continental's claims herein.  There is no indication of any fraud or collusion of the type that the "no action" clause was intended to prevent.  To the contrary, it would be illogical to argue that Continental should not have participated in settlement negotiations in the face of St. Paul's refusal to also participate, when failing to do so, and avoiding settling the wrongful death claim on Crown's behalf, would have left Crown exposed to a potential adverse judgment.

**E.   The Doctrine Of "Unclean Hands" Does Not Bar The Instant Lawsuit.**

The doctrine of unclean hands requires that a party "who comes into equity must come with clean hands.... [the doctrine] closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." <u>Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.</u>, 324 U.S. 806, 814 (1945).  As St. Paul points out, under California law unclean hands can operate to completely bar recovery by a culpable party in an equitable proceeding like this one involving issues of relative contribution:

///

///

///

> "[W]henever a party who, as actor, seeks to set
> judicial machinery in motion and obtain some remedy,
> has violated conscience, good faith or other equitable
> principle in his prior conduct, then the doors of the
> court will be shut against him in limine; the court
> will refuse to interfere on his behalf to acknowledge
> his right, or to afford him any remedy."

Lynn v. Duckel, 46 Cal.2d 845, 850 (1956).

Here, St. Paul argues that Continental's "highly questionable" handling of Crown's defense in the underlying action constitutes unclean hands and prevents Continental from invoking equity in maintaining this lawsuit. St. Paul cites two examples. First, it points to the fact that Crown failed to accept a California Code of Civil Procedure § 998 Offer to Compromise in the amount of $975,000 served by plaintiffs in the underlying action on October 3, 2003. St. Paul argues that Continental's refusal to settle the case against Crown within the $1,000,0000 limit of its general liability policy potentially exposed Crown to the risk of a judgment against it in excess of that policy limit. Second, St. Paul argues that a Continental adjuster, Mitchell Roberts, executed a sworn declaration used in opposition to Crown's motion for summary judgment in the underlying action as to the lease indemnity provisions between Tasq and Crown.

///
///
///
///
///
///
///

The Court is unconvinced by either of St. Paul's contentions.[4]  First, since the same $975,000 § 998 Offer to Compromise was directed to both Tasq and to Crown, Continental could not have paid both demands within its primary $1,000,000 policy limit.  Additionally, to the extent that coverage was also available under Continental's umbrella policy, Continental did proactively seek to mediate the case later and was successful in settling the case, even acceding to Crown's request that settlement be made without any apportionment of liability.  Those actions on Continental's part do not smack of bad faith.  Indeed, if anything, St. Paul's refusal to even participate in settlement discussions, along with the magistrate judge's finding which suggests that St. Paul and Crown worked in concert to defeat Continental's interest, appears far more questionable in that regard.

As to St. Paul's second argument, the Declaration of Mitchell Roberts merely explained his role as claims adjuster for Crown and his duties in adjusting bill incurred by Crown for independent counsel and submitted to Continental for payment.[5]

///

///

---

[4] While St. Paul also appears to argue that Continental's settlement may expose Crown to an obligation to pay its $250,000 in self-insured retention under the St. Paul policy (see St. Paul's Mot., 20:2-5), any payments made by Continental on Crown's behalf would operate to satisfy the self insured retention since such retention can be satisfied through payment by any other operative insurance.  See Vons Companies, Inc. v. United States Fire Ins. Co., 78 Cal. App. 4th 52, 63-64 (2000).

[5] St. Paul's Request for Judicial Notice pursuant to Federal Rule of Evidence 201, which includes the Roberts Declaration, is unopposed and is hereby granted.

22

1  That adjustment groundwork was more foundational than substantive

2  and also does not trigger application of the unclean hands

3  doctrine in this matter.

