UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

CONTINENTAL CASUALTY
COMPANY,

            Plaintiffs,

      v.

ST. PAUL SURPLUS LINES
INSURANCE COMPANY; DOES 1
through 10, inclusive,

            Defendants.

No.  2:07-cv-01744-TLN-EFB

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

## BACKGROUND

This is an insurance action between Plaintiff Continental Casualty Company ("Continental") and Defendant St. Paul Surplus Lines Insurance Company ("St. Paul"). Continental and St. Paul both provided certain insurance coverage to the defendants in a wrongful death action, Crown Equipment Corporation ("Crown") and Tasq Technology, Inc. ("Tasq"). The wrongful death action was brought by the heirs of a deceased forklift operator.  Crown was the company that manufactured a forklift the decedent was operating at the time he sustained injuries that he later died from.  The accident itself occurred at the premises utilized by Tasq.

Continental issued a general liability insurance policy with a per occurrence limit of

1   $1,000,000 that applied to Tasq.  This policy ostensibly covered Crown as an additional insured.

2   Continental also provided a $25,000,000 umbrella policy to cover additional liability exceeding

3   the limits of its primary policy.  St. Paul issued a general liability policy with limits of $5,000,000

4   to Crown.

5        In settling the underlying wrongful death lawsuit, Continental paid the entire $1,000,000

6   limit of its primary policy along with $2,500,000 of its umbrella policy to settle all claims against

7   both Crown and Tasq.  St. Paul refused to contribute to that settlement despite its $5,000,000 in

8   general liability coverage inuring to Crown's benefit.  Continental then filed this action for

9   declaratory relief, equitable contribution, subrogation, and indemnity.

10       The Court held a six-day bench trial from September 30, 2013, to October 9, 2013.

11  Considering the evidence presented therein, the evidence submitted through stipulation, and the

12  parties' written submissions thereafter, the Court enters the following findings of fact and

13  conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

**FINDINGS OF FACT**

14

15  **A.    THE PARTIES**

16       1.    Plaintiff Continental Casualty Company ("Continental") is an insurance company,

17  which is affiliated with CNA Financial ("CNA").  (Reporter's Transcript ("RT"), 29:18-21).

18       2.    St. Paul Surplus Lines Insurance Company ("St. Paul") is an insurance company

19  located in St. Paul, Minnesota.  (Trial Exhibit ("Exh.") 62-001).

20  **B.    DANIEL COUPÉ DIED FROM INJURIES INCURRED IN A FORKLIFT**

21       **ACCIDENT**

22       3.    On June 29, 2001, Daniel Coupé died after suffering fatal injuries while operating

23  the subject forklift.

24       4.    At the time of his death, Mr. Coupé was an employee of West Coast Conveyor and

25  Equipment ("West Coast Conveyor") working at a warehouse owned by Tasq.

26       5.    Tasq supplied West Coast Conveyor with a stand-up RC3020 series forklift

27  ("Forklift").  The Forklift had been leased by Tasq from Crown Credit on October 5, 2000,

28  pursuant to a Master Lease.

6.      While operating the Forklift, Mr. Coupé was injured when he backed the Forklift into a shelving unit, pinning himself between the Forklift and the shelving.

7.      Mr. Coupé was taken by ambulance from the Tasq warehouse to the hospital for treatment; however, he died in surgery.

8.      He was 42 years old at the time of his death.  He was survived by his wife and two children.

9.      Dan Coupé had years of experience operating forklifts at the time of the accident. (Roland Depo. 22:5-23, 26:22-28:23, 62:9-20; Smith Depo. 51:15-54:6; Lindsley Depo. 207:11-25, 210:13-16, 211:2-20, 256:10-22.)

10.      Mr. Coupé was not certified to operate the Forklift.  (Smith Depo. 118:25-119:3; Lindsley Depo. 160:1-15; 168:12-169:12; 215:11-14; RT 789:12-23).

11.      Mr. Coupé's forklift experience was primarily with sit down forklifts, which operate somewhat like a car, and stand up forklifts where the operator faces the forks.  (Smith Depo. 51:15-21; RT 837:20-838:13; 840:4-13).

12.      According to eyewitness accounts of the accident, Mr. Coupé was not standing in the side-stance position on the Forklift but instead, Mr. Coupé was facing the forks.  (Stewart Depo. 27:17-24, 32:22-33:6; 34:2-3; James Depo. 75:6-13).

**C.      THE ACCIDENT INVESTIGATION**

13.      The California Division of Occupational Safety and Health (OSHA) investigated the Coupé accident.

14.      OSHA summarized the following: "As [Coupé] approached the storage rack witnesses said he all of a sudden increased his speed, running into the storage rack.  The lower cross beam of the storage rack was at the same height as the forklifts stand-up compartment, and as he accelerated back he was crushed against the top of the compartment and the control lever.  I speculate that when he observed the storage rack, he moved the joystick type control lever in the wrong direction, accelerating backwards instead of reversing direction and moving forward.  The forklift controls are designed to be used for braking (or moving the opposite direction) by pushing the control lever in the opposite direction.  Mr. Coupé was well experienced in the operation of

1  forklifts and had been using them for more than 20 years, but he had not been certified." (Exh.
2  17-027.)

3       15.    OSHA issued citations to West Coast Conveyor as follows: "During the
4  investigation of fatal accident, it was found that the employee had not gone through the training
5  and be certified for operating forklifts as specified with this section (this is not an accident related
6  violation)." (Exh. 17-007, 17-027).

7       16.    On May 8, 2002, counsel for the Coupé plaintiffs and counsel for Continental
8  attended an inspection of the Forklift at the Washington Warehouse. The inspection did not
9  disclose any malfunction. (Exh. 64).

10      17.    The specific angle at which the Forklift hit the racking and at which the racking
11 intruded into the operator compartment is unknown. (RT 795:17-19; 795:23-796:3; 847:5-10).

12 **D.    THE CROWN RC3020 FORKLIFT**

13      18.    Crown is a company located in New Bremen, Ohio, which manufactures industrial
14 lift trucks. (RT 398:17-25; Dunlap Depo. 8:9-9:25).

15      19.    Crown Lift Trucks is a dba of Crown, which distributes Crown products. (Final
16 Pretrial Order, III. Undisputed Factual Issues, No. 7; Exh. Y(18)-2.

17      20.    The RC3020 series forklift is designed to be operated standing up with the
18 operator's body positioned perpendicular to the forks (side-stance) with the controls in front of
19 the operator. (Exh. O(10)-171; Dunlap Depo. 516:2-21).

20      21.    There are two ways to stop the RC3020 forklift. One way is for the operator to lift
21 his or her foot off of the brake, which stops the electrical power to the motor. (Exh. K(23)-11).
22 The operator must press down on the brake to activate the electrical motor on the RC3020 forklift
23 and travel. (Exh. K(23)-10; Depo. Dunlap, vol. III, 516:2-21). When the operator lifts his or her
24 foot off of the brake, power is cut off to the forklift and it will stop.

25      22.    A second method of stopping the RC3020 forklift is "plugging," which uses the
26 electric motor to stop the forklift and is accomplished by pushing the multi-function handle in the
27 direction opposite the direction of travel. (Exh. K(23)-11).

28      23.    The subject RC3020 forklift was delivered in October 2000. (McPhail Depo.

24:19-25:5, 102:15-23; Williams Depo. 34:14-23; Exh. 16-003; Exh. L(23)).

24.     The Forklift was delivered to Tasq with an operator's manual.  (RT, 538:23-539:9; 544:22-25; Exh. L(23); Depo. Williams, 83:1-9).

25.     The operator's manual delivered to Tasq with the Forklift states:

> It's the law, you must be trained and certified to operate this truck. (OSHA § 1910.178, Rev. 1999) [p. 1 of the Manual].

> You can be trapped or crushed by driving the operator area under racks or other objects.  Look where you are going.  [p. 1]).

> Keep your truck under control at all times.  Drive at a speed that allows you to stop safely [p. 3].

> You drive your truck by standing sideways and leaning back against the pad.  This, along with your hands on the controls and feet on the pedals, gives you both comfort and stability.  Plus you can see and travel in either direction by turning your head [p. 7].

> This style truck can be built with one of two different types of steering.  Your company has selected the type which is best for your work area.  Caution: If you ever drive a different truck, even one that looks just like yours, be careful.  The steering may be different [p. 21].

> Do not use this truck unless you are trained and certified [p. 31].

> Be certain you understand how your truck works and the hazards that go with it.  Don't drive the truck if you have any doubts [p. 31].

(Exh. K(23)).