4

5  **F.   Continental's Claims Are Ripe For Adjudication Despite
       St. Paul's Arguments To The Contrary**

6

7  Finally, St. Paul argues that the equitable claims made by

8  Continental through this lawsuit, which include equitable

9  contribution and declaratory relief, are not ripe because

10  Continental has not established that it in fact paid any monies

11  in settlement of claims attributable to Crown's negligence, as

12  opposed to Tasq's.  St. Paul points out that Continental's

13  settlement did not include any apportionment of liability (even

14  though that omission was at Crown's request.  St. Paul

15  accordingly contends that there is no concrete case in

16  controversy, and that pinning any damages on the fault of Crown

17  is no more than speculation.

18  Article III of the United States Constitution does limit the

19  jurisdiction of federal courts to actual cases and controversies,

20  and mere advisory opinions are not permitted.  Rhoades v. Avon

21  Products, Inc., 504 F.3d 1151, 1157 (9th Cir. 2007).  "If a claim

22  is unripe, federal courts lack subject matter jurisdiction and

23  the complaint must be dismissed."  Southern Pac. Transp. Co. v.

24  City of Los Angeles, 922 F.2d 498, 502 (9th Cir. 1990).

25  An insurer that has settled a claim, however, need not

26  secure a judgment that the insured was in fact liable before

27  seeking contribution from another insurer covering the same loss.

28  ///

1  "An insurer's good faith settlement prior to a judicial

2  determination of coverage does not automatically bar equitable

3  apportionment of a loss.  United Pacific Ins. Co. v. Hanover Ins.

4  Co., 217 Cal. App. 3d 925, 935 (1990).  Significantly, too, the

5  right of one insurer to seek equitable contribution against

6  another insurer does not necessarily depend on the comparative

7  negligence of the two carriers' respective insureds.  See  Fire

8  Ins. Exch. v. American States Ins. Co., 39 Cal. App. 4th 653, 663

9  (1995).  To find otherwise would inappropriately encourage

10 insurance companies to affirmatively establish the guilt of its

11 insureds rather than focusing on the settlement of claims and the

12 elimination of any potential for excess liability on the part of

13 said insureds.  Id.

14      St. Paul's contention that this matter is unripe therefore

15 fails to pass muster, particularly since it appears the parties

16 themselves agreed to decide the priority of coverage issues that

17 are the subject of this motion first, before moving on to any

18 determination of liability.  Given the $3,500,00 paid by

19 Continental to settle the underlying wrongful death claims, the

20 fact that St. Paul has a primary policy covering the same loss,

21 and the fact that St. Paul argues that Continental should have

22 settled any claims against Crown for the $975,000 amount of the

23 Offer to Compromise, it defies logic to contend as St. Paul does

24 that there is no actionable controversy.  Despite St. Paul's

25 protestations to the controversy, arguing that Continental seeks

26 nothing more than an advisory opinion under these circumstances

27 appears completely without merit.

28 ///

24

**CONCLUSION**

Based on the foregoing, Continental's Motion for Partial Summary Judgment (ECF No. 101) as to priority of coverage is GRANTED.  St. Paul's policy is primary, and to the extent that Crown is found to be liable for payments made by Continental to settle the underlying wrongful death lawsuit, St. Paul's general liability policy insuring Crown will apply before any excess coverage under Continental's umbrella policy is triggered.  St. Paul's Motion for Summary Judgment, or in the alterative for partial summary judgment, is DENIED.[6]

IT IS SO ORDERED.

Dated: March 21, 2011

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE

---

[6] While the Court recognizes that St. Paul also seeks summary adjudication as to the legal effect of the indemnity agreement between Crown and Tasq, and asks the Court to find that under the terms of the lease Tasq is in fact required to indemnify Crown for any all damages it incurs, that request goes beyond the scope of the present action, which seeks adjudication as to the priority of coverage and equitable contribution between the insurers, only.  The parties to the lease agreement at issue, Crown and Tasq, are not even parties to this litigation.

The Court further notes that St. Paul has filed extensive objections to certain of the evidence submitted by Continental in support of its motion.  Since the Court has not relied on that evidence in ruling on this matter, it need not rule on those objections and specifically declines to do so.