26.     The Forklift also came with a Stand-Up Rider Safety Video.  (Exh. D(23); Exh. K(23); RT 539:18-540:15; 545:5-17; Exh. L(23).)

27.     A decal also reminded the operator of the OSHA requirement that before operating the RC3020 lift, one must be trained and certified in the operation of the RC3020 lift.  (Exh. 64 at 1:30-1:33, Video of May 8, 2002 inspection of forklift; Exh. K(23)-2, Crown RC3000 Operator's Manual; RT 788:10-789:11.)

28.     The warning decals on the Crown forklifts did not advise owners or operators they could avoid the risk of rack underride by installing a third corner post or changing the racking configuration. (Exh. 64 (Video of Crown forklift inspection on 5/8/02); Exh. 68-006 to 68:013; RT 826:16-827:11.)

29.     The RC3020 series forklift had two posts located on the fork side of the operator's compartment, which supported an overhead guard.  (Exh. K(23)-6).)

30.      The particular RC3020 forklift used in the Coupé accident did not have any other vertical posts around the operator compartment.

E.     **CROWN'S ENGINEERING DESIGN ANALYSIS OF ADDITIONAL CORNER POSTS**

31.     Beginning in about 1985 Crown analyzed, among other things, accident reports, dating back to the late 1970s.  These reports included reports of under ride accidents[1] with the RC3020 forklift.  (Exh. 22 (Horizontal Intrusion Type Study Summary 6/21/96 and RC and RR Accident Summary); Dunlap Depo. 118:3-12; 149:4-22; RT 743:4- 744:11).)

32.     Crown investigated possible design changes which might serve to protect an operator from under ride accidents.  Crown considered the possible additions of third and fourth vertical posts around the operator compartment of the RC3020.  (Exh. O-(10)-170 to O(10)-176; RT 745:7-746:4; 746:25-748:21; 750:6-751:4; Dunlap Depo. 131:13-132:7; 149:4-22.)

33.     A third post would have been located to the front and left of the operator.  A fourth post would have been located to the rear and left of the operator.  (Exh. 20-003; Exh. O(10)-170; Dunlap Depo. 63:19-64:10; 101:24-102:9; 314:16-25.)

34.     **Third Post:**  With respect to the third post, based on its risk-benefit analysis, Crown concluded the third post on RC3020 forklifts offered some level of protection against under ride accidents.  (Exh. O(10)-172 to O(10)-174; Dunlap Depo. 164:2-3; 164:20-165:1; 166:13-22; 169:13-170:19; 519:22-520:22; 522:15-529:23; 530:7-532:4; RT 763:3-23).

35.     Crown decided not to incorporate a third post into every RC3020 forklift but did offer the third post as an option.  (Exh. O(10)-172 to O(10)-174; Dunlap Depo. 164:2-3; 164:20-165:1; 166:13-22; 169:13-170:19; 312:8-314:2; 317:4-15: 326:18-328:12; 328:13-330:6; 330:13-331:6; 331:17-332:5; 519:22-520:22; 522:15-529:23; 530:7-532:4; RT 763:24- 769:7.)

---

[1] In a warehouse setting, an under ride accident refers to an incident when a forklift is backed into racking that is higher than the lift body, thereby allowing the racking to intrude into the operator compartment. (Depo. Dunlap, vol. I, 224:18-225:25).

36. **Fourth Post:** Crown determined that the risk of injury introduced by a fourth post exceeds the marginal additional protection that a fourth post would offer from under ride accidents. These risks included the fact that a fourth post: 1) limited operator visibility; 2) permitted situations which created crush points, which would allow the operator's head of other parts of the anatomy to be crushed; 3) created pinch points involving hands and elbows; and 4) caused operators to utilize the fourth post in a way which would facilitate a lack of vigilance on the part of the operator. (Exh. O(10)-174 to O(10)-176; Dunlap Depo. 67:9-22; 245:17-23; 521:3-14; 521:23-522:7; RT 749:21-754:15; 755:4-758:5.)

37. Crown decided not to incorporate a fourth post as standard or optional equipment on its RC3020 forklifts. (Exh. O(10)-174 to O(10)-176; Dunlap Depo. 67:9-22; 245:17-23; 521:3-14; 521:23-522:7; RT 758:10-760:9).

38. Through its engineering design process, Crown developed a backrest extension that offers operator protection from horizontal intrusion at the fourth corner location. (Dunlap Depo. 159:15-21; 171:20-172:12; 193:17-196:12; 197:20-199:2; 314:16-316:4; RT 761:5-763:2).

39. **Product Evolutions:** In July 1999, Crown published its Product Evolutions, Product Reference 1.15, in which it provided information to users of its forklifts concerning suggested rack heights, means of avoiding under ride accidents, the availability of a third post, and the reasons why a fourth post would not be offered. Thousands of copies of this document were printed and distributed to users. (Exh. 20 Product Evolutions, Product Reference 1.15; RT 770:18-771:21; 773:6-10; 773:18-774:2; Dunlap Depo. 286:24-289:14; 312;8-314:2; 321:8-15.)

40. There is no evidence that Tasq, West Coast Conveyor or Mr. Coupé received this document.

F. **TASQ AND WEST COAST CONVEYOR**

41. Tasq is a company that sells and distributes point of sale terminals. (Crist Depo. 16:25-18:6.)

42. Tasq operates two warehouses, one in Rocklin, California, and another in Roseville, California.

43. Tasq had previously hired Crown for the installation of racks for its warehouse

1    located in Rocklin, California.  At that time, Crown had, in turn, hired West Coast Conveyor as a

2    subcontractor to install the racking at that location.  (Lindsley Depo. 244:18-245:8).

3           44.     Prior to the project at the Washington Warehouse, in June of 2001, Tasq had hired

4    West Coast Conveyor to work on several other projects involving configuration and installation

5    of warehouse pallet racks.  (McPhail Depo. 226:17-230:19; Lindsley Depo. 77:21-78:8.)

6           45.     Tasq directly hired West Coast Conveyor to perform the initial installation of the

7    conveyor system and metal pallet racks at the Washington Warehouse.  (McPhail Depo. 87:2-10.)

8           46.     Tasq's regular forklift operators received forklift training and certification.  (Foster

9    Depo. 36:22-37:11; 37:20-38:4; 39:25-40:7; Williams Depo. 41:18-42:18; 43:15-44:1; 86:9-19).

10   **G.      THE INSURANCE POLICIES**

11          47.     **The Continental Primary Policy:**  Continental insured Tasq as a Named Insured

12   under a Commercial General Liability policy GL 138201604 from March 31, 2001 to 2002 (the

13   "Continental Primary Policy").  (RT 45:11-19; Exh. 60-001, 60-005.)

14          48.     The Continental Primary Policy had a $1 million "per occurrence" limit of

15   liability.  (RT 45:20-23; Exh. 60.)

16          49.     The Continental Primary Policy contained a "Blanket Additional Insured

17   Endorsement," which provided, in relevant part, as follows:

18               WHO IS AN INSURED (Section II) is amended to include as an
19               insured any person or organization (called additional insured)
                 whom you are required to add as an additional insured on this
20               policy under: 1. A written contract or agreement; . . . The insurance
                 provided to the additional insured is limited as follows:

21               1. That person is only an additional insured with respect to liability
22               arising out of

23               a. Premises you own, rent, lease, or occupy or b. "Your work" for
                 that additional insured by or for you.

24               2. The limits of insurance applicable to the additional insured are
25               those specified in the written contract or agreement or in the
                 Declarations for this policy whichever are less. These limits of
26               insurance are inclusive of and not in addition to the limits of
                 insurance shown in the Declarations. . . .

27               Any coverage provided hereunder shall be excess over any other
                 valid and collectible insurance available to the additional insured
28               whether primary, excess, contingent or any other basis unless a

                                                      8

contract specifically requires that this insurance be primary or you request that it apply on a primary basis.

(Exh. 60-033 (emphasis added).)

50.     The relevant insuring agreement of the Continental Primary Policy states that Continental will

> pay all sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies.  We will have the right and duty to defend the insured against any 'suit' seeking those damages.  However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply.  We may, at our discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result.
>
> But:
> (1) The amount we will pay for damages is limited as described in Section     III     –     Limits     of     Insurance;     and (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements    .              .              .              .              .              .
> No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments . . ."

(Exh. 60-034.)

51.     **The Continental Umbrella Policy:**  Continental also insured Tasq under a Commercial Umbrella Policy, policy No. CUP 247893359 for the period from March 31, 2001 to March 31, 2002, (the "Continental Umbrella Policy").  (RT 48:21-49:15; Exh. 61.)

52.     The Continental Umbrella Policy had a $25 million "per occurrence" limit of liability.  (Exh. 61-002.)

53.     The Continental Umbrella Policy stated that each of the following was also an insured:

> c. A person or organization for which you are required, by virtue of a written contract entered into prior to an 'incident', [sic] to provide the insurance that is afforded by this policy. This insurance applies only with respect to operations by you or on your behalf or to facilities you own or use, but only to the extent of the limits of liability required by such contract, not to exceed the limits of liability in this policy. . . .
>
> e. Any other persons or organizations included as an insured under the provisions of the 'scheduled underlying insurance' in item 5. of the Declarations and then only for the same coverage, except for

> limits of liability afforded under such 'scheduled underlying insurance.'

(Exh. 61-020.)

54.     The scheduled underlying insurance in the Declarations of the Continental Umbrella Policy was the Continental Primary Policy.  (Exh. 61-002.)

55.     The Continental Umbrella Policy stated that "In the case of any payments by us under the coverages of this policy, we shall be subrogated to all rights of recovery against any other party which you may have and will cooperate with you and all other interests.  (Exh. 61-024.)

56.     **St. Paul Insurance Policy:**  St. Paul insured Crown Equipment Corporation ("Crown") under general liability policy no. LC05526260 for the period October 1, 1999 to October 1, 2002 (the "St. Paul Policy").  (RT 401:19-402: 3; Exh. F.)

57.     The St. Paul Policy had a limit of liability of $5 million "per event," with a $250,000 per event self-insured retention ("SIR") for product liability claims.  (RT 405: 18-406:1; Exh. F-3, F-42.)

58.     The St. Paul Policy provided that St. Paul had "no duty to defend any claim or suit or perform other acts or services under this agreement, even if the amount of damages exceeds the self-insured retention that applies." (RT 403:17-25; Exh. F-43.)

59.     The St. Paul Policy included the following language: "We'll consider any voluntary payment of, or assumption of any obligation to pay, damages for covered injury or damage above a self-insured retention without our consent to be your responsibility."  (RT 408:21-409: 3; Exh. F-45.)

60.     The St. Paul Policy required Crown, when carrying out its responsibilities for settlement under the policy, to use due diligence and prudence to settle all such claims and suits which, in the exercise of sound judgment, should be settled.  (Exh. F-43.)

61.     The St. Paul Policy included the following language, as amended by the Self Insured Retention endorsement:

> If there is any other valid and collectible insurance for injury or damage covered by this agreement, other than insurance

10

specifically purchased to be excess over this agreement, the  Other primary insurance section applies.

*Other insurance* means insurance, or the funding of losses, that's provided by or through:

- another insurance company;

- a risk retention group;

- a self-insurance method or program, other than any funded by you and over which this agreement applies; or

- any similar risk transfer or risk management method.

**Other primary insurance.** When there is other primary insurance, we'll share with that insurance the amounts you're legally required to pay as damages for injury or damage covered by this agreement. We'll do so with one of the methods of sharing described in the Methods of sharing section.

However, we'll apply this agreement as excess insurance over the part or parts of any other insurance which provide: . . . protection for you as an additional insured or additional protected person if you agree that we may apply this agreement as excess insurance.

**Excess insurance**. When this agreement is excess insurance over any other insurance, we'll pay only the amount of damages that's in excess of :

- the total amount that all such other insurance would pay if this agreement didn't exist; and

- the total of all deductible and self-insured amounts under all such other insurance.

(Exh. F-35; F-46.)

## H.     THE FORKLIFT LEASE

62.     On October 5, 2000, Crown Credit Company ("Crown Credit") and Tasq entered into a master lease agreement ("Lease") under which Tasq leased a Crown RC-3020-30 forklift ("Forklift") with a manufacturing date of August 22, 2000.  (Exh. 16.)

63.     **Compliance with Laws:**  Paragraph 5.01 of the Lease provided that "[Tasq] agrees to comply with all applicable federal, state, or local laws, regulations, or orders affecting the possession or use of any Unit by Lessee; to operate each Unit within its rated capacity and in accordance with any instructions provided by Lessor or the manufacturer of the Unit; to restrict

operation of each Unit to safe, careful, competent and trained personnel selected and controlled by [Tasq]." (Exh. 16-001.)

64.   **Securing Additional Insurance:** Paragraph 6.02 of the lease between Crown Credit Company and Tasq provided in relevant part as follows:

> Lessee shall, at its cost, provide all risk insurance for each Unit in an amount at least equal to the replacement cost thereof and maintain with respect to each Unit (and any temporary Units furnished by Lessor adequate comprehensive general liability insurance (minimum limits: $2,000,000.00 combined single limit) against any bodily injury and property damage arising out of or in any manner related to Lessee's possession, use or operation of the Unit.   All such insurance shall name Lessor and Crown as additional insureds, shall contain an endorsement providing that such insurance shall be primary insurance and shall provide that Lessor shall receive thirty days prior notice of cancellation, nonrenewal advance of any retrospective data or aggregate erosion. Lessee shall furnish to Lessor on or before the date of delivery of the Unit to Lessee, certificates evidencing such insurance. Lessee shall be liable for any amounts which are within the deductibles or which exceed the limits of the above described insurance.

(Exh. 16-001.)

## I.   THE COUPÉ LAWSUIT

65.   On June 25, 2002, Coupé's surviving wife and two daughters filed an action in Yolo County Superior Court against Crown Lift and Tasq.[2]   The operative complaint in that action alleged four causes of action sounding in negligence and strict liability against Tasq and Crown Lift.  (Exh. 1.)

66.   The Coupé plaintiffs sought the following relief: loss of consortium, non-economic damages, prejudgment interest, funeral and burial expenses, loss of economic support, costs of the suit and further unspecified relief, totaling no less than $7,760,000.  (Exh. 1, Statement of Damages.)

67.   The Coupé plaintiffs were represented by a Sacramento law firm that was well regarded in the community for its ability to pursue, fund, and bring to trial personal injury and product defect cases.

68.   Tasq filed a cross-complaint against Crown Lift seeking indemnification and

---

[2] The Coupé Plaintiffs also named

contribution for the liability alleged by the Coupé plaintiffs.  Final Pretrial Order, III. Undisputed Factual Issues, No. 22; Exh. Y(18)-3.)

69.     Crown also filed a cross-complaint against Tasq, alleging, among other things, that Crown was an intended beneficiary of the Lease and that Tasq breached the lease by allowing an uncertified operator to use the subject forklift.

70.     Crown also alleged in its cross-complaint that Tasq failed to obtain the insurance required by the lease agreement between Crown Credit and Tasq.  (Final Pretrial Order, III. Undisputed Factual Issues, No. 21; Exh. M(17)-33; Exh. Y(18)-3, Y(18)-4.)

**J.      TENDER OF DEFENSE TO CONTINENTAL**

71.     **Tasq and Crown's Tender to Continental and Continental's Eventual Reservation of Rights:**  Upon receiving notice of the Coupé action from Tasq, Continental appointed counsel to defend Tasq in the Coupé action.  (Exh. M(17)-004 (Tasq claim file log notes); JFPS - UD No. 9.)

72.     Crown also tendered its defense to Continental, however, Continental initially refused based on an opinion from its coverage counsel which suggested that no coverage existed.  (RT 33:24-34:6.)

73.     Continental subsequently re-evaluated its coverage position.  (Exh. X(20)-3 ("[O]ur original position is not as strong as first believed and [] CNA may be the primary carrier.").); RT 43:1-15.)  On or about December 15, 2005, Continental agreed to defend Crown under a reservation of rights through independent counsel who had already been representing Crown in the Coupé action.  (Exh. K(13) (12/15/06 reservation of rights letter to Crown); JFPS - UD No. 25.)

74.     **Continental Sets Up Claim File and Ethical Wall:** On or about December 27, 2005, Continental set up a file for the Crown defense that was separate from the Tasq claim file, which was being handled by Leroy "Lee" Salazar.  A different claim handler, Mitchell ("Mitch") Roberts, was assigned to the Crown defense file.  (Salazar Depo. 33:19-35:1, Exh. P(13)-1; Exh. M(17)-54.)

///

**K.     PARTIES IN COUPÉ ACTION ATTEND MEDIATION AND SETTLE ACTION**

75.     **Severity Counsel:**  Continental hired Robert Peterson a few months before the mediation of the Coupé action to provide an evaluation of the case and to possibly become counsel of record for Tasq, which he eventually did.  Peterson had previously been hired by CNA companies (including Continental) in connection with claims that had greater exposure or were more complex, when CNA companies required a higher level of expertise.  (RT 42:3-11; 292:7-294:23.)

76.     Continental's claim handler for the Tasq file previously estimated the following negligence allocations in January 2006: 25% to Tasq for allowing Coupé to operate the forklift without proper certification, 35% to Crown for not manufacturing the forklift with a third post, and 40% negligence to Coupé for improper lookout for the forklift and for operating without a certification.  (Exh.  M(17)-60.)

77.     **Mediation:** A mediation took place on October 10, 2006, with all parties represented by counsel.  (RT 296:17-22, 312:2-9; Exh. P(13)-47.)

78.     At Continental's request, Crown agreed to Continental's mediation strategy of presenting a unified front that focused on resolving Tasq's and Crown's potential liability to the Coupé plaintiffs without arguing about the relative liability of Tasq and Crown.  (Exh. 54.)

79.     St. Paul did not attend the mediation, at Crown's request.  (RT 412:12-15.)

80.     **Settlement:** After the October 10, 2006, mediation, further settlement discussions took place through the mediator, which resulted in a tentative agreement for a "global" settlement of $3.5 million.  (RT 297: 20-23; 311:6-13; 311:24- 312:15; Exh. P(13)-57.)

81.     After the tentative settlement agreement was reached, Continental directed Tasq's counsel to draft a settlement agreement, which provided that Continental would be paying $2,625,000 on behalf of Crown, i.e., 75% of the total payments, and Continental would only be paying $825,000 on behalf of Tasq.  (RT 314: 22-315:6; Exh. 56-011.)

82.     The proposed 75% allocation of the settlement amount to Crown in the draft settlement agreement was requested by Daniel Lambert, the CNA attorney in the Claim Legal Exposure Management group.  (RT 85:24-86:5; RT 307:25-308:3; 342:25-343:2.)

83.     Crown rejected the allocation language in the draft settlement agreement, which was removed.  (RT 343: 3-12; Exh. 56; Exh. W(19).)

84.     The final settlement with the Coupé plaintiffs ("Final Settlement") provided for a release of both Tasq and Crown in exchange for a total payment of $3.5 million by Continental.  (Exh. 59.)  The Final Settlement did not include any admission of liability by Crown or Tasq.  (Exh. 59; RT 252:11-15.)

85.     Continental funded the entire $3.5 million of the settlement.  (Exh. 67 (CNA negotiated settlement checks); Exh. 58 (letter transmitting settlement checks); RT 132:5-133:2; 297:20-25.)

86.     The Final Settlement did not address the pending cross-complaints between Crown and Tasq.  (Exh. 56; P(13)-72 to P(13)-80.)

**L.     CROWN'S SUMMARY JUDGMENT MOTION**

87.     Prior to the mediation, on or about December 30, 2005, Crown had filed a motion for summary judgment on its cross-complaint against Tasq.  (Exh. H(16)-10; Exh. P(13)-7.)

88.     On or about January 8, 2007, Continental was informed that the Court tentatively ruled that Tasq had breached the insurance provisions of the Lease, but, the Court allowed Tasq to submit supplemental briefing on the issue of whether Crown was damaged, as Tasq argued that Crown did not have to pay to settle the Underlying Action and Continental had reimbursed Crown for its defense costs.  (Exh. P(13)-83 to P(13)-84; Exh. P(13)-97, P(13)-98.)

89.     Tasq's cross-complaint against Crown was dismissed with prejudice on or about April 13, 2007.  (Exh. P(13)-97 to P(13)-98.)

90.     Thereafter, Crown dismissed its cross-complaint against Tasq without prejudice.  (Exh. P(13)-100.)  Crown's dismissal of its cross-complaint was not accompanied by any release of Tasq.

91.     **St. Paul's Communications with Crown:**  Crown first provided notice to St. Paul of the filing of the Coupé action in 2002 and thereafter provided St. Paul with quarterly reports throughout the litigation.  (Exh. 36 (Quarterly report regarding Coupé litigation); RT 413:11-25, 440:7-441:4, 441:16-442:12; JFPS - UF No. 23.)

15

92.     St. Paul did not participate in the defense of Crown in the Coupé action.  (RT 471:11-18; 474:5-7.)

 **PROCEDURAL POSTURE**

93.     **Complaint:** Continental filed this action in Yolo County Superior Court on July 18, 2007, alleging claims for declaratory relief, equitable contribution, equitable indemnity, and equitable subrogation.  (Compl., ECF No. 1-1 at 10-31.)  St. Paul removed the action on August 24, 2007.  (Not. of Removal, ECF No. 1.)

94.     Continental seeks reimbursement from St. Paul for sums that Continental paid under an umbrella policy to settle a wrongful death case entitled *Coupé v. Crown Lift Trucks et al.* ("the Underlying Action"), to the extent that such sums were paid to resolve the liability of Crown Equipment Corporation ("Crown") in that action.  (ECF No. No. 1-1 at  ¶¶ 22, 26, 30 and Judgment Demand ¶¶ 2-4.)

95.     Continental's complaint does not seek to recover from St. Paul any sums paid on a primary commercial general liability policy under which Tasq was a named insured.  (ECF No. 1-1 at 16, Judgment Demand ¶¶ 1-8.)

96.     Continental also does not seek reimbursement from St. Paul of any of the costs of defense in the Underlying Action.  (RT 262:19-263:13, October 1, 2013; Resp. to Req. for Admis. No. 1, Continental's Resp.to St. Paul's First Set of Req. for Admis., designated in ECF No. 215.)

97.     **Adverse Inference Against St. Paul:** Pursuant to a discovery motion, this Court, through the Honorable Magistrate Judge Brennan, found that St. Paul had destroyed relevant documents.  Accordingly, Judge Brennan ordered an inference in Continental's favor on factual disputes that depend on proving or disproving the following: (1) what St. Paul knew and when; and (2) that Crown and St. Paul acted in concert to defeat Continental, including Crown's insistence that the settlement agreement exclude apportionment of liability between Crown and Tasq.  (Order, ECF No. 73 at 39–42.)

98.     **Summary Judgment Order:**  During the pendency of this action, the parties also filed cross motions for partial summary judgment with respect to the priority of coverage.  This Court, through the Honorable Judge England, granted summary judgment in Continental's favor

1  finding that St. Paul's policy was primary and that St. Paul's general liability policy insuring

2  Crown will apply before any excess coverage under Continental's umbrella policy is triggered.

3       99.    The Court also found that the St. Paul policy allows any party (including, in this

4  instance, Continental) to satisfy that responsibility; once the retention amount is satisfied a policy

5  like St. Paul's becomes primary.  (*See* Mem. & Order, ECF No. 124 at 12 (citing *California Pac.*

6  *Homes, Inc. v. Scottsdale Ins. Co.*, 70 Cal. App. 4th 1187, 1193-94 (1999)).)

7       100.    In its summary judgment order, this Court also declined St. Paul's invitation to

8  decide the legal effect of the indemnity agreement between Crown and Tasq, i.e., whether under

9  the terms of the lease Tasq is in fact required to indemnify Crown for any and all damages it

10  incurs.  The Court found that the Lease issues exceeded the scope of the present action, which

11  seeks equitable contribution between the insurers only, particularly when the parties to the lease

12  agreement at issue, Crown and Tasq, are not parties to this litigation.

13       101.    **Motions in Limine and Final Pretrial Order:**  Prior to trial, the parties moved in

14  limine on several evidentiary matters.  This Court through the Honorable Judge England granted

15  Continental's motion *in limine* to exclude evidence concerning the indemnity provision in the

16  lease contract between Crown and Tasq.[3]

17  **N.**     **EVIDENCE PRESENTED AT TRIAL**

18       102.    Through live testimony, exhibits, the evidence submitted through stipulation, and

19  the parties' written submissions thereafter, the parties presented the following evidence.

20       103.    **The Coupé Plaintiffs' Trial Strategy:**  The Coupé plaintiffs were focused on

21  their strict liability theories against Crown, specifically the following allegations: (1) the

22  Forklift's design was defective because the forklift lacked third and fourth corner posts; and (2)

23  the Forklift lacked sufficient warnings of potential horizontal intrusions into the Forklift operator

24  area.

25       104.    With respect to the design defect, California law provides two methods of proving

26  a design defect claim – the consumer expectation test[4] and the risk/benefit test.  *Barker v. Lull*

27  _____

[3] The undersigned reaffirmed this ruling.  (RT 87:2-88:10; 240:8-15.)

28  [4] The parties agree that the consumer expectation test is inapplicable in this case.

1    *Engineering Co.*, 20 Cal.3d 413, 418, 432 (1978).  Under the risk/benefit test, a product is

2    defective in design if the plaintiff demonstrates that the product's design was a substantial factor

3    in causing harm.  Once the plaintiff meets his burden, then the defendant must establish that the

4    benefits of the design outweigh the risks of the design.  Judicial Council of Cal. Civil Jury

5    Instructions (2014 edition) ("CACI") No. 1204.  In deciding whether the benefits outweigh the

6    risks, the trier of fact is entitled to consider the gravity of the potential harm, the likelihood that

7    the harm would occur, the feasibility of safer alternative design, financial cost of improved

8    design, and adverse consequences to the product and to the consumer that would result from

9    alternative design.  *West v. Johnson & Johnson Products, Inc.*, 174 Cal. App. 3d 831, 864 (1985);

10   *Soule v. General Motors Corp.*, 8 Cal. 4th 548, 547 (1994).

11       105.    There is no dispute that Crown manufactured the Forklift and that Mr. Coupé was

12   harmed; the issue in the underlying Coupé action would have been whether the Forklift design

13   was a substantial factor in causing harm to Mr. Coupé.

14       106.    **Vertical Posts:** The Court finds that Crown would have been hard pressed to

15   argue that the benefits of its design outweighed the risks.  Crown knew for many years before the

16   accident that driver error was unavoidable and that the design of its forklifts exposed drivers to

17   horizontal intrusion which could cause serious injury or death.  (Exh. 20 (Product Reference

18   1.15), Exh. 22 (Under-Ride Accident Summary), Exh. 23 (6/12/90 Memo re Posts on Stand-up

19   Riders) and Exh. 24 (Notes from 2/2/88 K-Mart Meeting); Dunlap Depo. 70:13-19, 101:24-102:9,

20   103:9-15, 104:2-22, 118:3-12.)

21       107.    Crown stated, but provided no evidence, that the presence of a third or fourth

22   corner would likely result in the parade of "horribles" that it listed on its product reference guide

23   and in its analysis.  Furthermore, K-Mart's own remedial measures in the 1980s to add third and

24   fourth corner posts to its Crown forklifts undercuts Crown's argument that third and fourth corner

25   posts would create additional hazards.  (Dunlap Depo. 104:23-105:7, 307:9-23, 310:1-8, 149:7-

26   22, 164:2-3.)

27       108.    Continental correctly points out that subsequent remedial measures of the posts

28   would have likely been admissible in the Coupé action.  Unlike federal rules of evidence,

California rules of evidence permit evidence of subsequent remedial measures in strict liability actions. *See Ault v. Int'l Harvester Co.*, 13 Cal. 3d 113, 120 (1974) (holding "the purpose of [California Evidence Code] section 1151 is not applicable to a strict liability case and hence its exclusionary rule should not be gratuitously extended to that field"); Cal. Evid. Code § 1151 ("When, after the occurrence of an event, remedial or precautionary measures are taken, which, if taken previously would have tended to make the event less likely to occur, evidence of such subsequent measures is inadmissible to prove negligence or culpable conduct in connection with the event.").

109.    In particular, the Court finds that the lack of a third corner post would have likely been found to be a design defect.  Crown admitted that the third corner post is now a standard feature on its sidestance forklifts.  Furthermore, while there was ample evidence that Crown conducted a risk benefit analysis with respect to the fourth corner post, Crown admittedly did not have the same documentation for its evaluation of a third corner post.  The perfunctory analysis of the third corner post is more striking in juxtaposition with Crown's detailed conclusions of the risks of a fourth corner post.

110.    Even if the lack of third or fourth corner posts was not a product defect, the Court finds that Crown faced significant exposure under a failure to warn theory, either under strict liability or negligence.  As early as 1986, Crown had been recommending to K-Mart that it solve the horizontal intrusion problem by lowering the height of its storage racks.  In a 1999 pamphlet (entitled "Product Evolutions, Product Reference 1.15"), Crown described conditions that can result in horizontal intrusion and recommended either adjusting the height of shelving or purchase of an optional third corner post.  (Exh. 20.)  However, Crown did not provide this pamphlet to Tasq, and Crown apparently never made an effort to distribute the pamphlet or make this information available to its forklift buyers or lessees. (*See, e.g.*, Dolan Depo. 30:15-31:8, 69:11-23; 71:19-22; McPhail Depo. 120:17-13, 123:4-22.)  The lack of warning is particularly egregious here because Crown was familiar with the Tasq facilities and, therefore, had actual knowledge of the height of the shelves.  (McPhail Depo.105:15-106:9.)

111.    **Coupé Plaintiffs:** Additionally, the Court finds the evidence that the Coupé

1   plaintiffs would have provided at trial was compelling, credible, and sympathetic.  It would likely

2   have been devastating testimony to Crown and Tasq.  Mr. and Mrs. Coupé were happily married

3   for over 20 years.  They were a local family who owned several acres where sheep, ducks, cats

4   and dogs wandered about.  They had two loving adult daughters, Kimberly and Chrissy.  At trial,

5   evidence would likely have been introduced that Kimberly planned to be married after her

6   father's death, and that Chrissy suffers from hydrocephalus, which requires assistance with daily

7   living activities.  (*See generally* Coupé Depo.)

8          112.   **Crown's Counterarguments and Defenses:**  The Court acknowledges St. Paul's

9   argument that Crown would have had several counterarguments and defenses available to them at

10   trial.  For example, St. Paul argues that Tasq should not have allowed Coupé to operate the

11   Forklift without a certificate.  However, there was testimony from Tasq employee David

12   Williams that he asked whether Mr. Coupé was certified and that Mr. Coupé answered that he

13   was.  Furthermore, OSHA found that the absence of certification did not play a role in the

14   accident.  (Exh. 17.)   It was not in the Coupé plaintiffs' interest to focus on the absence of

15   certification.  Their claims were derivative of Mr. Coupé's, and any assignment of fault to Coupé

16   would have reduced their recovery.  (Exh. 50 (10/7/06 email.)  There was also credible testimony

17   from both Tasq and West Coast Conveyor employees that Mr. Coupé was a trained forklift

18   operator with several years of experience, and had used the Forklift without incident earlier the

19   day of the accident.

20          113.   St. Paul also argued that Mr. Coupé was not using the forklift in a foreseeable

21   manner because he was not standing in a sidestance position but rather was standing facing the

22   forks.  *See Perez v. VAS S.p.A.*, 188 Cal. App. 4th 658, 685 (2010) (holding product misuse is a

23   complete defense to strict products liability if the defendant proves that an unforeseeable misuse

24   of the product after it left the manufacturer's hands was the sole or superseding cause of the

25   plaintiff's injury).  However, Continental adjusters and lawyers assigned to both the Crown and

26   Tasq files acknowledged that juries tend to overlook operator error when the operator dies from

27   his injuries.  *See* CACI 1245 (instructing jurors to consider whether the misuse or modification of

28   the product was "so highly extraordinary that it was not reasonably foreseeable").

114.    Additionally, St. Paul proffers that at trial Tasq, as the lessee of the Forklift, would have been shown to be a business intermediary between the manufacturer, Crown, with an independent duty to exercise reasonable care in permitting the use of its forklift.  *Persons v. Salomon North America, Inc.*, 217 Cal. App. 3d 168, 177-78 (1990) (defendant manufacturer of ski bindings was justified in relying upon the ski shop to perform its independent duty to warn as required by law).  However, Tasq provided persuasive evidence that it was relatively new at procuring forklifts and relied on Crown's expertise.  Additionally, several Crown salespersons testified that they were not aware of the risks of horizontal intrusion, did not advise anyone at Tasq about those risks, nor did they know that a third post was an option available for Tasq to purchase in an effort to reduce the risk of horizontal intrusions.

115.    **Assessment of Risk:**  The Court finds Continental's evidence of estimated exposure persuasive.  For example, one of Continental's original claim handlers for the Tasq file estimated: 25% of fault attributable to Tasq; 35% to Crown; and 40% to Mr. Coupé.  (Salazar Depo. Exh. 89.)  The Court is persuaded by the increased estimates of the exposure to Crown for several reasons.  First as mentioned above, while the Coupé plaintiffs initially pursued a malfunction theory, several weaknesses developed in that theory during discovery (e.g. lack of evidence of an electrical malfunction, evidence that Coupé was standing facing the wrong direction and was not certified, and Tasq, Crown and West Coast Conveyor blaming one another for Coupé's injury and death).  Given the risks inherent in pursuing claims sounding in negligence, it is more likely that the Coupé plaintiffs would have focused their trial strategy on strict liability.

116.    Furthermore, the Court finds the testimony of Rob Peterson extremely credible.  Mr. Peterson was brought in as outside counsel for Tasq to provide an assessment and possibly associate into the case for Tasq, which he eventually did.   Unlike other witnesses working on the Tasq file, St. Paul does not contest Mr. Peterson's objectivity or his expertise.  Indeed, St. Paul admitted to using Mr. Peterson in other litigation, and Mr. Peterson was frequently described as having expertise for high stakes insurance litigation.  Mr. Peterson opined that the proposed allocation by Continental of 75% allocation to Crown and 25% to Tasq was reasonable and if

21

1   anything, beneficial to St. Paul.

2       117.    Additionally the timing of the evaluations is relevant.  Litigation evolves over time

3   as more facts are disclosed and the parties approach trial.  Therefore, although previous estimates

4   of exposure to Crown were less, the Court finds that the most accurate representation of the

5   allocation of liability to Crown are more in line with Mr. Peterson's estimate.

6       118.    **St. Paul's Conduct:**  The Court also finds that given St. Paul and Crown's lengthy

7   relationship, that the likelihood of collusion was great given Crown's position that Tasq was

8   obligated to indemnify it for any settlement in the Coupé action due to Tasq's breach of the lease.

9   Empowered by the indemnity agreement, St. Paul decided to sit on the sidelines and let

10  Continental defend the Coupé action and fund the settlement.  As part of this finding, the Court

11  does not find St. Paul's Thomas Coles's testimony credible.  His testimony regarding the

12  specifics of the Coupé action or settlement was riddled with answers that he did not recall, despite

13  being presented with emails and documents authored by him.  Furthermore, Mr. Coles's emails

14  are not indicative of a passive insurance company.  (*See, e.g.*, Exhs. 44, 46 (Crown asking if St.

15  Paul has any objection to its dismissal of its cross complaint against Tasq; Mr. Coles stating "As a

16  follow up to our telephone conversation I have no objection to Crown filing the dismissal.").)

17  Mr. Coles conveniently does not recall these emails, which belies his contention that St. Paul was

18  merely obeying the wishes of its customer.

19      With these findings of fact, the Court issues the following conclusions of law.

20                          **CONCLUSIONS OF LAW**

21  **A.    JURISDICTION**

22      1.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, based on

23  the diversity of citizenship of Continental and St. Paul, and the amount in controversy, which

24  exceeds $75,000.

25  **B.    APPLICABLE LAW**

26      2.    A federal court exercising diversity jurisdiction must apply the substantive law of

27  the state in which it sits except on procedural issues and on matters governed by the United States

28  Constitution or federal statutes.  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  Federal

1    courts sitting in diversity must enforce state rules that are clearly substantive, "intended to be

2    bound up with the definition of the rights and obligations of the parties." *Byrd v. Blue Ridge*

3    *Rural Elec. Coop., Inc.*, 356 U.S. 525, 536 (1958).  State rules that define the elements of a claim,

4    affirmative defenses, presumptions, burdens of proof, and rules that create or preclude liability

5    are clearly substantive and must be applied in a diversity action.  *See Dick v. New York Life Ins.*

6    *Co.*, 359 U.S. 437, 446–47 (1959) (presumptions and burden of proof); *Guar. Trust Co. of New*

7    *York v. York*, 326 U.S. 99, 109–11 (1945) (statute of limitations).

8              3.        As this is a diversity action, California law governs which party bears the burden

9    of proof.  *See Robinson, Leatham & Nelson, Inc. v. Nelson*, 109 F.3d 1388, 1391 (9th Cir. 1997)

10   (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)).  "As a general rule, the 'party desiring

11   relief' bears the burden of proof by a preponderance of the evidence." *Aguilar v. Atl. Richfield*

12   *Co.*, 25 Cal. 4th 826, 861 (2001) (quoting *Buss v. Super. Ct.*, 16 Cal. 4th 35, 53-54 (1997)); *see*

13   *also* Cal. Evid. Code § 500 ("Except as otherwise provided by law, a party has the burden of

14   proof as to each fact the existence or nonexistence of which is essential to the claim for relief or

15   defense that he is asserting.").  Therefore, as the party seeking affirmative relief in this action,

16   Continental has the burden of proving its entitlement to relief.[5]

17   **C.        EQUITABLE CONTRIBUTION[6]**

18             4.        An action for equitable contribution may be brought by an insurer that has paid

19

20   [5] Continental argues that "[i]n an action for equitable contribution by a settling insurer against a
     nonparticipating insurer, the settling insurer has met its burden of proof when it makes a prima
21   facie showing of potential coverage under the nonparticipating insurer's policy, as Continental
     has done in this case."  (ECF No. 268 at 25 (citing *Axis Surplus Ins. Co. v. Glencoe Ins. Ltd.*, 204
22   Cal. App. 4th 1214, 1231–32 (2012), *and Safeco Ins. Co. of America v. Super. Ct.*, 140
     Cal.App.4th 874, 879 (2006).)  However, because as set forth below *infra*, the Court finds that
23   this action is one for reimbursement under equitable subrogation or indemnity and not
     contribution, the Court does not adopt this standard.
24   [6] "It is hard to imagine another set of legal terms with more soporific effect than indemnity,
     subrogation, contribution, co-obligation and joint tortfeasorship.  Perhaps because the words
25   describe legal relationships between multiple parties, they are vaguely reminiscent of complex
     mathematical equations which, after all, also describe relationships, except in numbers rather than
26   words-and for most of us, they are about as easy to understand.  Even lawyers find words like
     'indemnity' and 'subrogation' ring of an obscure Martian dialect." *Herrick Corp. v. Canadian*
27   *Ins. Co.*, 29 Cal. App. 4th 753, 756 (1994).

28

1    more than its share of the cost of defending or indemnifying a mutual insured.  The insurer seeks

2    to recover part of these costs from a coinsurer that shares the obligation to defend or indemnify

3    the same loss or claim.  *Herrick Corp. v. Canadian Ins. Co.* 29 Cal. App. 4th 753, 762 (1994).

4         5.    However, the right to equitable contribution arises only when all of the insurance

5    carriers "share the same level of obligation on the same risk as to the same insured."  *Fireman's*

6    *Fund Ins. Co v. Maryland Cas. Co.*, 65 Cal. App. 4th 1279, 1294 n.4 (1998) (hereinafter

7    "*Maryland.*").  The rationale is that excess and primary insurers do not cover the same risks

8    because an excess insurer intends only to cover the risk that a loss will exceed the amount

9    covered by the primary insurer.  *See* 15 Couch on Insurance (3d ed.) (hereinafter "Couch") §

10   218:13 ("where a loss is within the policy limits of a primary policy, the primary insurer should

11   not have a right to contribution from the excess insurer").  Thus, "in the absence of an express

12   agreement to the contrary, there is *never* any right to contribution between primary and excess

13   carriers of the same insured."  *Maryland*, 65 Cal. App. 4th at 1300 (italics in original).

14        6.    Here, Continental seeks reimbursement for amounts paid as an excess insurer.

15   (*See* ECF No. 1-1 at 7 (Continental's complaint seeking reimbursement for monies paid under its

16   umbrella policy).)  Continental has never provided any evidence of any right to contribution

17   between itself and St. Paul's primary insurance policy.[7]  Therefore, the Court finds that because

18   Continental has not shown by a preponderance of evidence that it is entitled to equitable

19   contribution i.e., that it is seeking reimbursement as a primary insurer instead of an excess

20   insurer, the Court finds that equitable contribution does not apply.  *See, e.g.*, *Fireman's Fund Ins.*

21   *Co. v. Commerce & Indus. Ins. Co.*, No. C-98-1060VRW, 2000 WL 1721080, at *3 (N.D. Cal.

22   Nov. 7, 2000) (hereinafter "*Commerce*") ("Plaintiffs here are excess insurers seeking

23   reimbursement from defendant, a primary insurer, and the parties have no express contribution

24

25   [7] In the parties' joint pretrial statement, Continental indicated that it also seeks equitable
     contribution from St. Paul for the portion of Crown's settlement of the Coupé matter that

26   Continental paid under its primary policy in excess of St. Paul's $250,000 self-insured retention.
     (Joint Pretrial Statement, No. 173 at 13.)  St. Paul argues, however, that Continental should be

27   bound by its allegations in the complaint that it was only seeking reimbursement from its
     umbrella policy.  Continental did not address this argument in its final pretrial statement, at trial,

28   in its trial brief, or in its proposed findings of fact and conclusions of law.

1   agreement.  Thus, to the extent plaintiffs state a claim under equitable contribution, it fails as a

2   matter of law.").

3   / / /

4   **D.    EQUITABLE SUBROGATION**

5       7.    The doctrine of equitable subrogation includes every instance in which one person,

6   not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and

7   which in equity and good conscience should have been discharged by the latter.  *Maryland*, 65

8   Cal. App. 4th at 1291–92.

9       8.    An excess insurer may maintain an equitable subrogation action against a primary

10  insurer for sums the excess insurer paid to settle a third party claim against the insured.  *See*

11  *Commercial Union Assurance Companies v. Safeway Stores, Inc.*, 26 Cal. 3d 912, 918 (1980); *see*

12  *also Reliance Nat. Indemnity Co. v. General Star Indemn. Co.*, 72 Cal. App. 4th 1063, 1077–79

13  (1999) ("[W]here different insurance carriers cover differing risks and liabilities, they may

14  proceed against each other for reimbursement by subrogation rather than by contribution.").[8]

15      9.    The test as to whether the party has the right to maintain the action for subrogation

16  "involves a consideration of, and must necessarily depend upon the respective equities of the

17  parties."  *Meyers v. Bank of America etc. Ass'n*, 11 Cal. 2d 92, 102 (1938).  Based on the above

18  findings of fact, the Court concludes that the equities lie with Continental and not St. Paul.

19      10.   St. Paul argues Continental's equitable subrogation claim fails because the insured,

20  Crown, has been fully indemnified citing *American States Ins. Co. v. National Fire Ins. Co. of*

---

[8] "The essential elements of an insurer's cause of action for equitable subrogation are as follows:
(a) the insured suffered a loss for which the defendant is liable, either as the wrongdoer whose act
or omission caused the loss or because the defendant is legally responsible to the insured for the
loss caused by the wrongdoer; (b) the claimed loss was one for which the insurer was not
primarily liable; (c) the insurer has compensated the insured in whole or in part for the same loss
for which the defendant is primarily liable; (d) the insurer has paid the claim of its insured to
protect its own interest and not as a volunteer; (e) the insured has an existing, assignable cause of
action against the defendant which the insured could have asserted for its own benefit had it not
been compensated for its loss by the insurer; (f) the insurer has suffered damages caused by the
act or omission upon which the liability of the defendant depends; (g) justice requires that the loss
be entirely shifted from the insurer to the defendant, whose equitable position is inferior to that of
the insurer; and (h) the insurer's damages are in a liquidated sum, generally the amount paid to
the insured."  *Maryland*, 65 Cal. App. 4th at 1292 (internal citations omitted).

25

1  *Hartford*, 202 Cal. App. 4th 692, 704 (2011); *RLI Ins. Co. v. CNA Cas. of California*, 141 Cal.

2  App. 4th 75, 82-83 (2006); and *Fireman's Fund*, 65 Cal. App. 4th at 1295.

3      11.    The cases on which St. Paul relies are inapposite.  The court in *American States*

4  held that a primary insurer could not seek reimbursement from another primary insurer through

5  equitable subrogation.  *RLI* involved an excess insurer seeking reimbursement for failure to

6  accept a settlement offer within the primary insurance limits after the resulting settlement invaded

7  the excess insurance.  *Fireman's Fund* held that an insured could not recover the full amount of

8  its loss from one or more primary insurance carriers in a contribution action.  None of the cases

9  addressed the situation here, i.e., where an excess insurer seeks **reimbursement** from a primary

10  insurer who refused to contribute to the settlement at all.

11      12.    Furthermore, "[d]amages in an equitable subrogation action are measured by the

12  difference between the amount the excess carrier would have contributed to the settlement

13  unreasonably refused by the primary carrier, if any, and the amount ultimately paid by the excess

14  carrier in satisfaction of the judgment or in settlement."  *Continental Cas. Co. v. Royal Ins. Co.*,

15  219 Cal. App. 3d 111, 120 (1990) (citing *Continental Cas. Co. v. United States Fid. & Guar. Co.*,

16  516 F. Supp. 384, 391 (N.D. Cal. 1981)).

17      13.    Therefore, the proper measure of alleged damages is the difference from what

18  Continental would have contributed to the settlement under its umbrella policy, i.e., nothing, and

19  the amount ultimately paid by it, i.e., $2.5 million.

20      14.    St. Paul also argues that Crown does not have any existing assignable rights

21  against St. Paul pertaining to the settlement of the Underlying Action because Crown never made

22  a claim to St. Paul or paid its self-insured retention amount.  However, in an equitable

23  subrogation action, Continental stands in the shoes of Crown.  Additionally, as this Court has

24  already found, the St. Paul policy allows any party (including, in this instance, Continental) to

25  satisfy the self-insured retention.  (ECF No. 124 at 12 (citing *California Pacific Homes, Inc. v.*

26  *Scottsdale Ins. Co.*, 70 Cal. App. 4th 1187, 1193-94 (1999).)

27  **E.      EQUITABLE INDEMNITY**

28      15.    Equitable indemnity "applies in cases in which one party pays a debt for which

another is primarily liable and which in equity and good conscience should have been paid by the latter party." *Aetna Life & Cas. Co. v. Ford Motor Co.*, 50 Cal. App. 3d 49, 52–53 (1975).

16.     The basis for the remedy of equitable indemnity is restitution, i.e., one person is unjustly enriched at the expense of another when the other discharges liability that it should be his responsibility to pay. *Amerigas Propane, LP v. Landstar Ranger, Inc.*, 184 Cal. App. 4th 981, 989 (2010).

17.     Where the primary insurer is wholly liable for the loss, an excess insurer can maintain a cause of action against a primary insurer. *See JPI Westcoast Const., L.P. v. RJS & Assocs., Inc.*, 156 Cal. App. 4th 1448, 1464 (2007) (holding that "the basic rules construing primary and excess policies would be altered" if primary insurer avoided liability); *but see Fireman's Fund Ins. Co. v. Commerce & Indus. Ins. Co.*, C–98–1060VRW, 2000 WL 1721080, at *5 (N.D. Cal. Nov. 7, 2000) ("[E]xcess insurers are limited to equitable subrogation when seeking reimbursement from a primary insurer" and cannot proceed under a theory of equitable indemnity).

18.     Based on the above findings of fact, the Court finds, in the alternative, that Continental is owed reimbursement from St. Paul based on equitable indemnity.

**F.     ST. PAUL'S COUNTERARGUMENTS**

19.     **Volunteer:** St. Paul argues that Continental acted as a volunteer.  (ECF No. 176 at 10 ("Continental can succeed in this litigation only if it can establish that it was obligated to pay damages in the Underlying Action on behalf of Crown because Crown was an additional insured.").)  This argument is misplaced.

20.     California insurance case law holds that a volunteer is "a stranger or intermeddler who has no interest to protect and is under no legal or moral obligation to pay under the circumstances." *United Pac. Ins. Co. v. Hanover Ins. Co.*, 217 Cal. App. 3d 925, 935 (1990)

21.     But a settling insurer is not a volunteer if it settled in good faith and in the face of "actual, potential or reasonably apparent liability." *Id.*  Indeed, this is true even though the settling insurer is later determined to not cover the loss. *Id.* ("An insurer's good faith settlement prior to a judicial determination of coverage does not automatically bar equitable apportionment

1  of a loss.").

2      22.      The Court finds that Crown was potentially covered by the Continental primary

3  policy.  The Continental Primary Policy includes as an "additional insured" a person or

4  organization "whom you are required to add as an additional insured on this policy under: 1. A

5  written contract or agreement[.]"  It is undisputed that the Lease between the parties required

6  Tasq to obtain insurance for Crown Equipment.  Therefore, Crown was included as an additional

7  insured on the policy.

8      23.      St. Paul points to provisions in the Continental policies which limit the coverage

9  afforded to an additional insured under a written contract or agreement to liability "arising out of"

10  premises that Tasq, as the named insured, owned, rented, leased or occupied.

11      24.      "The 'arising out of' language has been broadly interpreted in favor of coverage

12  for the additional insured for its own wrongdoing."  *St. Paul Mercury Ins. Co. v. Frontier Pacific*

13  *Ins. Co.*, 111 Cal. App. 4th 1234, 1243 (2003); *see id.* at 1244 ("[T]his language does not import

14  any particular standard of causation or theory of liability into an insurance policy.  Rather, it

15  broadly links a factual situation with the event creating liability, and connotes only a minimal

16  causal connection or incidental relationship." (internal quotation marks omitted)); *Fireman's*

17  *Fund Ins. Cos. v. Atlantic Richfield Co.*, 94 Cal. App. 4th 842, 851 (2001) (sufficient causal

18  connection to cover owner/additional insured when employee of contractor/named insured was

19  injured on owner's defective wooden steps while performing work for contractor); *Century*

20  *Transit Systems, Inc. v. American Empire Surplus Lines Ins. Co.*, 42 Cal. App. 4th 121, 127 fn. 4

21  (1996).

22      25.      The Court finds that there was **potential** for Crown's liability to "arise out of the

23  Tasq premises" as set forth in the Continental primary policy.  Mr. Coupé's death resulted from

24  injuries sustained when he collided with the racking system which pinned him to the Forklift.

25  Similarly, the configuration of the racking system in conjunction with the design of the Forklift

26  caused, at least in part, Mr. Coupé's injury; the height of the first rack combined with the open

27  area in the Forklift permitted the horizontal intrusion into the forklift where Mr. Coupé was

28  pinned.  Therefore, regardless of whether Crown was an **actual** additional insured under the

1    Continental primary policy, Continental's payments to settle the Coupé action were not made as a

2    volunteer.  Continental may seek reimbursement from St. Paul.  *See United Pacific Ins. Co. v.*

3    *Hanover Ins. Co.*, 217 Cal. App. 3d 925, 935 (1990) ("A company which honors its obligation by

4    settling is not a volunteer, and may be able to recover its fair share from the company whose

5    hands failed to loosen its purse strings." (internal brackets, citations and quotation marks

6    omitted)).

7           26.    St. Paul renews its argument (also made at summary judgment) that Tasq was

8    required to indemnify Crown pursuant to the Lease.  St. Paul contends, therefore, that any

9    payments made by Continental to settle the Coupé action were made to satisfy Tasq's indemnity

10   obligation to Crown.  However, this Court finds, again, that it would be improper to adjudicate

11   the legal effect of the indemnity agreement between Crown and Tasq as beyond the scope of this

12   action.  (ECF No. 124 at 25 n. 6 ("While the Court recognizes that St. Paul also seeks summary

13   adjudication as to the legal effect of the indemnity agreement between Crown and Tasq, and asks

14   the Court to find that under the terms of the lease Tasq is in fact required to indemnify Crown for

15   any all damages it incurs, that request goes beyond the scope of the present action, which seeks

16   adjudication as to the priority of coverage and equitable contribution between the insurers, only.

17   The parties to the lease agreement at issue, Crown and Tasq, are not even parties to this

18   litigation.").)  St. Paul provides no legal argument to the contrary.

19          27.    **<u>Unclean Hands:</u>**  St. Paul also argues that Continental is barred from recovery by

20   its unclean hands.  The doctrine of unclean hands requires that a party "who comes into equity

21   must come with clean hands. . . . [the doctrine] closes the door of a court of equity to one tainted

22   with inequitableness or bad faith relative to the matter in which he seeks relief, however improper

23   may have been the behavior of the defendant."  *Precision Instrument Mfg. Co. v. Auto. Maint.*

24   *Mach. Co.*, 324 U.S. 806, 814 (1945) (internal quotation marks omitted).  Under California law

25   unclean hands can operate to completely bar recovery by a culpable party in an equitable

26   proceeding like this one involving issues of relative contribution.  *Lynn v. Duckel*, 46 Cal. 2d 845,

27   850 (1956).

28          28.    St. Paul's purported examples of unclean hands are paltry ones at best and have

1    already been rejected by this Court.  The Court reaffirms the summary judgment order finding

2    that Continental could not have accepted settlement offers which exceeded the $1 million policy

3    limits.  The Court also reaffirms the summary judgment order finding that the submission of the

4    declaration of Mitchell Roberts in opposition to Crown's summary judgment was more

5    foundational than substantive.  Moreover, the declaration was made after the Coupé plaintiffs had

6    settled against Crown and Tasq.  Therefore, the conduct of which St. Paul complains is irrelevant

7    to the claims of relief at issue in this action for reimbursement for that settlement.   The Court

8    reaffirms this Court's notice that St. Pauls' refusal to even participate in settlement discussions,

9    makes it far more likely that St. Paul and Crown worked in concert to defeat Continental's

10   interest, not the other way around.[9]

11   **G.     <u>RELIEF SOUGHT</u>**

12          29.     With the above equitable principles in mind, the Court finds that an appropriate

13   allocation of the settlement paid to settle the Coupé action is 75% to Crown and 25% to Tasq.

14   Although earlier estimates of fault opined that Tasq and Crown shared similar exposure,

15   Continental has put on persuasive evidence that the Coupé plaintiffs were shifting their trial

16   strategy focusing on a purported malfunction of the Forklift to the refusal of Crown to incorporate

17   vertical posts in its design.

18          30.     Therefore, Continental shall recover judgment from St. Paul in the amount of

19   $1,875,000, which represents 75% of the $2,500,000 paid by Continental from its umbrella

20   policy.  (*See* RT 874:13-22 (setting forth damages calculations incorporating pro rata share of

21   policies and $250,000 self-insured retention).)

22          31.     Underscoring this award is the policy that insurance companies need incentives –

23   not disincentives – to step up and cover the risks of which they insure.  Although addressing a

24   slightly different issue, the court of appeal in *Maryland* stated:

25   _____

26   [9] St. Paul also argues that Continental is barred from recovery based on the doctrine of laches
     because Continental knew about the St. Paul insurance contract in February 2003 but did not
27   provide notice to St. Paul of the underlying action until September 2006.  The Court finds,
     however, the adverse inference sanction precludes finding St. Paul from proving this affirmative
28   defense.

> [O]nce one insurer assumes its obligations to its insured for indemnification or defense costs, the insured no longer has any motivation to pursue its claim for those costs against a nonparticipating insurer.  The result [the defendant] advocates in this case would actually encourage primary insurers covering the same risk to delay responding to an insured's tender of defense or request for indemnification until some other carrier accepts the tender, in the hope of subsequently making a more advantageous settlement with the insured.  The outcome of a given case could be made to depend on such chance factors as which insurance carrier the insured happened to tender its defense to first, or the insured's willingness to pursue its rights against a recalcitrant insurance carrier, rather than each carrier's actual obligation under its individual contract with the insured to provide coverage and a defense.  By such fortuities, one insurance carrier could be unfairly relieved of its rightful obligations while another insurer was burdened with the entire loss and deprived of its right to contribution, in derogation of the public policies of encouraging insurers to assume their duty to defend and promptly indemnify their insureds in good faith.

*Maryland*, 65 Cal. App. 4th at 1297.

32.     The Court finds that this public policy applies with exceptional force in this case. St. Paul was a primary insurance carrier who covered the general liability risk of which Crown found itself subject to.  Continental has provided persuasive evidence that Crown was looking to Continental to subsidize its defense costs and settlement because it believed that Tasq had breached the lease provisions discussed *supra*.  While this Court expresses no opinion on the substantive lease provisions between Crown and Tasq, the Court finds that even if it was at Crown's request, St. Paul's collusion with Crown cannot be countenanced.[10]  Thomas Coles inability to recall details of the Coupé action on cross examination and inferences resulting from St. Paul's conduct in discovery lead the undersigned to assume the worst behind St. Paul's motives.

33.     **Prejudgment interest:**  The Court declines to award prejudgment interest as the method of allocation and amount was disputed.  Therefore St. Paul's share of the loss was not certain, or capable of being made certain by calculation.  Cal. Civ. Code § 3287(a); *St. Paul Mercury Ins. Co. v. Mountain W. Farm Bureau Mut. Ins. Co.*, 210 Cal. App. 4th 645, 665–66

---

[10] Indeed, this Court through the Honorable Judge England and Magistrate Judge Brennan have commented on St. Paul's inequitable conduct.  (Order, ECF No. 73; ECF No. 124.)

(2012) (reversing prejudgment interest award); *Employers Mut. Cas. Co. v. Philadelphia Indem. Ins. Co.*, 169 Cal. App. 4th 340, 354–55 (2008) (holding that prejudgment interest was properly denied because amount of damage depended on judicial determination based upon conflicting evidence).

### CONCLUSION

For the foregoing reasons, Continental is entitled to judgment in its favor against St. Paul. Judgment shall be entered as follows:

1.      The Court finds in favor of Plaintiff in the amount of $1,875,000, which represents 75% of the $2,500,000 paid by Continental from its umbrella policy.  This award is subject to the obligation to satisfy the self-insured retention amount in the St. Paul policy.

2.      The Court DENIES Continental's request for prejudgment interest.

3.      The Clerk shall close the case.

**IT IS SO ORDERED.**

Dated: September 16, 2014

Troy L. Nunley
United States District Judge